UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60298-Cr-Scola/O'Sullivan

UNITED STATES OF AMERICA,
    Plaintiff,

vs.

SHEHERYAR ALAM QAZI,
    Defendant.
_____/

# DEFENDANT'S REPLY TO GOVERNMENT'S UNCLASSIFIED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISCLOSE FISA MATERIALS AND TO SUPPRESS FISA-ACQUIRED EVIDENCE (DE 132)

Mr. Qazi, through undersigned counsel, files this Reply to DE 132 and in support thereof states the following:

1. On page 11 of DE 132, the government states that "[t]he FISC may approve the requested electronic surveillance, physical searches, or both, only upon finding, among other things, that . . . (2) there is probable cause to believe that (A) the target of the electronic surveillance and/or physical search is a foreign power or an agent of a foreign power, and that (B) the facilities or places at which the electronic surveillance is directed are being used, or are about to be used, by a foreign power or an agent of a foreign power (or that the premises or property to be searched is, or is about to be, owned, used, possessed by, or is in transit to or from, a foreign power or an agent of a foreign power). . . . *Citing to* 50 U.S.C. §§ 1805(a)(1)-(4) and 1824(a)(1)-(4). On pages 12 and 13 of DE 132, the government defines "[a]gent of a foreign power" as codified at 50 U.S.C. §§ 1801(b)(1) and (2) and at 50 U.S.C. § 1821(1).

1

In the instant case, there was no probable cause to believe that Mr. Qazi was an agent of a foreign power prior to the government applying to the FISC for a FISA order.  Nor was there probable cause to believe that the physical property that was searched contained foreign intelligence information.  Therefore, no FISA orders should have been entered.

In *In re Sealed Case*, 310 F. 3d 717, 738 (Foreign Int. Surv. Ct. Rev. 2002), the U.S. Foreign Intelligence Surveillance Court of Review[1] stated:

> [W]here a U.S. person is involved, an "agent of a foreign power" is defined in terms of criminal activity.  Admittedly, the definition of one category of U.S.-person agents of foreign powers – that is, persons engaged in espionage and clandestine intelligence activities for a foreign power – does not necessarily require a showing of an imminent violation of criminal law. *See* 50 U.S.C. § 1801(b)(2)(A) (defining such activities as those which "involve" or "*may* involve" a violation of criminal statutes of the United States). Congress clearly intended a lesser showing of probable cause for these activities than that applicable to ordinary criminal cases. *See* H. REP. at 39-40, 79. And with good reason – these activities present the type of threats contemplated by the Supreme Court in *Keith* when it recognized that the focus of security surveillance "may be less precise than that directed against more conventional types of crime" even in the area of *domestic* threats to national security. *Keith,* 407 U.S. at 322, 92 S. Ct. at 2139. Congress was aware of *Keith*'s reasoning, and recognized that it applies *a fortiori* to foreign threats. . . Congress allowed this lesser showing for clandestine intelligence activities – *but not, notably, for other activities, including terrorism* – because it was fully aware that such foreign intelligence crimes may be particularly difficult to detect (endnote omitted, emphasis added).

In the present case, Mr. Sheheryar is a U.S. citizen, and the government is not alleging that he was engaged in espionage and clandestine intelligence activities for a foreign power.

---

[1] The U.S. Foreign Intelligence Surveillance Court of Review acts as the court of appeals for the FISC.

Therefore, his being an alleged agent of a foreign power must be defined in terms of criminal activity. But prior to applying to the FISC for a FISA order, the government did not have probable cause to believe that Mr. Qazi was engaged in any criminal activity. Therefore, no FISA orders should have been entered.

Additionally, as the government observes on page 26 of DE 132, when the target of a FISA application is a United States person, a district court must ensure that each FISA certification is not "clearly erroneous." Because the government's certification that Mr. Qazi was an agent of a foreign power *was* clearly erroneous, that provides an additional ground for Mr. Qazi's argument that no FISA orders should have been entered.

2. On page 23 of DE 132, the government states: "Understanding that the Eleventh Circuit has not addressed the standard of review applicable in this matter, the Government respectfully submits that it is appropriate to accord due deference to the findings of the FISC, but notes that a number of courts have declined to do so, citing the *ex parte* nature of the proceedings, and have instead reviewed the FISC's probable cause determination *de novo*."

However, in *United States v. Campa*, 529 F. 3d 980, 991 (11th Cir. 2008), the Eleventh Circuit Court of Appeals stated: "We review the denial of a motion to suppress evidence obtained under the Foreign Intelligence Surveillance Act *de novo, see United States v. Squillacote,* 221 F.3d 542, 554 (4th Cir. 2000), but our scope of review is no greater than that of the court that approved the searches and surveillance, *United States v. Badia,* 827 F.2d 1458, 1463 (11th Cir.1987). We review *de novo* the interpretation of the Classified Information Procedures Act, *see United States v. Gilbert,* 130 F.3d 1458, 1461 (11th Cir.1997), but we review discovery rulings for abuse of discretion, *see United States v. Quinn,* 123 F.3d 1415, 1425 (11th Cir. 1997)."

The *Campa* Court cited to *Squillacote* in which the Fourth Circuit Court of Appeals reviewed *de novo* more than 20 FISA applications in order to determine whether they established probable cause to believe that the appellants were agents of a foreign power at the time that the FISA applications were granted. *See Squillacote*, 221 F. 3d at 554. Accordingly, Mr. Qazi submits that this court should review the FISC's probable cause determination *de novo* rather than giving due deference to the FISC's findings as advocated by the government.

3. On pages 26-27 of DE 132, the government argues that FISA is subject to the good-faith exception to the exclusionary rule as set forth in *United States v. Leon*, 468 U.S. 897 (1984). In support of its position, the government cites to *United States v. Ning Wen*, 477 F. 3d 896 (7th Cir. 2007). However, the *Ning Wen* Court itself stated that the exclusionary rule *should* be applied to evidence seized pursuant to a warrant where "probable cause was so transparently missing that -no reasonably well trained officer [would] rely on the warrant.'" *Ning Wen* at 897, *quoting Leon*, 468 U.S. at 923.

In the instant case, probable cause to believe that Mr. Qazi was an agent of a foreign power prior to the government applying to the FISC for a FISA order *was* transparently missing as was probable cause to believe that the physical property that was searched contained foreign intelligence information. Therefore, the *Leon* good-faith exception to the exclusionary rule does not apply in Mr. Qazi's case.

4. Beginning on page 39 of DE 132, the government submits that Mr. Qazi has not "merited" an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), at which hearing he could challenge the veracity of the information set forth in the FISA applications in this case. On page 40 of DE 132, the government states that "[t]he defendant's burden in establishing the need for a *Franks* hearing is a heavy one." Of course, this already-heavy burden

4

has been made even heavier by the government's intentional withholding of FISA documents from undersigned counsel in this case.

In the presently-pending case of *United States v. Adel Daoud*, Case Number 12-Cr-723 Coleman (Northern Dist. Ill.), Mr. Daoud, like Mr. Qazi, sought to have a *Franks* hearing where he could challenge the veracity of the information set forth in the FISA applications in his case. Beginning on page 19 of DE 52[2] in that case, Mr. Daoud stated the following in support of his requested evidentiary hearing:

> [W]ithout the opportunity to review the applications, counsel cannot point to or identify any specific false statements or material omissions in those applications. Although that lack of access prevents counsel from making the showing that *Franks* ordinarily requires, counsel note that the possibility that the government has submitted FISA applications with intentionally or recklessly false statements or material omissions is hardly speculative.
>
> For instance, in 2002, in *In re All Matters Submitted to the Foreign Intelligence Surveillance Court*, 218 F. Supp. 2d 611, 620-21 (FISC 2002), *rev'd on other grounds sub nom., In re Sealed Case*, 310 F.3d 717 (FISCR 2002),[3] the FISC reported that beginning in March 2000, the Department of Justice (hereinafter "DoJ") had come "forward to confess error in some 75 FISA applications related to major terrorist attacks directed against the United States. The errors related to misstatements and omissions of material facts," including:
>
> - "75 FISA applications related to major terrorist attacks directed against the United States" contained "misstatements and omissions of material facts." 218 F. Supp. 2d at 620-21;
>
> - the government's failure to apprise the FISC of the existence and/or status of criminal investigations of the target(s) of FISA surveillance. *Id*.; and

---

[2] DE 52 was filed on CM/ECF on August 9, 2013, that being after DE 132 was filed by the government in the instant case.

[3] The FISCR's 2002 decision in *In re Sealed Case* marked its first case since enactment of FISA in 1978.

5

- improper contacts between criminal and intelligence investigators with respect to certain FISA applications. Id.

According to the FISC, "[i]n March of 2001, the government reported similar misstatements in another series of FISA applications . . ." *Id.* at 621. Nor were those problems isolated or resolved by those revelations. Instead, they proved persistent. A report issued March 8, 2006, by the DoJ Inspector General stated that the FBI found apparent violations of its own wiretapping and other intelligence-gathering procedures more than 100 times in the preceding two years, and problems appear to have grown more frequent in some crucial respects. *See* Report to Congress on Implementation of Section 1001 of the USA PATRIOT Act, March 8, 2006 (hereinafter "DoJ IG Report"), available at http://www.usdoj.gov/oig/special/s0603/final.pdf.

The report characterized some violations as "significant," including wiretaps that were much broader in scope than authorized by a court ("over-collection"), and others that continued for weeks and months longer than authorized ("overruns"). *Id.* at 24-25.[4] FISA-related overcollection violations constituted 69% of the reported violations in 2005, an increase from 48% in 2004. *See* DoJ IG Report, at 29. The total percentage of FISA-related violations rose from 71% to 78% from 2004 to 2005, id., at 29, although the amount of time "over-collection" and "overruns" were permitted to continue before the violations were recognized or corrected decreased from 2004 to 2005. *Id.* at 25.

Thus, a *Franks* hearing, and disclosure of the underlying FISA materials, are necessary in order to permit counsel the opportunity to prove that the affiants before the FISC intentionally or recklessly made materially false statements and omitted material information from the FISA applications.

---

[4] The DoJ Inspector General's report was not instigated by the government itself. Rather, the publication of documents released to Electronic Privacy Information Center (hereinafter "EPIC") in Freedom of Information Act litigation prompted the DoJ IG to use those and other documents as a basis for the report. In preparing the report the IG reviewed only those 108 instances in which the FBI itself reported violations to the Intelligence Oversight Board– a four-member Executive Branch body that ordinarily does not submit its reports to Congress.

In addition, on October 3, 2011, U.S. Foreign Intelligence Surveillance Court Judge John Bates wrote an opinion in a case in which the government sought approval of the acquisition of certain telephone and internet communications pursuant to the FAA.[5] Judge Bates concluded that "one aspect of the proposed collection– the 'upstream collection' of Internet transactions containing multiple communications– is, in some respects, deficient on statutory and constitutional grounds." Memorandum opinion at 2. In the course of reaching this conclusion, Judge Bates wrote the following:

a. "The Court met with senior officials of the Department of Justice on July 8, 2011, to discuss the information provided by the government in the June 1 and June 28 Submissions. During the meeting, the Court informed the government that it still had *serious concerns* regarding NSA's acquisition of internet transactions and, in particular, whether the Court could make the findings necessary to approve the acquisition of such transactions pursuant to Section 702. . . ." *Id*. at 7-8. (Emphasis added).

b. "The Court is troubled that the government's revelations regarding NSA's acquisition of Internet transactions mark the third instance in less than three years in which the government has disclosed a *substantial misrepresentation* regarding the scope of a major collection program.

In March, 2009, the Court concluded that its authorization of NSA's bulk acquisition of telephone call detail records from [redacted] in the so-called 'big business records' matter 'ha[d] been premised on a *flawed depiction* of how the NSA uses [the acquired] metadata,' and that '[t]his *misperception by the FISC* existed from the inception of its authorized collection in May 2006, *buttressed by repeated inaccurate statements made in the government's submissions*, and despite a government-devised and Court-mandated oversight regime.' Docket [redacted].

---

[5] This heavily-redacted opinion, which can be found at https://www.fas.org/irp/agency/doj/fisa/fisc100311.pdf, was only recently released to the public.

*Contrary to the government's repeated assurances*, NSA has been routinely running queries of the metadata using querying terms that did not meet the required standard for querying. The Court concluded that this requirement had been "so *frequently and systemically violated* that it can fairly be said that this critical element of the overall . . . regime has *never* functioned effectively." Memorandum opinion at 16, footnote 14.

    c. "The government's submissions make clear . . . that NSA has been acquiring Internet transactions since *before* the Court's approval of the first Section 702 certification in 2008." Memorandum opinion at 17. (Emphasis added.)

    d. "The government's revelations regarding the scope of NSA's upstream collection implicate 50 U.S.C. § 1809(a), which makes it a crime (1) to "engage[] in electronic surveillance under color of law except as authorized" by statute or (2) to "disclose[] or use[] information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized" by statute. See [redacted] (concluding that Section 1809(a)(2) precluded the Court from approving the government's proposed use of, among other things, certain data acquired by NSA without statutory authority through its "upstream collection"). Memorandum opinion at 17, footnote 15.[6]

    The above-quoted statements of Judge Bates lend additional support to Mr. Qazi's argument that the government may very well have submitted FISA applications in the instant case containing false statements that were made either intentionally or recklessly as well as

---

[6] On November 30, 2011, Judge Bates issued another heavily-redacted opinion, this one found at https://www.fas.org/irp/agency/doj/fisa/fisc1111.pdf, in which the court concluded that the government had adequately corrected the deficiencies identified in the October 3, 2011 order.

material omissions. Accordingly, Mr. Qazi has, in fact, "merited" an evidentiary hearing pursuant to *Franks v. Delaware*.

     5. On pages 53-54 of DE 132, the government relies primarily upon *Khan v. Obama*, 646 F. Supp. 2d 6 (D. D.C. 2009) in arguing that "raw intelligence" is not inherently unreliable. In *Khan*, the Court stated that when evaluating raw intelligence, a court should (a) conduct a report-by-report analysis and (b) determine whether there is any evidence to corroborate the allegations made in the raw intelligence reports. *See id*. at 13-18. Without receding from his argument made on page 37 of DE 93 that the FISA applications in the instant case may have been based upon unreliable raw intelligence, Mr. Qazi requests that this Court conduct the two-pronged analysis set forth in *Khan* if the Court were to ultimately deny Mr. Qazi's request to examine the FISA-materials in this case.

                              Respectfully submitted,

                              /s/ Ronald S. Chapman
                              Ronald S. Chapman (Bar No. 898139)
                              400 Clematis Street, Suite 206
                              West Palm Beach, FL 33401
                              Tel (561) 832-4348
                              Fax (561) 832-4346
                              Email:  ronchapman@bellsouth.net
                              Attorney for defendant Sheheryar Qazi

## Certificate of Service

     Undersigned counsel certifies that on September 10, 2013 this reply was electronically filed with the Clerk of Court using CM/ECF, and it was electronically transmitted to all counsel of record.

                              /s/ Ronald S. Chapman
                              Ronald S. Chapman