UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60298-Cr-Scola/O'Sullivan

UNITED STATES OF AMERICA,
    Plaintiff,

vs.

SHEHERYAR ALAM QAZI,
    Defendant.
_____/

# DEFENDANT SHEHERYAR QAZI'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING *IN CAMERA, EX PARTE* PROCEEDING (DE 131)

Mr. Qazi, through undersigned counsel, files this Reply to DE 131 and in support thereof states the following:

## INTRODUCTION

In a belated effort to square its position in this Court with the Department of Justice's repeated representations to the Supreme Court in *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013), the government has reinvented its stance on Mr. Qazi's motion for notice of FAA-derived evidence. The government now concedes— for the first time in these proceedings— that it must provide specific notice when prosecutors intend to use or disclose evidence derived from FAA surveillance of a criminal defendant. *See* DE 131 at 2, 3 n.2. Yet the government also offers new arguments in its attempt to avoid telling Mr. Qazi how the FAA was used in his case. In short, the government leaves a fundamental question unresolved: admitting, after months of denials, its general duty to provide notice of FAA-derived evidence, while refusing to explain or account for the testimony of Senator Dianne Feinstein, Chair of the Senate Select Committee on Intelligence, indicating that FAA surveillance contributed to Mr. Qazi's arrest and prosecution.

1

More specifically, on December 27, 2012 Senator Feinstein urged the U.S. Senate to reauthorize the FAA which was set to expire at the end of 2012.[1] In connection with her testimony in support of the FAA and the government's program of warrantless surveillance, Senator Feinstein specifically identified Mr. Sheheryar Qazi and his brother, Raees Qazi, when she stated:

> There is a view by some that this country no longer needs to fear attack. I don't share that view, and I have asked the intelligence committee staff to compile arrests that have been made in the last 4 years in America on terrorist plots that have been stopped. There are 100 arrests that have been made between 2009 and 2012. There have been 16 individuals arrested just this year alone. Let me quickly review some of these plots. Some of these may arrests come about as a result of this program. Again, if Members want to see the specific cases where *FISA Amendments Act authorities* were used, they can go and look at the classified background of these cases.
>
> *First, in November, 1 month ago, two arrests for conspiracy to provide material support to terrorists and use a weapon of mass destruction. That was Raees Alam Qazi and Sheheryar Alam Qazi. They were arrested by the FBI in Fort Lauderdale, FL.* The next case is another conspiracy to provide material support. Arrested were Ralph Deleon, Miguel Alejandro Santana Vidriales and Arifeen David Gojali. These three men were planning to travel to Afghanistan to attend terrorist training and commit violent jihad; third, was a plot to bomb the New York Federal Reserve Bank; fourth, a plot to bomb a downtown Chicago bar; fifth, a conspiracy to provide material support to the Islamic Jihad Union; sixth, a plot to carry out a suicide bomb attack against the U.S. Capitol in February of 2012; seventh, a plot to bomb locations in Tampa, FL; eighth, a plot to bomb New York City targets and troops returning from combat overseas; ninth, a plot to assassinate the Saudi Ambassador to the United States; and it goes on and on and on.
>
> *So I believe the FISA Amendments Act is important and these cases show the program has worked.* As the years go on, I believe good intelligence is the most important way to prevent these attacks.
>
> *Information gained through programs such as this one—and through other sources as well—is able to be used to prevent future attacks. So, in*

---

[1] The FAA was subsequently extended for five years until December 31, 2017.

> *the past 4 years, there have been 100 arrests to prevent something from happening in the United States, some of these plots have been thwarted because of this program. I think it is a vital program. We are doing our level best to conduct good oversight and keep abreast of the details of the program and to see that these reports come in. I have tried to satisfy Senator WYDEN but apparently have been unable to do so. I am hopeful the Senate Intelligence Committee's 13-to-2 vote to reauthorize this important legislation will be considered by all Members.*

Page S8393 of the Congressional Record dated December 27, 2012, http://www.gpo.gov/fdsys/pkg/CREC-2012-12-27/html/CREC-2012-12-27-pt1-PgS8384-2.htm (Emphasis added.)

Based upon Senator Feinstein's statements, it appears that at least some of the information that was obtained by the government about Mr. Sheheryar Qazi in the present case was acquired pursuant to or derived from surveillance under the FAA.

DE 131 does not resolve this obvious tension– and the government does not deny, as it could, the fact that FAA surveillance was used in this case. Instead, it offers only opaque hypotheticals about why the notice requirement theoretically *might* not be triggered. This lack of candor is deeply troubling because it continues a pattern of cases in which government prosecutors have failed to provide notice of FAA surveillance to criminal defendants. In particular, we now know of at least a dozen such cases, identified either by Senator Feinstein or, more recently, by FBI Deputy Director Sean Joyce in testimony before the House Permanent Select Committee on Intelligence.[2] In fact, since the FAA was enacted five years ago, *not one defendant* has received notice of the government's intent to use or disclose FAA-derived evidence– despite reports that the government apparently intercepts millions of communications

---

[2] *See* text and accompanying footnotes below on page 7-8.

under its FAA authority each month. Because of this lack of notice, the warrantless surveillance program has never been subjected to judicial review in any public courtroom.

And there are strong signs that the government will go to great lengths to keep it that way. The public has recently learned of efforts by federal law enforcement agencies to conceal their use of foreign intelligence information from criminal defendants. *See* John Shiffman & Kristina Cooke, *U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, Reuters, Aug. 5, 2013, http://reut.rs/15xWJwH.  Employing a practice called "parallel construction," agents are trained to "recreate" an investigative trail to cover up the underlying foreign intelligence information. That same practice, if it was used in this case, would circumvent the requirement that the government provide notice of evidence "derived" from FAA surveillance of Mr. Qazi by allowing the government to manufacture a parallel source for its evidence. That is a distinct possibility that has profound implications for Mr. Qazi's rights under the Fourth, Fifth, and Sixth Amendments to the U.S. Constitution because it would deny him an opportunity to challenge the true origins of the government's evidence.

Because of these troubling patterns and inconsistencies, the Court should not permit the government to simply police itself when it comes to Mr. Qazi's right to notice of FAA evidence. Recent disclosures show that the government has repeatedly taken liberties with respect to its FISA and FAA activities, including before the Foreign Intelligence Surveillance Court. *See, e.g.*, Memorandum Opinion, [Title Redacted], No. 11 BR [Dkt. No. Redacted], at 16 n.14 (FISA Ct. Oct. 3, 2011) (Bates, J.), http://bit.ly/13UH2dS ("The Court is troubled that the government's revelations regarding NSA's acquisition of Internet transactions mark the third instance in less than three years in which the government has disclosed a substantial misrepresentation regarding

4

the scope of a major collection program.") [3] This Court should require the government to explain the role of FAA surveillance in this prosecution as well as the specific legal and factual basis for its assertion that notice is not required.

## ARGUMENT

I. **The Court Should Require The Government To Explain The Role Of FAA Surveillance In This Case Prior To Any Determination That Its Statutory and Constitutional Notice Obligations Have Been Satisfied**

The government's position has changed repeatedly since the parties began briefing Mr. Qazi's motion to compel notice of FAA-derived evidence on April 22, 2013.[4] *See* DE 67 and 76. Most recently, on July 30, 2013, shortly after the *New York Times* published an article highlighting the inconsistencies between the Department of Justice's statements to the Supreme Court in *Clapper* and its filings with respect to FAA notice in this case, the government submitted an unsolicited brief containing a crucial change in its posture. *See* DE 131. *Compare* Adam Liptak, *A Secret Surveillance Program Proves Challengeable in Theory Only*, N.Y. Times, July 15, 2013, http://nyti.ms/18hjYK9 ("By insisting that they need not disclose whether

---

[3] Additional statements made by Judge Bates in this same memorandum opinion are quoted in DE 143 at pages 7-8.

[4] It is worth reviewing the procedural history of this motion to understand how far the government has traveled in its filings. After the government initially claimed, in a two-page filing, that the defendant's motion was moot, DE 75, the Court granted Mr. Qazi's motion to compel notice. DE 77. The government then filed a motion for stay and reconsideration of that order, presenting new arguments while insisting that it had no duty to provide specific notice of FAA-derived evidence. DE 80, 88. Mr. Qazi opposed these arguments, based in part on representations that the Department of Justice made to the Supreme Court in *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013). *See* DE 83, 91. On June 5, 2013, the Court granted the government's motion for a temporary stay while it considered the parties' briefing on this notice issue together with briefing on Mr. Qazi's separate motions to compel discovery of FISA-related material. *See* DE 105. On July 30, 2013, prior to any ruling, the government offered a new position to the Court, DE 131, which is the subject of this submission.

5

there had been surveillance under the 2008 law, . . . prosecutors have so far accomplished precisely what Mr. Verrilli said would not happen."), *with* Devlin Barrett, *U.S. Spy Program Lifts Veil In Court*, Wall St. J., July 31, 2013 (describing the government's July 30, 2013 filing as an "about-face" and a "change in legal direction") (attached as Exhibit "A"). Significantly, the government now agrees—at least as a general matter—that it must provide notice when prosecutors intend to use or disclose evidence derived from FAA surveillance of a criminal defendant. *See* DE 131 at 2.

The government has spent months of the parties' time and resources, as well as the Court's, resisting a point of law that the Solicitor General himself made repeatedly to the Supreme Court—and which it now finally recognizes in this case. If that is a model of the government's litigation strategy when it comes to surveillance issues, this Court has good reason to closely examine Mr. Qazi's right to notice and the government's assertions on this point. In particular, even in making its recent concession, the government raises more questions than it answers. As a result, this Court should require prosecutors to explain the role of FAA surveillance in this case *prior to* any determination that its statutory and constitutional notice obligations have been satisfied.

### A. The Government's Position Is In Tension With Senator Feinstein's Testimony That FAA Surveillance Was Used In Mr. Qazi's Case

The government's most recent filing does not address a key fact supporting Mr. Qazi's motion for notice: Senator Feinstein's statement, in urging Congress to renew the FAA just last year, that this controversial surveillance program contributed to Mr. Qazi's arrest and

6

prosecution.[5] That is puzzling, because it is uniquely within the government's power to resolve this fundamental question. Instead, the government offers the Court a number of hypothetical scenarios in which it says notice would not be required under the statute— but then disavows all of those scenarios. *See* DE 131 at 3 n.3 (stating that the examples provided "are not intended to suggest that such circumstances are or are not present in this particular case"). The government could readily confirm whether FAA surveillance was used, as Senator Feinstein has suggested, and explain the basic reason that notice is not required. Its failure to do so is a warning sign. In essence, the government asks the Court to treat its hypotheticals as a substitute for any explanation about *why* notice is not required in the face of an official statement implying exactly the opposite.

When put in context, the government's position is even more troubling— because it suggests that the government has found itself an exception to the rule in every criminal case involving FAA-derived information. Given the scale of the NSA's surveillance under this statute,[6] and the victories the government routinely touts, that is a remarkable feat. Because of officials' recent efforts to defend the warrantless wiretapping program, the public can now put names to at least a dozen criminal cases in which FAA surveillance apparently played a role. Eight of these cases were named by Senator Feinstein, including Mr. Qazi's.[7] *See* Testimony of Senator Diane Feinstein, 158 Cong. Rec. S8393 (daily ed. Dec. 27, 2012). Three others were

---

[5] *See* above at pages 2-3.

[6] *See, e.g.*, Ellen Nakashima, *Obama Administration Had Restrictions on NSA Reversed in 2011*, Wash. Post, Sept. 7, 2013, http://wapo.st/1as9VWZ ("The NSA intercepts more than 250 million Internet communications each year under [the FAA]").

[7] In addition to this prosecution, the cases identified by Senator Feinstein are: *United States v. Daoud*, No. 12-cr-00723 (N.D. Ill.); *United States v. Gojali*, No. 12-cr-00092 (C.D. Cal.); *United States v. Nafis*, No. 12-cr-00965 (E.D.N.Y.); *United States v. Muhtorov*, No. 12-cr-00033 (D. Colo.); *United States v. El Khalifi*, No. 12-cr-00037 (E.D. Va.); *United States v. Osmakac*, No. 12-cr-00045 (M.D. Fl.); *United States v. Arbabsiar*, No. 11-cr-00897 (S.D.N.Y.).

named by FBI Deputy Director Sean Joyce in more recent congressional testimony in defense of the FAA, and one more is a related prosecution.[8] *See How Disclosed NSA Programs Protect Americans, and Why Disclosure Aids Our Adversaries: Hearing Before the H. Permanent Select Intelligence Comm.*, 113th Cong. (June 18, 2013) ("HPSCI Hearing"), http://bit.ly/15kZ9wh. An examination of the docket in each case shows that the government did not give a single one of these many defendants notice of FAA surveillance.[9] In fact, in *United States v. Daoud*, the only other pending prosecution where a defendant has sought to compel FAA notice, the government has filed, almost word-for-word, the very same brief submitted in this case. *See* Gov't Sur-Reply to Def.'s Motion for Notice of FAA Evidence, *United States v. Daoud*, No. 12-cr-00723 (N.D. Ill. Aug. 8, 2013) (DE 49) (attached as Exhibit "B").

The pattern that emerges from these cases is a disturbing one. It indicates that the government has, in every instance, conjured up a theory that allows it to avoid giving notice. Yet public statements by intelligence officials belie this unbroken record, suggesting that the government is in fact improperly withholding notice. In recent months, the government has repeatedly claimed that the FAA is "critical" to its ability to identify plots and arrest suspects.[10] Yet the government now argues here that one way prosecutors can avoid an obligation to provide notice of FAA surveillance is simply by deciding not to use any of that information at trial, or any evidence derived from it. *See* DE 131 at 2 ("No notice would be necessary . . . if the

---

[8] The cases identified by FBI Deputy Director Joyce are: *United States v. Zazi*, No. 09-cr-00663 (E.D.N.Y.); *United States v. Headley*, No. 09-cr-00830 (N.D. Ill.); *United States v. Ouazzani*, No. 10-cr-00025 (W.D. Mo.); *United States v. El-Hanafi*, No. 10-cr-00162 (S.D.N.Y.) (not named, but related to *Ouazzani*).

[9] In two of the cases, *Ouazzani* and *El-Hanafi*, the government did not even file a traditional FISA notice.

[10] *See, e.g.*, HPSCI Hearing (testimony of NSA Director Keith Alexander, describing FAA surveillance as "critical" to dozens of cases).

8

Government has acquired information obtained or derived from FISA surveillance but does not intend to "enter into evidence or otherwise use or disclose" such information in the prosecution."). In reality, that is far easier said than done. When FAA surveillance is critical to identifying a plot, an immense amount of the resulting evidence will be "derived" from that initial surveillance—unless the government has adopted practices or legal theories that improperly sever the fruit of FAA surveillance from its source.

### B. Recent Disclosures Show That Federal Law Enforcement Agencies Frequently Conceal Their Reliance On Foreign Intelligence Information

Recent reports have exposed one way the government seeks to shield foreign intelligence information from judicial scrutiny—by routinely concealing its investigative trail using a technique called "parallel construction." As detailed in government training materials, law enforcement agents who receive tips based on foreign intelligence information are instructed to manufacture an alternative basis to investigate those targets, in order to obscure the original source of the tip. *See* John Shiffman & Kristina Cooke, *U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, Reuters, Aug. 5, 2013, http://reut.rs/15xWJwH.[11] This practice effectively covers up the true source of the government's investigation, ensuring that the defendant never has the opportunity to challenge the legality of controversial tactics, such as the warrantless wiretapping program. *See id.* (describing example where federal agent sought to conceal reliance on NSA intercept). Federal law enforcement agents interviewed by Reuters stated that parallel construction is "decades old" and remains "a law enforcement technique they use every day." *Id.*

---

[11] *See also* John Shiffman & David Ingram, *IRS Manual Detailed DEA's Use of Hidden Intel*, Aug. 7, 2013, http://reut.rs/13Ocyd2.

9

Parallel construction is one of the ways the government might seek to excise FAA-derived evidence from its prosecution of Mr. Qazi in order to avoid providing notice. In particular, the government may have initially identified Mr. Qazi as a person of interest based on FAA surveillance of his communications, then subsequently obtained other sources of evidence to justify its investigation of him, all without acknowledging the original FAA intercepts. Thus, even if the government did not expressly rely on FAA surveillance of Mr. Qazi in seeking its traditional FISA application— a question that it has refused to answer— FAA surveillance may still have played a significant or even pivotal role in its investigation. Yet simply because the government is able to construct a parallel source for its evidence does not mean that it is permitted to conceal the true origins of its investigation from a criminal defendant such as Mr. Qazi.

Indeed, this practice and others like it have grave implications for the Fourth, Fifth, and Sixth Amendment rights of criminal defendants like Mr. Qazi. Parallel construction deprives such defendants of an adequate opportunity to challenge the basis for the original search and to suppress any fruit of that search. At the same time, it also deprives criminal defendants of opportunities to secure potentially exculpatory evidence that is in the government's possession. The Fourth Amendment requires notice of a search because it allows the target to test the legality of that search in any resulting prosecution. *See Berger v. New York*, 388 U.S. 41, 60 (1967) (invalidating electronic eavesdropping statute for, among other things, lack of notice requirement); S. Rep. No. 1097, at 2194 (1968) (explaining the inclusion of a notice requirement in Title III's wiretapping provisions and citing *Berger*, 388 U.S. 41); *cf. Alderman v. United States*, 394 U.S. 165, 171-72 (1969) (holding that the victim of an unlawful search has the right to suppression). In much the same way, the Fifth Amendment requires the government to

disclose its reliance on evidence derived from FAA surveillance of Mr. Qazi. Due process mandates the disclosure of information in the government's possession if nondisclosure would "affect the outcome of [a] suppression hearing." *Smith v. Black*, 904 F.2d 950, 965 (5th Cir. 1990); *see also United States v. Gamez-Orduño*, 235 F.3d 453, 461 (9th Cir. 2000). Here, Mr. Qazi has a strong claim that suppression of FAA-derived evidence is constitutionally required. *See, e.g.*, *Michigan v. DeFillippo*, 443 U.S. 31, 39 (1979) (recognizing that statutes which, "by their own terms, authorize[] searches under circumstances which d[o] not satisfy the traditional warrant and probable-cause requirements of the Fourth Amendment," are on their face more constitutionally suspect).

To raise an effective suppression claim, however, Mr. Qazi must know if the government intends to rely on any evidence that is, in reality, derived from FAA surveillance of his communications. Simply because the government is able to recreate its investigative trail does not alter the constitutional calculus: a defendant is entitled to trace the prosecution's evidence back to its original root. The government is not permitted to hide or deny the chain of causation simply by substituting a different investigative trail—that would be wishful thinking, or "evidence laundering,"[12] and would defy what it means for evidence to be "derived" from FAA surveillance.

---

[12] *See* John Shiffman & Kristina Cooke, *U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, Reuters, Aug. 5, 2013, http://reut.rs/15xWJwH (describing parallel construction as "just like money laundering— you work it backwards to make it clean").

11

### C. The Government Has Not Demonstrated That Its Standard For Determining That Evidence Is "Derived" From FAA Surveillance Meets Constitutional And Statutory Requirements

The revelations concerning parallel construction highlight a broader gap in the government's position before the Court which goes well beyond this one technique. The government has told the Court almost nothing about how it determines whether its evidence is "derived" from FAA surveillance. At most, the government says in a footnote that its "standards and analyses are similar to those appropriate in the context of surveillance conducted pursuant to Title III." DE 131 at 3 n.3. Exactly what the government means by "similar" is unclear; it is a term that seeks to reassure without making any firm or specific commitments. This vague assurance is not enough to satisfy the constitutional minimums described above, or even the terms of the FAA's notice provision itself. *See* 50 U.S.C. §§ 1806(c), 1881e(a) (providing for notice of "derived" evidence).

Because reliance on FAA-obtained information can easily be camouflaged by other investigative methods, the meaning of "derived" evidence is perhaps the key legal issue now before the Court. The Court should require the government to explain the role of FAA surveillance in this prosecution, and should then apply a clear and rigorous standard for "derived" evidence. Mr. Qazi is all but powerless to root out instances of parallel construction, or other techniques like it, unless the Court holds the government to such a demanding standard and showing in this case.

The meaning of "derived" evidence has a long and developed pedigree in Fourth Amendment case law under the "fruit of the poisonous tree" doctrine. Evidence is "derived" from illegal surveillance when it is the "product" of that surveillance or "is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the

12

unlawful search becomes "so attenuated as to dissipate the taint."" *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341(1939)). "Derived" evidence is a "well established term of art" in the search context, carrying a meaning that pre-dates and was incorporated into FISA. *Chandler v. U.S. Army*, 125 F.3d 1296, 1304 (9th Cir. 1997); *see United States v. Giordano*, 416 U.S. 505, 531-32 (1974) (interpreting the meaning of derived evidence in relation to a sequence of electronic intercepts and wiretap orders); S. Rep. No. 95-701, at 13 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3973, 3982 ("[FISA] embodies a legislative judgment that court orders and other procedural safeguards are necessary to ensure that electronic surveillance by the U.S. government within this country conforms to the fundamental principles of the Fourth Amendment."). In this way, both the Fourth Amendment and the statute attach significant weight and meaning to "derived" evidence.

In fact, a robust definition of "derived" evidence is essential to the FAA's notice provision and FISA's overall statutory scheme. The notice requirement in section 1806(c) has a specific procedural purpose: it is closely tied to the suppression provisions that immediately follow in sections 1806(e) and 1806(g). There, Congress provided that aggrieved persons must have an adequate opportunity to challenge and suppress evidence obtained or derived from electronic surveillance. As the statutory scheme makes plain, these suppression provisions depend on notice— they have no force unless a defendant is first given notice of the basis for the government's search. *Cf. United States v. Eastman*, 465 F.2d 1057, 1062–63 & n.13 (3d Cir. 1972) (concluding that Title III's statutory notice provision was "intended to provide the defendant whose telephone has been subject to wiretap an opportunity to test the validity of the wiretapping authorization"). But adequate notice depends, in turn, on the courts' willingness to hold the government to a demanding standard when tracing the sources of derived evidence.

Judging whether evidence is properly considered derivative of FAA surveillance is the type of analysis a court is best-equipped to make in this case, particularly in an area where the government is routinely biased in favor of secrecy. As the legal standards above suggest, whether one piece of evidence is "derived" from another can be a nuanced question of both causation and degree. *See Murray*, 487 U.S. at 536-37. If unexamined, the government's answers to this question are likely to be self-serving. In fact, the reports concerning parallel construction even suggest an effort to compartmentalize knowledge so that prosecutors may themselves be unaware of certain underlying NSA sources. *See* John Shiffman & Kristina Cooke, *U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, Reuters, Aug. 5, 2013, http://reut.rs/15xWJwH (describing agent's effort to conceal a tip from prosecutors). Because these strategies conceal the true origins of later-acquired evidence, defendants have no way of independently uncovering their use.

Given the facts of Mr. Qazi's case, where official statements plainly suggest FAA surveillance was used, the Court should not permit the government to police the boundaries of "derived" evidence all on its own. It should demand a far more detailed accounting of the FAA surveillance directed at Mr. Qazi than the government has provided to date.

## II. The Government Must Provide Notice Of FAA Surveillance When Disclosing Material Pursuant To Its *Brady* Obligations

The government suggests in its filing that it can avoid triggering the notice requirement simply by electing not to use FAA-derived evidence at trial. *See* DE 131 at 2, 3. But that is not accurate, and vastly overstates the government's ability to pick and choose when it provides notice to criminal defendants. Section 1806(c) states that notice is required "[w]henever the Government intends to enter into evidence *or otherwise use or disclose* in any trial, hearing, or

14

other proceeding in or before any court, against an aggrieved person—any FAA-derived material as to which the defendant is aggrieved. 50 U.S.C. § 1806(c) (emphasis added). If the government has exculpatory *Brady* material in its possession, it is required to "disclose" that material to the defendant as part of this criminal proceeding— and thus it must provide notice if that material is derived from its FAA surveillance of the defendant.

The government is bound by *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny to disclose to defendants any potentially exculpatory material in its possession, including that of investigative agencies. *See also United States v. Bagley*, 473 U.S. 667 (1985); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). The Department of Justice itself recognizes this obligation to search intelligence community files in certain instances, including where the intelligence community has been an active participant in the investigation or prosecution of a case, or where the known facts and the nature of a case suggest that there may be *Brady* material within the intelligence community. *See* U.S. Dep't of Justice, Criminal Resource Manual § 2052 (2002), http://1.usa.gov/19zaZUB. Both of these conditions apply here. Thus, if the NSA has in its possession potentially exculpatory information related to Mr. Qazi's prosecution, the government must turn that material over to him.

Moreover, because this *Brady* disclosure is part and parcel of the criminal proceeding against Mr. Qazi, the government is bound to provide FAA notice if any of this material was derived from FAA intercepts of the defendant's communications. *See* 50 U.S.C. § 1806(c). In short, the government cannot simply walk away from its FAA notice obligation by excising all FAA-derived evidence from its case. Rather, it must conduct a reasonable search of the NSA's files for exculpatory material— including emails, text messages, phone calls, and

communications metadata belonging to Mr. Qazi' and must provide notice if any piece of that material was obtained or derived from FAA surveillance.

## CONCLUSION

For the foregoing reasons, as well as those contained in Mr. Qazi's prior briefing, *see* DE 67, 76, 83, and 91, this Court should require the government to explain the role of FAA surveillance in this case prior to any determination that its statutory and constitutional notice obligations have been satisfied. Mr. Qazi respectfully requests that, upon the conclusion of this inquiry, the Court grant his amended motion to compel notice, DE 67, and deny the government's motion for reconsideration, DE 80.

Respectfully submitted,

/s/ Ronald S. Chapman
Ronald S. Chapman (Bar No. 898139)
400 Clematis Street, Suite 206
West Palm Beach, FL 33401
Tel (561) 832-4348
Fax (561) 832-4346
Email: ronchapman@bellsouth.net
Attorney for defendant Sheheryar Qazi

## Certificate of Service

Undersigned counsel certifies that on September 10, 2013 this reply was electronically filed with the Clerk of Court using CM/ECF, and it was electronically transmitted to all counsel of record.

/s/ Ronald S. Chapman
Ronald S. Chapman