# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 12-60298-CR-SCOLA/O'SULLIVAN

**UNITED STATES OF AMERICA**

      **v.**

**RAEES ALAM QAZI**
**and SHEHERYAR ALAM QAZI,**

        **Defendants.**

## UNITED STATES' MEMORANDUM ON THE MERITS OF DEFENDANTS' FACIAL CONSTITUTIONAL CHALLENGE TO THE FISA AMENDMENTS ACT OF 2008

The defendants have challenged the facial constitutionality of the FISA Amendments Act of 2008 ("FAA"). The government does not intend to use any information obtained or derived from FAA-authorized surveillance as to which either defendant is an aggrieved person. The defendants therefore have not established standing to challenge the constitutionality of the FAA. Notwithstanding that deficiency, the government submits this memorandum pursuant to the Court's order.[1] As enacted, the provision of the FAA that the defendants seek to challenge - Section 702 - is facially constitutional, and does not violate the First or Fourth Amendments, nor Article III of the Constitution.[2]

---

[1] The Court's May 12, 2014 Order (DE 194) provided additional time to brief the merits of the FAA's constitutionality until May 19, 2014. The government interpreted this Order to extend the response time on the merits as to <u>both</u> defendants, an error that may have then prompted the Court's May 14, 2014 Order and admonishment (DE 197). We now offer this brief on the merits of the FAA's constitutionality as to both defendants, along with our apologies for the apparent misunderstanding.

[2] The defendants did not submit an appropriate memorandum of law tailored to this case, but rather simply attached a brief filed in an unrelated civil case in another district, *Amnesty Int'l v. McConnell*, No. 08 CV 6259 (KG) (S.D. N.Y.). Thus, the government's response here is limited to addressing the arguments made in that case. For the government's substantive response to the brief attached by the defendants, please see the government's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for

## PROCEDURAL BACKGROUND

On November 30, 2012, Defendants Sheheryar Qazi and Raees Qazi were indicted on charges of conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2, and conspiring to use a weapon of mass destruction in violation of 18 U.S.C. § 2332A and 18 U.S.C. § 2.  On December 6, 2012, the United States provided notice to each defendant that the government intended to use "information obtained or derived from electronic surveillance or physical search conducted pursuant to [FISA], 50 U.S.C. §§ 1801-1812 and 1821-1829."  DE 9, 10.  The statutory provisions cited in these notices are to Titles I and III of FISA, which are known as "traditional FISA," and allow for, respectively, electronic surveillance and physical search when a significant purpose is to obtain foreign intelligence, provided that the government establishes to the satisfaction of the Foreign Intelligence Surveillance Court (FISC) that, among other things, the target is an agent of a foreign power.  *See* 50 U.S.C. §§ 1801, 1804-5, 1821, 1823-24.

The provision of the FAA at issue in the defendants' motion is codified as Section 702 of Title VII of FISA.  *See* 50 U.S.C. §§ 1881-1881g.  Section 702 permits the targeting of non-U.S. persons reasonably believed to be located outside the United States, in order to acquire foreign intelligence information, subject to certain statutory requirements.  *See* 50 U.S.C. § 1881a.

On April 7, 2013, defendants filed motions seeking to compel production of FISA materials pertaining to electronic search and physical search.  DE 45, 46.  On April 22, 2013, S. Qazi filed a Motion To Compel Advance Notice of the Government's Intent To Use Information Obtained or Derived Pursuant to the FISA Amendments Act, which R. Qazi moved to join the following day.  DE 67, 69.  On May 6, 2013, after the government filed a response and S. Qazi filed a reply, the Court (Judge O'Sullivan) issued an Order granting defendants' motion, and ordering

Summary Judgment.  *Amnesty Int'l v. McConnell*, No. 08 CV 6259 (KG), DE 10 (S.D. N.Y. Oct. 28, 2008).

the government to disclose, *inter alia*, "whether the affidavit and other evidence offered in support of any FISA order relied on information obtained under or derived from an FAA surveillance order."  DE 77.  On May 9, 2013, the government sought reconsideration of this portion of the Court's Order, arguing that it should not be required to disclose the classified content of any FISA application, but noting that it had previously "provided both the defendant and the Court with notice that any FISA-obtained or derived information that it would enter into evidence was acquired pursuant to Title I and Title III of FISA."  DE 80, at 2.  On June 5, 2013, the Court entered an Order staying its May 6, 2013, order, pending resolution of the defendants' motion to compel FISA-related material.  DE 105.

By this time, Defendant S. Qazi had filed another FISA-related motion.  DE 96.  In this two-page motion filed on May 28, 2013, he stated, "Mr. Qazi now requests that this Court declare the FAA to be unconstitutional because it violates the First and Fourth Amendments to the U.S. Constitution as well as Article III of the Constitution."  DE 96, at 1.  Defendant S. Qazi provided no legal argument of his own in support of these contentions, but instead attached a brief that had been filed nearly five years earlier in a civil case in the Southern District of New York.  *See id.* at 2.  On July 30, 2013, the government responded to this motion.  DE 130.  In this response, the government stated unequivocally that "in this case the Government does not intend to use any information obtained or derived from FAA-authorized surveillance as to which Defendant S. Qazi is an aggrieved person."  *Id.* at 1.  For this reason, the government argued, and continues to maintain, there is no suppression or other remedy that could be available to S. Qazi from a declaration regarding the constitutionality of the FAA, and thus any such declaration would be an impermissible advisory opinion.  *See id.* at 2-3.[3]

---

[3]  The government also argued then, and continues to maintain now, that even if the Court had jurisdiction over the May 28, 2013 motion seeking a declaration that the FAA is unconstitutional, that motion should be denied both be-

On March 14, 2014, Judge Scola referred S. Qazi's motion for a declaration that the FAA is unconstitutional to Judge O'Sullivan.  DE 167.  On March 28, 2014, the Court ordered the government to file "a substantive memorandum of law addressing the defendant's [S. Qazi's] assertion that the FISA Amendments Act of 2008 is unconstitutional" by April 10, 2014.  DE 173.

On April 8, R. Qazi moved to adopt S. Qazi's motion seeking a declaration that the FAA is unconstitutional.  DE 175.  The next day, the Court granted R. Qazi's motion.  DE 176.  On April 10, the government moved for an extension of time to respond to R. Qazi's adoption of DE 96.  DE 178.  Since the government's prior response had only addressed the issues raised with respect to S. Qazi, the government requested the opportunity to respond to the issues raised in the original motion as they applied to defendant R. Qazi.  *Id.* at 2.

On April 11, 2014, the Court granted the government additional time until May 12, 2014, to: (1) file a "supplemental substantive memorandum of law on the merits of Sheheryar Qazi's constitutional challenge to the [FAA]"; and (2) "respond to R. Qazi's adoption of DE 96 [S. Qazi's motion]."  DE 179.  The Court also set a deadline for the government to file any motion for reconsideration.  *Id.*

On April 28, 2014, in accordance with the Court's April 11, 2014, order, the government filed a motion to reconsider the Court's March 28, 2014, order that the government brief the constitutionality of the FAA as to S. Qazi, on the grounds that S. Qazi lacks standing to challenge the FAA and a decision by the Court on the constitutionality of the FAA would not affect any substantive right of S. Qazi.  DE 181.  In its motion, the government also requested that the Court quash or hold in abeyance its orders that the government submit any substantive memorandum of law on the merits of the FAA's constitutionality until after it reviewed the govern-

cause 50 U.S.C. § 1806 provides the sole vehicle for such a challenge, *see id.* at 3-5, and because the motion is procedurally deficient because it was not accompanied by an appropriate memorandum of law, *see id.* at 5-6.

ment's response to R. Qazi's adoption of S. Qazi's motion.  In the event that the Court still required such briefing after reviewing the government's response to R. Qazi's motion, then the government requested a revised response date for that brief.  *Id.* at 1.

On May 12, 2014, in accordance with the Court's April 11, 2014, order, the government filed its response to R. Qazi's adoption of S. Qazi's motion.  DE 195.  This response stated that the government does not intend to use or disclose any information obtained or derived from FAA-authorized collection as to which defendant R. Qazi is an aggrieved person, and argued that there is no suppression or other remedy that could be available to R. Qazi from a declaration regarding the constitutionality of the FAA, and thus any such declaration would be an impermissible advisory opinion.  *Id.* at 2.

On the same date, the Court denied the motion for reconsideration as to S. Qazi, and ordered the government to file its substantive response to the defendant's motion by May 19, 2014.  DE 194.  Thus, the government hereby submits this supplemental memorandum as to both defendants regarding the facial constitutionality of the FAA.

## STATUTORY BACKGROUND

### A.  THE FOREIGN INTELLIGENCE SURVEILLANCE ACT

Since the founding of this country, the government has relied on foreign intelligence collection to protect the nation.  For the majority of that time and through the present day, much of this intelligence gathering has been conducted under the President's constitutional authority over national security and foreign affairs, with methods of surveillance evolving over time in light of developing technologies.  Presidents have authorized warrantless wiretaps for foreign intelligence purposes since at least 1940.  *See, e.g.*, *United States v. United States Dist. Court*, 444 F.2d 651, 669-71 (6th Cir. 1971) (reproducing as an appendix memoranda from Presidents Roo-

sevelt, Truman, and Johnson).

In 1978, Congress enacted FISA "to regulate the use of electronic surveillance within the United States for foreign intelligence purposes." *See* S. Rep. No. 95-604, at 7 (1977). The statute was a response to congressional investigations into abuses of surveillance directed at specific American citizens and political organizations. *Id.* at 7-8. FISA was designed to provide a check against such abuses by placing certain types of foreign intelligence surveillance under the oversight of the FISC.[4]

Before the United States may conduct "electronic surveillance," as defined in FISA, to obtain foreign intelligence information, the statute generally requires the government to obtain an order from a judge on the FISC. *See* 50 U.S.C. §§ 1805, 1809(a)(1); *see* 50 U.S.C. §§ 1803(a), 1804(a). To obtain such an order, the government must establish, *inter alia*, probable cause to believe that the "target of the electronic surveillance is a foreign power or an agent of a foreign power" and that "each of the facilities or places at which the surveillance is directed" (inside or outside the United States) "is being used, or is about to be used, by a foreign power or an agent of a foreign power." 50 U.S.C. § 1805(a)(2). The government must also establish that the "minimization procedures" that it will employ are reasonably designed in light of the purpose and technique of the particular surveillance to minimize the acquisition and retention, and prohibit the dissemination, of nonpublic information concerning unconsenting "United States persons," consistent with the government's need to obtain, produce, and disseminate foreign intelligence information. *See* 50 U.S.C. §§ 1801(h), 1805(a)(3) and (c)(2)(A).

In FISA, Congress limited the definition of the "electronic surveillance" governed by the statute to four discrete types of domestically-focused foreign intelligence collection activities.

---

[4] The judges who sit on the FISC are Article III judges with life tenure that serve by designation of the Chief Justice of the Supreme Court of the United States. 50 U.S.C. § 1803(a).

*See* 50 U.S.C. § 1801(f).  Specifically, Congress defined "electronic surveillance" to mean (1) the acquisition of the contents of a wire or radio communication obtained by "intentionally targeting" a "particular, known United States person who is *in the United States*" in certain circumstances; (2) the acquisition of the contents of a wire communication to or from a "person *in the United States*" when the "acquisition occurs in the United States"; (3) the intentional acquisition of the contents of certain radio communications when the "sender and all intended recipients are located *within the United States*"; and (4) the installation or use of a surveillance device "*in the United States*" for monitoring or to acquire information other than from a wire or radio communication in certain circumstances.  *Id.* (emphasis added); *cf.* 50 U.S.C. § 1801(i) (defining "United States person" to mean, as to natural persons, a citizen or permanent resident of the United States).

Because of FISA's definition of "electronic surveillance," FISA as originally enacted did not apply to the vast majority of surveillance the government conducted outside the United States.  This was true even if that surveillance might specifically target U.S. persons abroad or incidentally acquire, while targeting third parties abroad, communications to or from U.S. persons or persons located in the United States.  *See* S. Rep. No. 95-701, 2d Sess. 7 & n.2, 34-35 & n.16 (1978).[5]  Congress was told in the hearing leading to FISA's enactment that the acquisition of international communications at the time did not rely on the four types of "electronic surveillance" covered by the definitions in the proposed legislation – including wire interceptions executed in the United States – and thus those operations would not be affected by FISA.  *See For-*

---

[5]  Executive Order No. 12,333, as amended, addresses, *inter alia*, the government's "human and technical collection techniques . . . undertaken abroad."  Exec. Order No. 12,333, § 2.2, 3 C.F.R. 210 (1981 Comp.), *reprinted as amended in* 50 U.S.C. § 401 note (Supp. II 2008).  That Executive Order governs the intelligence community, *inter alia*, in collecting "foreign intelligence and counter-intelligence" abroad, collecting "signals intelligence information and data" abroad, and utilizing intelligence relationships with "intelligence or security services of foreign governments" that independently collect intelligence information.  *Id.* §§ 1.3(b)(4), 1.7(a)(1), (5) and (c)(1).

*eign Intelligence Surveillance Act:  Hearing before the Subcomm. On Crim. Laws and Proce-dures of the S. Judiciary Comm.*, 94th Cong., 2d Sess., at 11 (Mar. 29, 1976 *et seq.*) ("Mar. 29, 1976 FISA Hrg.").[6]  Congress heard similar testimony from other witnesses.[7]  Accordingly, at the time FISA was enacted, Congress understood that most foreign-to-foreign and international communications fell outside the definition of "electronic surveillance." *See* S. Rep. No. 95-701, at 71 (1978) ("[T]he legislation does not deal with international signals intelligence activities as currently engaged in by the National Security Agency.").  Where the government did not inten-tionally target a particular, known U.S. person in the United States, FISA allowed the govern-ment to monitor international communications through radio surveillance, or wire surveillance of transoceanic cables offshore or on foreign soil, outside the statute's regulatory framework.

## B.  THE PROTECT AMERICA ACT AND THE FISA AMENDMENTS ACT OF 2008

In 2006, Congress began considering proposed amendments to FISA aimed at moderniz-ing the statute in response to changes in communications technology since its original enactment. *See Modernization of the Foreign Intelligence Surveillance Act:  Hearing before the H. Perma-nent Select Comm. On Intel.,* 109th Cong., 2d Sess. (Jul. 19, 2006)  Congress took up the issue concurrently with an inquiry into the Terrorist Surveillance Program ("TSP") – a program au-

---

   [6]  Attorney General Levi subsequently elaborated:  "The bill does not purport to cover interceptions of all interna-tional communications where, for example, the interception would be accomplished outside of the United States, or, to take another example, a radio transmission that does not have both the sender and all intended recipients within the United States."  *Electronic Surveillance within the United States for Foreign Intelligence Purposes:  Hearings before the Subcomm. On Intel. And the Rights of Americans of the S. Select Comm. On Intel.*, 94th Cong., 2d Sess., at 180-81 (Jun. 29, 1976 .).

   [7]  *See, e.g., Foreign Intelligence Surveillance Act:  Hearings before the Subcomm. On Courts, Civil Liberties, and the Admin. Of Justice of the H. Comm. On the Judiciary*, 94th Cong., 2d Sess. at 8 (Apr. 12, 1976 ) (statement of former Justice Department official Philip Lacovara) ("[N]ot covered [under the bill] are international wire commu-nications since it is relatively simple, I understand, to intercept these communications at a point outside the United States.  Similarly, * * * the bill would have no application whatsoever to international radio traffic."); Mar. 29, 1976 FISA Hrg. at 31 testimony of Morton Halperin) (stating that "if I am an American citizen [in the United States] and I make a phone call to London, and the Government picks it up on a transatlantic cable under the ocean, it is not cov-ered," and "if it goes by microwave, or if it passes through Canada, it would not be covered").

thorized by the President after the terrorist attacks of September 11, 2001, which allowed the NSA to intercept communications into, and out of, the United States where the government reasonably believed that a communicant included a member or agent of al Qaeda or an affiliated terrorist organization.  S. Rep. No. 110-209  at 2-5 (2007).  The TSP was not carried out under FISA or with the authorization of the FISC.  The President's confirmation of the program in 2005 led Congress to "inquire vigorously" into the TSP and to "carefully review[] the impact of technological change on FISA collection to assess whether amendments to FISA should be enacted." *Id.* at 2.

The Director of National Intelligence ("DNI") and other government officials explained the need for this legislation in various appearances before Congress from 2006 to 2008.  As the DNI explained, it was necessary to amend FISA because its definition of "electronic surveillance" was "tie[d] to a snapshot of outdated technology." *Modernization of the Foreign Intelligence Surveillance Act:  Hearing before the S. Select Comm. on Intel.*, 110th Cong., 1st Sess. (May 1, 2007) ("May 1, 2007 FISA Modernization Hrg."), at 19.  The DNI explained further that, since the creation of the definition three decades previously, "[c]ommunications technology ha[d] evolved in ways that have had unforeseen consequences under [the statute]." *Id.*

More specifically, the DNI explained that, whereas international communications were predominantly carried by radio when FISA was enacted, that was no longer true:  "Communications that, in 1978, would have been transmitted via radio or satellite, are now transmitted principally by fiber optic cables" – and therefore qualify as wire communications under FISA.  *Id.* Thus, many international communications that would have been generally excluded from FISA regulation in 1978, when they were carried by radio, were now potentially included, due merely

to a change in technology rather than any intentional decision by Congress.  *Id.*[8]

Further, the DNI stated, with respect to the collection of wire communications, FISA's "electronic surveillance" definition "places a premium on the location of the collection."  May 1, 2007 FISA Modernization Hrg. at 19; *see* 50 U.S.C. § 1801(f)(2).  The DNI explained that technological advances had rendered this distinction outmoded as well:  "Legislators in 1978 could not have been expected to predict an integrated global communications grid that makes geography an increasingly irrelevant factor.  Today, a single communication can transit the world even if the two people communicating are only located a few miles apart."  May 1, 2007 FISA Modernization Hrg. at 19.  In this environment, regulating communications differently based on the location of collection arbitrarily limits the government's intelligence-gathering capabilities.  As the Director of the NSA elaborated in an earlier hearing:

> [As a communication travels the global communications network,] NSA may have multiple opportunities to intercept it as it moves and changes medium.  As long as a communication is otherwise lawfully targeted, we should be indifferent to where the intercept is achieved.  Signals intelligence is a difficult art and science, especially in today's telecommunication universe.  Intercept of a particular communication * * * is always probabilistic, not deterministic.  No coverage is guaranteed.  We need to be able to use all the technological tools we have.

*FISA for the 21st Century:  Hearing before the S. Comm. On the Judiciary*, 109th Cong., 2d Sess., at *9 (Jul. 26, 2006) (statement of then-NSA Director General Michael V. Hayden).

Although FISA was originally crafted to accommodate the government's collection of foreign and international communications as those operations were commonly conducted in 1978, the government in 2008 faced a different communications technology environment and a

---

8  *Compare* 50 U.S.C. § 1801(f)(2) (defining wire communication as "electronic surveillance" if, *inter alia*, one party is in the United States) *with* 50 U.S.C. § 1801(f)(3) (defining radio communication as "electronic surveillance" only if the sender and all intended recipients are in the United States).

different terrorist threat and needed greater flexibility than the statute's terms allowed.[9]  The fix needed for this problem, as a Department of Justice official put it, was a "technology-neutral" framework for surveillance of foreign targets – focused not on "how a communication travels or where it is intercepted," but instead on "who is the subject of the surveillance, which really is the critical issue for civil liberties purposes."  May 1, 2007 FISA Modernization Hrg. at 46 (statement of Asst. Att'y Gen. Kenneth L. Wainstein).

That review initially led to the enactment in August 2007 of the Protect America Act ("PAA"), Pub. L. 110-55 (2007).  Congress enacted the PAA in order to bring FISA "up to date with the changes in communications technology," while at the same time preserving "the privacy interests of persons in the United States" and addressing the "degraded capabilities in the face of a heightened terrorist threat environment" that resulted from FISA's "requirement of a court order to collect foreign intelligence about foreign targets located overseas."  S. Rep. No. 110-209, at 5-6 (2007).  The PAA fulfilled these purposes by empowering the DNI and the Attorney General to jointly authorize "the acquisition of foreign intelligence information concerning persons reasonably believed to be located outside the United States."  50 U.S.C. § 1805b(a).  To authorize such collection, the PAA required the DNI and the Attorney General to certify, *inter alia*, that there were reasonable procedures in place for determining that the acquisition concerned persons (whether U.S. persons or non-U.S. persons) reasonably believed to be located outside the United

---

[9]  As the DNI testified:

> In today's threat environment, … FISA * * * is not agile enough to handle the community's and the country's intelligence needs.  Enacted nearly 30 years ago, it has not kept pace with 21st century developments in communications technology.  As a result, FISA frequently requires judicial authorization to collect the communications of non-U.S. – that is foreign – p[ersons] located outside the United States * * * This clogs FISA process with matters that have little to do with protecting civil liberties or privacy of persons in the United States.  Modernizing FISA would greatly improve that process and relieve the massive amounts of analytic resources currently being used to craft FISA applications.

May 1, 2007 FISA Modernization Hrg. at 18.

States ("targeting procedures"), there were minimization procedures in place that satisfied FISA's requirements for such procedures, and a significant purpose of the acquisition was to acquire foreign intelligence information. *See* 50 U.S.C. § 1805b(a)(1)-(5). The PAA also authorized the FISC to review the DNI and Attorney General's determination regarding the reasonableness of the targeting procedures. Finally, the PAA authorized private parties who had been directed by the government to assist in effectuating surveillance under the statute to challenge the legality of such a directive in the FISC, 50 U.S.C. § 1805b(h)(1)(A), and to appeal an adverse decision to the Foreign Intelligence Surveillance Court of Review ("FISA Court of Review"), *id.* § 1805b(i).[10] One private party brought such a challenge, and both the FISC and the FISA Court of Review upheld the PAA. *See In re Directives Pursuant to Section 105B of the Foreign Intelligence Surveillance Act*, 551 F.3d 1004 (FISC Ct. Rev. 2008) (holding that surveillance authorized under the PAA fell within the foreign intelligence exception to the warrant requirement and was otherwise reasonable under the Fourth Amendment).

### C.  SECTION 702 OF THE FAA

Due to a sunset provision, the PAA expired in February 2008. In July 2008, Congress enacted the FISA Amendments Act of 2008 ("FAA"), Pub. L. No. 110-261, § 101(a)(2), 122 Stat. 2436.[11] The FAA provision at issue here, Section 702 of the FAA (50 U.S.C. § 1881a), "supplements pre-existing FISA authority by creating a new framework under which the government may seek the FISC's authorization of certain foreign intelligence surveillance targeting . . . non-U.S. persons located abroad." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1144

---

[10]  The FISA Court of Review is composed of three United States District or Circuit Judges who are designated by the Chief Justice of the Supreme Court. *See* 50 U.S.C. § 1803(b).

[11]  In 2012, Congress reauthorized the FAA for an additional five years. *See* FISA Amendments Act Reauthorization Act of 2012, Pub. L. No. 112-238, 126 Stat. 1631.

(2013).[12]  Section 702 provides that, "upon the issuance" of an order from the FISC, the Attorney General and DNI may jointly authorize the "targeting of persons reasonably believed to be located outside the United States" for a period of up to one year to acquire "foreign intelligence information."  50 U.S.C. § 1881a(a).[13]

Under Section 1881a(b), the authorized acquisition must comply with each of the following requirements, which are directed at preventing the intentional targeting of U.S. persons or persons located within the United States, or collection of communications known at the time of acquisition to be purely domestic:

(1)  The authorized acquisition "may not intentionally target any person known at the time of acquisition to be located in the United States."  50 U.S.C. § 1881a(b)(1).

(2)  It may not intentionally target a person outside the United States "if the purpose . . . is to target a particular, known person reasonably believed to be in the United States."  50 U.S.C. § 1881a(b)(2).

(3)  It "may not intentionally target a United States person reasonably believed to be located outside the United States."  50 U.S.C. § 1881a(b)(3).

(4)  It may not intentionally acquire any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States.  50 U.S.C. § 1881a(b)(4).

(5)  The acquisition must be "conducted in a manner consistent with the [F]ourth [A]mendment."  50 U.S.C. § 1881a(b)(5).

Section 702 does not require an individualized court order addressing each non-U.S. person to be targeted under its provisions.  Section 702 instead permits the FISC to approve annual

---

[12]  The FAA enacted other amendments to FISA, including provisions not raised in the defendants' motion that govern the targeting of United States persons outside the United States.  *See* 50 U.S.C. §§ 1881b, 1881c.

[13]  The Attorney General and DNI may authorize targeting to commence under Section 702 before the FISC issues its order if they determine that certain "exigent circumstances" exist.  50 U.S.C. § 1881a(a), (c)(2).  If that determination is made, the Attorney General and DNI must, as soon as practicable (and within seven days), submit for FISC review their Section 702 certification, including the targeting and minimization procedures used in the acquisition.  50 U.S.C. 1881a(g)(1)(B); *see* 50 U.S.C. § 1881a(d), (e), (g)(2)(B).

certifications by the Attorney General and DNI that authorize the acquisition of certain categories of foreign intelligence information through the targeting of non-U.S. persons reasonably believed to be located outside the United States.

### 1. The Government's Submission to the FISC

Section 702 requires the government to obtain the FISC's approval of (1) the government's certification regarding the proposed collection, and (2) the targeting and minimization procedures to be used in the acquisition.  50 U.S.C. § 1881a(a), (c)(1), (i)(2), (3); *see* 50 U.S.C. § 1881a(d), (e), (g)(2)(B).  The certification must be made by the Attorney General and DNI and must attest that

> (1)  there are targeting procedures in place, that have been or will be submitted for approval by the FISC, that are reasonably designed to ensure that the acquisition is limited to targeting persons reasonably believed to be located outside the United States and to prevent the intentional acquisition of purely domestic communications;

> (2)  the minimization procedures meet the definition of minimization procedures set forth in Titles I and III of FISA (50 U.S.C. §§ 1801(h), 1821(4)) and have been or will be submitted for approval by the FISC;

> (3)  guidelines have been adopted by the Attorney General to ensure compliance with the aforementioned limitations set forth in Section 1881a(b) prohibiting, among other things, the targeting of United States persons;

> (4)  the targeting and minimization procedures and guidelines are consistent with the Fourth Amendment;

> (5)  a significant purpose of the acquisition is to obtain foreign intelligence information;

> (6)  the acquisition involves obtaining "foreign intelligence information from or with the assistance of an electronic communication service provider"; and

> (7)  the acquisition complies with the limitations in Section 1881a(b).[14]

---

[14]  Those limitations, as described above, generally prevent the intentional targeting of United States persons or persons located within the United States or collection of communications known at the time of acquisition to be purely domestic.

50 U.S.C. § 1881a(g)(2)(A)(i) - (vii); *see* 50 U.S.C. §§ 1801(h), 1821(4), 1881a(b); *cf.* 50 U.S.C. §§ 1801(e), 1881(a) (defining "foreign intelligence information").   Such certifications are "not required to identify the specific facilities, places, premises, or property at which an acquisition authorized under [section 1881a(a)] will be directed or conducted."  50 U.S.C. § 1881a(g)(4).

The certification must include copies of the targeting and minimization procedures, and a supporting affidavit, "as appropriate," from the head of an Intelligence Community element or other Senate-confirmed official "in the area of national security."  50 U.S.C. § 1881a(g)(2)(B) - (C).  Finally, the certification must include "an effective date for the authorization that is at least 30 days after the submission of the written certification" to the FISC.  50 U.S.C. § 1881a(g)(2)(D)(i).

## 2.  The FISC's Order

The FISC must review the certification, targeting and minimization procedures, and any amendments thereto.  50 U.S.C. § 1881a(i)(1) and (2).  If the FISC determines that the certification contains all the required elements and concludes that the targeting and minimization procedures and Attorney General guidelines for compliance with the statutory limitations are "consistent with" both the Act and "the [F]ourth [A]mendment," the FISC will issue an order approving the certification and the use of the targeting and minimization procedures.  50 U.S.C. § 1881a(i)(3)(A).  If the FISC finds deficiencies in the certification or procedures, it must issue an order directing the government to, at the government's election and to the extent required by the court's order, correct any deficiency within 30 days, or cease or not begin implementation of the authorization.  50 U.S.C. § 1881a(i)(3)(B).

## 3.  Implementation of Section 702 Authority

The government acquires communications pursuant to Section 702 through compelled as-

sistance from electronic communications service providers.  50 U.S.C. § 1881a(h).  The government identifies to these service providers specific accounts, addresses, and/or identifiers, such as email addresses and telephone numbers, that the government has assessed, through the application of FISC-approved targeting procedures, are likely to be used by non-U.S. persons reasonably believed to be located overseas who possess, communicate, or are likely to receive a type of foreign intelligence information authorized for collection under a certification approved by the FISC.  *See* NSA, The National Security Agency:  Missions Authorities, Oversight and Partnerships at 4 (Aug. 9, 2013) (describing the NSA's collection of foreign intelligence information under Section 702), available at http://www.nsa.gov/public_info/_files/speeches_testimonies/2013_08_09_the_nsa_story.pdf.  Such "identifiers are used to select communications for acquisition," and the "[s]ervice providers are compelled to assist [the government] in acquiring the communications associated with those identifiers." *Id.*

### 4. Targeting and Minimization Procedures

The government may conduct acquisitions under Section 702 only in accordance with specific targeting and minimization procedures that are subject to review and approval by the FISC.  50 U.S.C. § 1881a(c)(1)(A), (d), (e), and (i)(3)(A).  Not only must the targeting procedures be reasonably designed to restrict acquisitions to the targeting of persons reasonably believed to be outside the United States and applied using compliance guidelines to ensure that the acquisitions do not intentionally target U.S. persons or persons located in the United States, 50 U.S.C. §§ 1881a(b), (d)(1) and (f)(1)(A), the minimization procedures also must be reasonably designed to minimize any acquisition of nonpublicly available information about unconsenting U.S. persons, and to minimize the retention and prohibit the dissemination of any such information that might still be acquired, consistent with the need to obtain, produce, and disseminate

foreign-intelligence information.    50 U.S.C. §§ 1801(h)(1), 1821(4)(A); *see* 50 U.S.C. § 1881a(e)(1).  FISA-compliant minimization procedures are, in pertinent part:

> (1) specific procedures, which shall be adopted by the Attorney General, that are reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information;

> (2) procedures that require that nonpublicly available information, which is not foreign intelligence information . . . , shall not be disseminated in a manner that identifies any United States person, without such person's consent, unless such person's identity is necessary to understand foreign intelligence information or assess its importance; [and]

> (3) notwithstanding paragraphs (1) and (2), procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes.

50 U.S.C. § 1801(h); *see also* 50 U.S.C. § 1821(4); 50 U.S.C. § 1801(e) (defining "foreign intelligence information").[12]  The FISC, in turn, must substantively review the targeting and minimization procedures to ensure that they satisfy the statutory criteria and are consistent with the Fourth Amendment.  50 U.S.C. § 1881a(i)(2)(B), (C) and (3)(A).

.

### 5. Oversight

Section 702 requires that the Attorney General and DNI periodically assess the government's compliance with both the targeting and minimization procedures and with relevant compliance guidelines, and that they submit those assessments both to the FISC and to Congressional oversight committees.  50 U.S.C. § 1881a(*l*).  In addition, not less often than once every six months, the Attorney General must keep the relevant Congressional oversight committees "fully inform[ed]" concerning the implementation of Section 702.  50 U.S.C. § 1881f(a) and (b)(1); *see*

---

[12] The definitions of minimization procedures in 50 U.S.C. §§ 1801(h)(4) and 1821(4)(D), which apply only to electronic surveillance approved pursuant to  50 U.S.C. § 1802(a) and physical searches approved pursuant to 50 U.S.C. § 1822(a), respectively, do not apply to acquisitions conducted under Section 702.

*also Clapper*, 133 S. Ct. at 1144 ("Surveillance under [Section 702] is subject to statutory conditions, judicial authorization, congressional supervision, and compliance with the Fourth Amendment.").[15]

### Argument

Defendants present a facial challenge to Section 702 of the FAA, and thus "they bear a heavy burden of persuasion." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 200 (2008). A challenger "can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Defendants cannot meet that heavy burden, as Section 702 is consistent with the Fourth Amendment, the First Amendment, and Article III of the United States Constitution.

First, the Section 702 collection is reasonable under the Fourth Amendment. The collection lawfully targets non-U.S. person(s) located outside the United States, who generally are not protected by the Fourth Amendment, for foreign intelligence purposes. That U.S. persons' communications might be incidentally acquired during such collection does not trigger a warrant requirement. Nor does that fact render the collection unreasonable, in light of the compelling national security interests at stake and the extensive procedural safeguards that protect the privacy interests of U.S. persons.

Second, Section 702, in requiring the FISC to review the government's proposed certifi-

---

[15]  Rule 13(b) of the Rules of Procedures for the FISC requires the government to report, in writing, all instances of non-compliance. FISA Ct. R. of P. 13(b). The government reports Section 702 compliance incidents to the FISC via individual notices and quarterly reports. *See* NSA, Civil Liberties and Privacy Office Report on NSA's Implementation of FISA Section 702, Apr. 16, 2014, publicly available at http://icontherecord/tumblr.com, at 3. Depending on the type or severity of compliance incidents, the NSA also may promptly notify the relevant Congressional intelligence committees of an individual compliance matter. *Id.* at 3.

cations and implementing procedures for acquisitions, does not place the FISC in a role incon-

sistent with that accorded to Article III courts under the Constitution.  The FISC's role under

Section 702 is similar to the ability of federal courts to review *ex parte* applications for warrants,

wiretap orders, and subpoenas.  Like those provisions, Section 702 is entirely consistent with

governing Article III principles.

Third, defendants fail to show that Section 702 violates their First Amendment rights or

those of anyone else.  Defendants' claim, adopted from the *Amnesty International* brief, that the

statute has an unconstitutional chilling effect on Americans generally and on various specific

third parties (who were plaintiffs in an unrelated lawsuit against the government), does not pro-

vide a basis for exclusion of evidence in a criminal case.  Additionally, the Supreme Court and

various Circuits have held that when the government's investigative activities have an effect on

individuals' First Amendment interests, those interests are safeguarded by adherence to Fourth

Amendment standards.

### A.  The FAA Does Not Violate the Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their per-

sons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violat-

ed" and that "no Warrants shall issue, but upon probable cause."  "[A]lthough 'both the concept

of probable cause and the requirement of a warrant bear on the reasonableness of a search,'" *New

Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985) (citation omitted), "neither a warrant nor probable

cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of

reasonableness in every circumstance."  *Nat'l Treas. Employees Union v. Von Raab*, 489 U.S.

656, 665 (1989).  The "touchstone" of a Fourth Amendment analysis "is always 'the reasonable-

ness in all the circumstances of the particular governmental invasion of a citizen's personal secu-

rity.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (per curiam) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).

First, the Fourth Amendment generally does not apply to non-U.S. persons abroad, and the fact that collection targeting such persons also incidentally collects communications of U.S. persons does not trigger a warrant requirement or render the collection constitutionally unreasonable.  Second, collection authorized under Section 702 falls within the well-recognized "foreign intelligence exception" to the warrant requirement because (1) the government's purpose – protecting against terrorist attacks and other external threats – extends "beyond routine law enforcement," and (2) "insisting upon a warrant would materially interfere with the accomplishment of that purpose."  *In re Directives*, 551 F.3d at 1010-11.

Given the inapplicability of the warrant requirement, Section 702 need only meet the Fourth Amendment's general reasonableness standard.  That standard is satisfied here.  The government has interests of the utmost importance in obtaining foreign intelligence information under Section 702 to protect national security.  In contrast, the privacy interests of U.S. persons in international communications are significantly diminished when those communications have been transmitted to or obtained from non-U.S. persons located outside the United States.  Finally, the privacy interests of U.S. persons whose communications are incidentally collected are amply protected by stringent safeguards the government employs in implementing the collection.  Those safeguards include (1) certifications by Executive Branch officials concerning the permissible foreign intelligence purposes of the collection; (2) targeting procedures designed to ensure that  only non-U.S. persons abroad are targeted; (3) minimization to protect the privacy of U.S. persons whose communications are incidentally acquired; (4) the requirement of a significant purpose to obtain foreign intelligence information; (5) extensive oversight within the Executive

Branch, as well as by Congress and the FISC; and (6) a prior judicial finding that the targeting and minimization procedures are consistent with the Fourth Amendment.  In light of these and other safeguards employed by the government, the FISC has repeatedly concluded that acquisition of foreign intelligence information under Section 702 and the applicable targeting and minimization procedures is constitutionally reasonable.  This Court should reach the same conclusion.

**1.   There is No Judicial Warrant Requirement Applicable to Foreign Intelligence Collection Targeted at Foreign Persons Abroad**

*a.   The Fourth Amendment Generally Does Not Apply to Non–U.S. Persons Abroad*

The Supreme Court has held that the Fourth Amendment does not "apply to activities of the United States directed against aliens in foreign territory."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 267 (1990); *see also id*. at 271 (noting that only persons who "have come within the territory of the United States and developed substantial connections" to the country have Fourth Amendment rights).  Based on the Fourth Amendment's text, drafting history, and post-ratification history, *id.* at 265-67, as well as its own precedents, *id.* at 268-71, the Supreme Court concluded that the Fourth Amendment was not intended "to restrain the actions of the Federal Government against aliens outside of the United States territory," *id.* at 266.  "If there are to be restrictions on searches and seizures which occur incident to such American action," the Court explained, "they must be imposed by the political branches through diplomatic understanding, treaty, or legislation." *Id.* at 275.  Because the Fourth Amendment generally does not protect non-U.S. persons outside the United States, at least where such persons lack "substantial connections" to this country, the Fourth Amendment *a fortiori* does not prevent the government from subjecting them to surveillance without a warrant.

Intelligence collection under Section 702 targets non-U.S. persons located outside the

United States.  Accordingly, under *Verdugo-Urquidez*, the Fourth Amendment generally is inap-

plicable to persons who are targeted for collection in accordance with the requirements of the

statute.[16]  For that reason, the defendants' facial challenge to Section 702 fails because the statute

has a "plainly legitimate sweep" in its intended application to persons unprotected by the Fourth

Amendment.  *See Washington State Grange* , 552 U.S.  at 449 (2008) (citation omitted).

> b. *Incidental Collection of U.S. Person Communications Pursuant to Intelligence Collection Lawfully Targeting Non-U.S. Persons Located Outside the United States Does Not Trigger A Warrant Requirement*

The statute does not permit U.S. persons to be intentionally targeted by surveillance con-

ducted under Section 702.  To the extent that U.S. person communications are collected *inci-*

*dentally* under Section 702, in the course of intelligence collection targeted at one or more non-

U.S. persons outside the United States: "incidental collections occurring as a result of constitu-

tionally permissible acquisitions do not render those acquisitions unlawful."  *In re Directives*,

551 F.3d at 1015; *see also United States v. White*, 401 U.S. 745, 751-53 (1971) (holding that a

conversation recorded with the consent of one participant did not violate another participant's

Fourth Amendment rights); *United States v. Kahn*, 415 U.S. 143, 156-57 (1974) (upholding in-

terception of communications of a woman that were incidentally collected pursuant to a criminal

wiretap order targeting her husband); *United States v. Martin*, 599 F.2d 880, 884-85 (9th Cir.

1979), *overruled in part on other grounds by United States v. De Bright*, 730 F.2d 1255 (9th Cir.

1984) (en banc); *United States v. Campa,* 539 F.3d 980, 994 (11th Cir. 2008) (affirming denial of

suppression motion regarding FISA evidence by defendant whose existence and identity were

unknown to the government when the FISA application was submitted because "when 'the prop-

---

[16]  The head of each element of the intelligence community must report annually to the FISC concerning, *inter alia*, how many persons the element targeted under Section 1881a (based on the belief that the persons were located outside the United States) who were later determined to be located inside the United States.  *See* 50 U.S.C. § 1881a(*l*)(3)(A)(iii).

er preconditions are established with respect to a particular target, there is no requirement in FISA that all those likely to be overheard engaging in foreign intelligence conversations be named'") (citation omitted)); *United States v. Figueroa*, 757 F.2d 466, 472-73 (2d Cir. 1985) (rejecting challenge to Title III on the ground that it allows interception of conversations of unknown third parties); *United States v. Butenko*, 494 F.2d 593, 608 (3d Cir. 1974) (upholding the constitutionality of warrantless surveillance for foreign intelligence purposes even though "conversations . . . of American citizens[] will be overheard"); *United States v. Bin Laden*, 126 F. Supp. 2d 264, 280 (S.D.N.Y. 2000) ("[I]ncidental interception of a person's conversations during an otherwise lawful surveillance is not violative of the Fourth Amendment."). Therefore the incidental collection of U.S. person communications is lawful.

Under these principles, incidental capture of a U.S. person's communications during surveillance that lawfully targets non-U.S. persons abroad does not imply that a judicial warrant or other individualized court order is required for such surveillance to be reasonable under the Fourth Amendment. *See Bin Laden*, 126 F. Supp. 2d at 281 (noting that "the combination of *Verdugo-Urquidez* and the incidental interception cases" would permit surveillance that collects a U.S. person's communications as an incident to warrantless surveillance targeting a non-U.S. person abroad, so long as the United States person is not a "known and contemplated" surveillance target). Thus, surveillance of non-U.S. persons outside the United States pursuant to Section 702, even without a warrant or probable cause, is not rendered unlawful if the surveillance incidentally captures the communications of non-targeted persons in the United States. This conclusion is particularly appropriate here because the privacy interests of U.S. persons whose communications are incidentally collected are specifically protected by minimization procedures. *See In re Directives*, 551 F.3d at 1016 (noting that the minimization procedures under the PAA

"serve . . . as a means of reducing the impact of incidental intrusions into the privacy of non-targeted United States persons").

Application of a warrant requirement to incidental interception of U.S.- person communications during surveillance targeting non-U.S. persons abroad for foreign intelligence purposes not only would be contrary to case law but also would be impracticable and inconsistent with decades of foreign-intelligence collection practice. *See In re Terrorist Bombings of U.S. Embassies*, 552 F.3d 157, 169 (2d Cir. 2008) (holding that the warrant requirement does not apply to searches or surveillance of U.S. citizens that occur outside the United States because the original purpose of the Fourth Amendment "was to restrict searches and seizures which might be conducted by the United States in domestic matters"); *United States v. Barona*, 56 F.3d 1087, 1092 n.1 (9th Cir. 1995) (foreign searches have "neither been historically subject to the warrant procedure, nor could they be as a practical matter"); *United States v. Stokes*, 726 F.3d 880, 893 (7th Cir. 2013) (rejecting warrant requirement for extraterritorial searches targeting United States persons and holding such searches "are subject only to the Fourth Amendment's requirement of reasonableness"). Before initiating surveillance of a foreign target, the government cannot know the identities of all those with whom the target will communicate in the future, and there will generally be at least some possibility that the target will communicate with a U.S. person. *See Bin Laden*, 126 F. Supp. 2d at 280 ("[T]he government is often not in a position of omniscience regarding who or what a particular surveillance will record."). Thus, imposition of a warrant requirement for any incidental interception of U.S. person communications would effectively require a warrant for all foreign intelligence collection, even though the foreign targets lack Fourth Amendment rights and their communications often involve only other foreigners. Such a rule would unduly restrict the government's intelligence collection against foreign targets and de-

grade its ability to protect against foreign threats.  *See Warrantless Surveillance and The Foreign Intelligence Surveillance Act: The Role of Checks and Balances in Protecting Americans' Privacy Rights (Part II) Hearing Before the H. Judiciary Comm.*, 110th Cong., 1st Sess. At 8 (2007) (statement of Rep. Forbes) ("To require a court order for every instance in which a foreign target communicates with someone inside the United States is to require a court order for every foreign target, and requiring this would reverse 30 years of established intelligence gathering . . . .  The intelligence community cannot possibly know ahead of time who these terrorists will talk to.  It needs to have the flexibility to monitor calls that may occur between a foreign terrorist and a person inside the United States.").

### c.   *The Location of the Search Does Not Trigger a Warrant Requirement*

*Verdugo-Urquidez* involved a physical search that was conducted overseas, while collection under Section 702 takes place within the United States.  In the context of electronic communications, however, the fact that the communications of a non-U.S. person outside the United States may be collected from within the United States is not the kind of "significant voluntary connection with the United States" that brings that person within the protection of the Fourth Amendment under *Verdugo-Urquidez*.  494 U.S. at 271-72.  Otherwise, any foreign person abroad seeking to evade United States surveillance, including al Qaeda terrorists, could claim the protections of the Fourth Amendment merely due to this type of insignificant connection to the United States.  That result would be plainly contrary to the Supreme Court's statements in *Verdugo-Urquidez* that the Fourth Amendment was not originally intended to protect "aliens outside of the United States territory."  *Id*. at 266-67.  Moreover, when the government collects the communications of a non-U.S. person located abroad, whether the collection takes place in the United States or abroad makes no difference to the person's privacy interests and should not af-

fect the constitutional analysis. When it comes to the content of communications, "the Fourth Amendment protects people, not places." *United States v. Yonn*, 702 F.2d 1341, 1347 (11th Cir. 1983) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). Accordingly, there is no "constitutional distinction which depends upon the location of the recording apparatus." *Yonn*, 702 F.2d at 1347.

### 2. The Foreign Intelligence Exception Applies

Even assuming, *arguendo*, that incidental collection of U.S.-person communications under Section 702 is subject to the same constitutional scrutiny as foreign intelligence collection targeting U.S. persons, *cf. [Caption Redacted]*, 2011 WL 10945618, *26 (FISC Oct. 3, 2011) (noting that "[t]here surely are circumstances in which incidental intrusions can be so substantial as to render a search or seizure unreasonable"), the Fourth Amendment does not require a warrant here because such surveillance falls within the well-recognized foreign intelligence exception.

#### a. The "Special Needs" Doctrine

The touchstone of the Fourth Amendment is reasonableness, which is assessed by balancing the degree to which a search is needed to promote legitimate governmental interests against the search's intrusion on a person's privacy interests. *See United States v. Knights*, 534 U.S. 112, 118-19 (2001). In certain contexts, a search or surveillance is impermissible without a warrant or other individualized court order. *See Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652-53 (1995) ("Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant."). But that procedure is by no means inflexibly required. *Maryland v. King*, 133 S. Ct. 1958, 1969 (2013) (The Fourth Amendment "imposes no irreducible require-

ment" of individualized suspicion.); *see, e.g.*, *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (The government has "plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant.").

The Supreme Court has recognized exceptions to the Fourth Amendment's warrant requirement "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable," *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987), such as where the governmental need is especially compelling or especially likely to be frustrated by a warrant requirement, where expectations of privacy are diminished, and where alternative safeguards restrain the government within reasonable limits.  *See King*, 133 S. Ct. at 1969; *see also*, *e.g. Griffin*, 483 U.S. at 873-74*,* (upholding warrantless search of probationer's home); *Vernonia School Dist.*, 515 U.S. at 653 (upholding warrantless drug testing of student-athletes by public school district); *Samson v. California*, 547 U.S. 843, 847 (2006) (upholding suspicionless searches of parolees).  In evaluating whether the "special needs" doctrine applies, the Supreme Court has distinguished between searches designed to uncover evidence "of ordinary criminal wrongdoing" and those motivated "at [a] programmatic level" by other governmental objectives. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37-40, 48 (2000) (reviewing cases).  The "special needs" doctrine applies where special government interests beyond the normal need for law enforcement make the warrant and probable-cause requirement impracticable, and in such cases the court "employ[s] a balancing test that weigh[s] the intrusion on the individual's interest in privacy against the 'special needs' that supported the program." *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001).  Accordingly, the Supreme Court has permitted, *inter alia*, warrantless stops of motorists at roadblocks for the purpose of securing borders, *see United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), warrantless searches of the homes of probationers to ensure com-

pliance with probation conditions, *see Griffin*, 483 U.S. at 872, and warrantless searches of public school students to enforce school rules, *see T.L.O.*, 469 U.S. at 340.

b.       *The Foreign Intelligence Exception*

Several courts of appeals – including the FISA Court of Review – have held, by analogy to the "special needs" doctrine, that the government's "special need" for foreign intelligence information justifies an exception to the warrant requirement.  *See, e.g., United States v. Buck*, 548 F.2d 871, 875 (9th Cir. 1977) ("Foreign security wiretaps are a recognized exception to the general warrant requirement."); *United States v. Duka*, 671 F.3d 329, 341 (3d Cir. 2011) ("[C]ourts [that have considered the question] almost uniformly have concluded that the important national interest in foreign intelligence gathering justifies electronic surveillance without prior judicial review, creating a sort of 'foreign intelligence exception' to the Fourth Amendment's warrant requirement."); *In re Directives*, 551 F.3d at 1010-11 (recognizing "a foreign intelligence exception" to the warrant requirement); *In re Sealed Case*, 310 F.3d 717, 742 (FISA Ct. Rev. 2002) ("[A]ll the . . . courts to have decided the issue [have] held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information."); *United States v. Truong Dinh Hung*, 629 F.2d 908, 912-13 (4th Cir. 1980) (upholding warrantless foreign intelligence surveillance authorized by the Attorney General); *Butenko*, 494 F.2d at 605 (upholding warrantless foreign intelligence surveillance); *United States v. Brown*, 484 F.2d 418, 426 (5th Cir. 1973) (holding that "the President may constitutionally authorize warrantless wiretaps for the purpose of gathering foreign intelligence");[17] *but see Zweibon v. Mitchell*, 516 F.2d 594, 618-20 (D.C. Cir. 1975) (en banc) (plurality opinion suggesting in dicta that a warrant may

---

[17]   Except for *In re Directives*, these cases involved collection of foreign intelligence information from persons inside the United States.  Their reasoning applies *a fortiori* to Section 702 acquisition, which targets non-United States persons reasonably believed to be outside the United States.

be required even in a foreign intelligence investigation).[18]  These decisions have found that for-

eign intelligence collection justifies an exception because the "programmatic purpose" of obtain-

ing foreign intelligence information goes "beyond any garden-variety law enforcement objec-

tive," and "requiring a warrant would hinder the government's ability to collect time-sensitive

information and, thus, would impede the vital national security interests that are at stake."  *In re*

*Directives*, 551 F.3d at 1011.

The foreign intelligence exception allows for broad collection of information without a

warrant.  *Cf. MacWade v. Kelly*, 460 F.3d 260, 269 (2d Cir. 2006) (noting, in upholding under

special needs doctrine warrantless subway searches to prevent terrorist attacks, that "[t]he Su-

preme Court never has implied – much less actually held – that a reduced privacy expectation is

a *sine qua non* of special needs analysis").  While considerations of intrusiveness and executive

discretion may be relevant to the reasonableness of a government program designed to serve a

special need, neither factor is decisive regarding whether the doctrine applies at the threshold as

an exception to the warrant clause.  *See id.* at 268-69 (addressing such factors under the general

reasonableness test, separately from the threshold question whether the searches served a gov-

ernmental purpose distinct from ordinary law enforcement).

Reliance on the Supreme Court's decision in *United States v. United States District Court*

*(Keith)*, 407 U.S. 297 (1972) to challenge the constitutionality of FAA would be misplaced, as

the Court in *Keith* expressly reserved the issue of a warrant requirement for foreign intelligence

collection.  As the FISA Court of Review recognized in *In re Sealed Case*, the Supreme Court

explained in *Keith* that "the focus of security surveillance 'may be less precise than that directed

against more conventional types of crime' even in the area of *domestic* threats to national securi-

---

[18]  The plurality in *Zweibon* specifically noted that the surveillance at issue targeted a domestic organization and suggested that its conclusion might be different if a foreign power were targeted.  *See* 516 F.2d at 651.

ty." 310 F.3d at 738 (emphasis in original); *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143 (2013) (noting that *Keith* "implicitly suggested that a special framework for foreign intelligence surveillance might be constitutionally permissible"). The same rationale "applies *a fortiori* to foreign threats," a fact that Congress necessarily recognized in enacting FISA. *In re Sealed Case*, 310 F.3d at 738; *see also Truong*, 629 F.2d at 913 ("For several reasons, the needs of the executive are so compelling in the area of foreign intelligence, unlike the area of domestic security, that a uniform warrant requirement would, following *Keith*, 'unduly frustrate' the President in carrying out his foreign affairs responsibilities."). In addition, unlike Section 702 intelligence collection, the surveillance in *Keith* was conducted not only without a warrant but without any judicial or congressional oversight of any kind. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 (1952) (Jackson, J. concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum."). The courts that have addressed the issue of whether foreign intelligence collection is subject to a warrant requirement have expressly distinguished *Keith* in holding that it is not. *In re Directives*, 551 F.3d at 1010; *In re Sealed Case*, 310 F.3d at 744; *Truong*, 629 F.2d at 913; *Butenko*, 494 F.2d at 602 n.32; *Brown*, 484 F.2d at 425.

In sum, courts have generally recognized, by analogy to the "special needs" doctrine, that a foreign intelligence exception to the warrant requirement exists. As the FISC has held, and for the reasons set forth below, that exception applies to acquisitions under Section 702. *[Caption Redacted]*, 2011 WL 10945618, at *24 (FISC Oct. 3, 2011) ("The Court has previously concluded that the acquisition of foreign intelligence information pursuant to Section 702 falls within the 'foreign intelligence exception' to the warrant requirement of the Fourth Amendment.").

       c.  *The Government's Purpose in Section 702 Collection Goes Beyond Ordinary Crime Control*

First, it is clear that the government's programmatic purpose in obtaining the information pursuant to Section 702 goes beyond routine law enforcement.  *See In re Sealed Case*, 310 F.3d at 717 (holding that the government's "programmatic purpose" in obtaining foreign intelligence information is "to protect the nation against terrorist and espionage threats directed by foreign powers" – "a special need" that fundamentally differs from "ordinary crime control."); *see also Cassidy v. Chertoff*, 471 F.3d 67, 82 (2d Cir. 2006) (upholding warrantless searches of ferry passengers because "[p]reventing or deterring large-scale terrorist attacks present problems that are distinct from standard law enforcement needs and indeed go well beyond them").  Acquisitions under Section 702 must be conducted with a "significant purpose" to "obtain foreign intelligence information."  *See* 50 U.S.C. § 1881a(g)(2)(A)(v).  As the FISA Court of Review found in the context of the PAA, the "stated purpose" of the collection "centers on garnering foreign intelligence," and "[t]here is no indication that the collections of information are primarily related to ordinary criminal-law enforcement purposes." *In re Directives,* 551 F.3d at 1011.

### d.  A Warrant or Probable Cause Requirement Would Be Impracticable

Second, as the FISA Court of Review found with respect to the FAA's predecessor statute, "there is a high degree of probability that requiring a warrant would hinder the government's ability to collect time-sensitive information and, thus, would impede the vital national security interests that are at stake."  *Id.*; *see also Truong,* 629 F.2d at 913 (noting that "attempts to counter foreign threats to the national security require the utmost stealth, speed, and secrecy" and, therefore, "[a] warrant requirement would add a procedural hurdle that would reduce the flexibility of executive foreign intelligence initiatives, in some cases delay executive response to foreign intelligence threats, and increase the chance of leaks regarding sensitive executive operations").  Changes in technology and the manner of collecting foreign intelligence information, as well as

the shifting threat and communications methods employed by transnational terrorist groups, make it impracticable for the government to obtain traditional warrants or FISC orders for the acquisitions currently authorized under Section 702. Indeed, Congress enacted the FAA in part because the burden of preparing individualized FISA applications for intelligence collection targeting non-U.S. persons outside the United States was harming the government's ability to collect foreign intelligence information from targets overseas. *See* 154 Cong. Rec. S6097, S6122 (June 25, 2008) (statement of Senator Chambliss) ("[T]he [FAA] will fill the gaps identified by our intelligence officials and provide them with the tools and flexibility they need to collect intelligence from targets overseas.").

When the government has reason to believe that a non-U.S. person overseas is connected to international terrorist activities but the government lacks sufficient evidence to establish probable cause that the target is an agent of a foreign power, a warrant requirement could prevent the government from obtaining significant information. Even in circumstances where the government succeeded in eventually gathering enough information to establish probable cause under FISA, the need to develop such information and obtain approval of the FISC could result in delays that would hinder the government's ability to monitor fast-moving threats. *See In re Directives*, 551 F.3d at 1011-12 (Because of the government's "need for speed, stealth, and secrecy" in this context, "[c]ompulsory compliance with the warrant requirement would introduce an element of delay, thus frustrating the government's ability to collect information in a timely manner"); *cf. Verdugo-Urquidez*, 494 U.S. at 273-74 ("Application of the Fourth Amendment" to aliens abroad could "significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest."); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 623 (1989) (upholding warrantless search in part because "the delay necessary to pro-

cure a warrant . . . may result in the destruction of valuable evidence").  Finally, a warrant requirement in this context would impose significant burdens on the government, because substantial resources and time of national security personnel would be diverted to preparing individualized warrant applications targeting persons who lack Fourth Amendment rights.  *Cf. Von Raab*, 489 U.S. at 666-67 (the mission of the Customs Service "would be compromised if it were required to seek search warrants in connection with routine, yet sensitive, employment decisions"); *O'Connor v. Ortega*, 480 U.S. 709, 722 (1987) (plurality opinion) ("requiring an employer to obtain a warrant" to access employee's office or files "would seriously disrupt the routine conduct of business and would be unduly burdensome").

In short, a warrant requirement would significantly undermine the government's ability to obtain foreign intelligence information vital to the Nation's security.  *See Bin Laden*, 126 F. Supp. 2d at 273 ("[T]he imposition of a warrant requirement [would] be a disproportionate and perhaps even disabling burden" on the government's ability to obtain foreign intelligence information).  That would be a particularly unnecessary result because Section 702 collection may not intentionally target persons protected by the Fourth Amendment, *see* 50 U.S.C. § 1881a(b), and the law contains robust safeguards that protect the interests of U.S. persons whose communications might be incidentally collected.  *See United States v. Abu-Jihaad*, 630 F.3d 102, 121-22 (2d Cir. 2010) ("[T]he Constitution's warrant requirement is flexible, so that different standards may be compatible with the Fourth Amendment in light of the different purposes and practical considerations at issue.") (internal quotation marks and citation omitted).[19]

---

[19]  Courts have recognized the continuing validity of the rationale for the foreign intelligence exception even after the enactment of FISA created a regime in which the government could obtain a court order to conduct foreign intelligence surveillance in certain circumstances.  *See, e.g.*, *In re Directives*, 551 F.3d at 1010-11; *In re Sealed Case*, 310 F.3d at 742; *Duka*, 671 F.3d at 341; *[Caption Redacted]*, 2011 WL 10945618, at *24.

> *e.  A Warrant Requirement Would Inappropriately Interfere with Executive Branch Discretion in the Collection of Foreign Intelligence*

The Fourth Amendment's warrant requirement is based in part on the interest in "interpos[ing] a judicial officer between the zealous police officer ferreting out crime and the subject of the search."  *In re Terrorist Bombings*, 552 F.3d at 170 n.7.  But that concern is considerably diminished in this context because of "the acknowledged wide discretion afforded the executive branch in foreign affairs."  *Id.*; *see Truong*, 629 F.2d at 914 ("[T]he executive branch not only has superior expertise in the area of foreign intelligence, it is also constitutionally designated as the pre-eminent authority in foreign affairs.").  For that reason, the Fourth Amendment does not require that courts interpose themselves in the Executive Branch's collection of foreign intelligence beyond the procedures provided for by Congress.[20]

**3.  The Government's Collection of Foreign Intelligence Information Pursuant to Section 702 Is Constitutional Under the Fourth Amendment's General Reasonableness Test**

As explained above, incidental collection of communications of U.S. persons during an otherwise lawful collection does not render the collection constitutionally unreasonable.  That principle applies because Section 702 collection lawfully targets non-U.S. persons outside the United States for foreign intelligence purposes.  Moreover, as set forth below, even assuming that such incidental collection must satisfy the Fourth Amendment's "general reasonableness" test, the acquisitions were lawful under that test.

In circumstances where a warrant and probable cause are not required, searches and seizures are generally subject to the Fourth Amendment's "traditional standards of reasonableness."

---

[20]  Section 702 does not authorize "unilateral" Executive Branch surveillance, as the Supreme Court has recognized.  *See Clapper*, 133 S. Ct. at 1144 ("Surveillance under § 1881a is subject to statutory conditions, judicial authorization, congressional supervision, and compliance with the Fourth Amendment.").

*Maryland v. King*, 133 S. Ct. at 1970; *see id.* ("To say that no warrant is required is merely to acknowledge that rather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.") (internal quotation marks and citation omitted).  In assessing the constitutional reasonableness of a government search, the court must weigh "the promotion of legitimate governmental interests against the degree to which [the search] intrudes upon an individual's privacy."  *Id.* (internal quotation marks and citation omitted); *Knights*, 534 U.S. at 117-19 (describing balancing as "general Fourth Amendment approach"); *T.L.O.*, 469 U.S. at 337 (stating that "[t]he determination of the standard of reasonableness" requires balancing).  The court determines what is reasonable, and what safeguards may be necessary in a particular context, by balancing the interests at stake in light of "the totality of the circumstances."  *Samson*, 547 U.S. at 848; *see also Von Raab*, 489 U.S. at 665, 668 (recognizing that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance" and that "the traditional probable-cause standard may be unhelpful" when the government "seeks to *prevent*" dangers to public safety); *In re Directives*, 551 F.3d at 1012 (reviewing collection under the PAA under the general reasonableness test).

Under the general reasonableness balancing test, searches without a warrant or individualized finding of probable cause are particularly likely to be found reasonable when the governmental need is especially great or especially likely to be frustrated by a warrant requirement, where the search involves modest intrusions on the individual's privacy, and where alternative safeguards restrain the government within reasonable limits.  *See, e.g.*, *Illinois v. McArthur*, 531 U.S. 326, 330-31 (2001) ("When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or indi-

vidual, circumstances may render a warrantless search or seizure reasonable."); *King*, 133 S. Ct. at 1969 (warrantless search may be reasonable where "the public interest is such that neither a warrant nor probable cause is required" or where "an individual is already on notice . . . that some reasonable [government] intrusion on his privacy is to be expected") (citation omitted); *Skinner*, 489 U.S. at 623-33.

The Supreme Court recently engaged in this kind of balancing in *King*, which involved warrantless searches of arrestees to obtain DNA samples. 133 S. Ct. at 1968-69. The Court examined the totality of the circumstances, weighed the various interests at stake, and concluded, in light of the government's "substantial interest" in the "identification of arrestees," the diminished expectations of privacy of an individual taken into police custody, and statutory protections that limited the purposes for which the DNA evidence could be collected and stored, that the balance favored the government. *Id.* at 1977-80; *see also Samson*, 547 U.S. at 848-57 (applying reasonableness balance in upholding warrantless, suspicionless search of the person of a parolee).

In *In re Directives*, the FISA Court of Review applied the general reasonableness test in considering the constitutional reasonableness of the PAA, the FAA's predecessor statute, in the context of an as-applied challenge brought by a private party that had been directed by the government to assist in effectuating surveillance under the statute. 551 F.3d at 1012-15.[21] In balancing the respective interests, the FISA Court of Review recognized that the government's interest in national security was of such a "high[] order of magnitude" that it would justify signifi-

---

[21] The PAA was not identical to, and in certain respects was broader than, Section 702. Notably, the PAA authorized surveillance concerning "persons reasonably believed to be outside the United States" without distinguishing between U.S.- and non-U.S. persons, *In re Directives*, 551 F.3d at 1007, while Section 702 authorizes only surveillance targeting non-U.S. persons outside the United States. In addition, the petitioner in *In re Directives* limited its claims to alleged injuries to U.S. persons. Accordingly, the analysis in *In re Directives* addresses certain issues specific to foreign intelligence surveillance targeted at U.S. persons abroad, including a requirement that surveillance targeting U.S. persons be based on a finding by the Attorney General of probable cause to believe that the U.S. person was a foreign power or agent of a foreign power, that are not applicable here.

cant intrusions on individual privacy.  *Id*. at 1012.  The FISA Court of Review noted further that the PAA, the certifications, and the directives contained a "matrix of safeguards," *id*. at 1013, including "effective minimization procedures" that were "almost identical to those used under FISA to ensure the curtailment of both mistaken and incidental acquisitions," *id*. at 1015, as well as "targeting procedures" that included "provisions designed to prevent errors" and provided for Executive Branch and congressional oversight of "compliance with the targeting procedures," *id*. The FISA Court of Review concluded, based on the panoply of safeguards in the statutory provisions and implementing procedures, that "the surveillances at issue satisfy the Fourth Amendment's reasonableness requirement."  *Id*. at 1016.[22]

The FAA provisions, certifications, and procedures, with respect to collection targeting non-U.S. persons overseas, are as protective as, and in some respects significantly more robust than, the comparable PAA procedures that the FISA Court of Review considered in holding that the directives issued under the PAA were constitutional.  In addition, the FAA goes beyond the PAA by requiring a prior finding by the FISC that the targeting and minimization procedures are reasonable under the Fourth Amendment. 50 U.S.C. § 1881a(i).  The FAA, unlike the PAA, also expressly prohibits "reverse targeting" of U.S. persons. 50 U.S.C. § 1881a(b)(2).  The FAA thus stands on an even firmer constitutional foundation than the PAA, and the FISA Court of Review's analysis upholding the latter applies also to the former.

In addition, the FISC has repeatedly reviewed the targeting and minimization procedures governing the government's acquisition of foreign intelligence information under Section 702 and held that acquisitions pursuant to those procedures satisfy the Fourth Amendment reasonableness standard.  *See [Caption Redacted]*, 2011 WL 10945618, at *6 (FISC Oct. 3, 2011) ("The

---

[22]  *In re Directives* was not litigated *ex parte*.  The FISA Court of Review considered briefing and oral argument from both the government and the communications provider that challenged the directives.  *In re Directives*, 551 F.3d at 1008.

Court found in those prior dockets that the targeting and minimization procedures were consistent with the requirements of [Section 702] and with the Fourth Amendment.").  There is no reason for a different outcome here.

a.  *Acquisitions Under Section 702 Advance the Government's Compelling Interest in Obtaining Foreign Intelligence Information To Protect National Security*

The government's national security interest in conducting acquisitions pursuant to Section 702 "is of the highest order of magnitude."  *In re Directives*, 551 F.3d at 1012; *see also [Caption Redacted]*, 2011 WL 10945618, at *25 (FISC Oct. 3, 2011); *Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation.") (citation omitted).  The terrorist threat the United States is facing today "may well involve the most serious threat our country faces."  *In re Sealed Case*, 310 F.3d at 746; *see also Holder v. Humanitarian Law Project*,  561 U.S. 1, 28 (2010) ("[T]he Government's interest in combating terrorism is an urgent objective of the highest order."); *Duka*, 671 F.3d at 340 ("The government's interests in security and intelligence are entitled to particular deference.").  Courts have recognized that the government's compelling interest in collecting foreign intelligence information to protect the Nation against terrorist groups and other foreign threats may outweigh individual privacy interests.  *See, e.g., In re Terrorist Bombings*, 552 F.3d at 172-76 (upholding search and surveillance targeting U.S. person abroad because the intrusion on the individual's privacy was outweighed by the government's need to monitor the activities of al Qaeda); *Cassidy*, 471 F.3d at 82 (upholding warrantless searches of ferry passengers in light of government interest in "[p]reventing or deterring large-scale terrorist attacks").

The collection authorized by Section 702 is crucial to the government's efforts against terrorism and other threats both to the United States and its interests abroad.  *See* National Security Agency, *The National Security Agency:  Missions Authorities, Oversight and Partnerships* at

4 (August 9, 2013) ("[C]ollection under FAA Section 702 is the most significant tool in the NSA collection arsenal for the detection, identification, and disruption of terrorist threats to the U.S. and around the world.").  As the Senate Select Committee on Intelligence found in recommending re-authorization of the FAA in 2012, "the authorities provided under the FISA Amendments Act have greatly increased the government's ability to collect information and act quickly against important foreign intelligence targets."  S. Rep. No.174, 112th Cong., 2d Sess. 2 (June 7, 2012); *see also id*. at 17 (noting that Section 702, in addition to "provid[ing] information about the plans and identities of terrorists" also enables the government to collect "information about the intentions and capabilities of weapons proliferators and other foreign adversaries who threaten the United States").  The Committee noted further that "failure to reauthorize Section 702" would "result in a loss of significant intelligence and impede the ability of the Intelligence Community to respond quickly to new threats and intelligence opportunities."  *Id*.; *see also* H.R. Rep. 112-645 (II) 112th Cong., 2d Sess. at 3 (August 2, 2012) ("The importance of the collection of foreign intelligence under the FISA Amendments Act . . . cannot be underscored enough. . . . The information collected under this authority is often unique, unavailable from any other source, and regularly provides critically important insights and operationally actionable intelligence on terrorists and foreign intelligence targets around the world.").

> b.  *U.S. Persons Have, at Most, Limited Expectations of Privacy in Communications Obtained Through the Targeting of Non- U.S. Persons Outside the United States*

The other side of the Fourth Amendment reasonableness balance is the degree to which the search "intrudes upon an individual's privacy."  *Knights*, 534 U.S. at 118-19 (citation omitted).  Of course, where an individual has no reasonable expectation of privacy at all, his Fourth Amendment claim fails at the threshold.  And where the search takes place in circumstances

where the individual's expectations of privacy are limited, the diminished character of the privacy interest must be taken into account in the court's assessment of reasonableness.

An individual's ability to "claim the protection of the Fourth Amendment depends . . . upon whether" he "has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).[23]  A court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure "invaded [the defendant's] legitimate expectation of privacy rather than that of a third party." *United States v. Payner*, 447 U.S. 727, 731 (1980).  To claim the protection of the Fourth Amendment, a defendant "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"  *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas*, 439 U.S. at 144 n.12); *see also United States v. Wells*, 739 F.3d 511, 522-23 (10th Cir. 2014) (holding that an individual lacked a reasonable expectation of privacy in his communications while in another person's hotel room).

The Supreme Court has long held that when one person voluntarily discloses information to another, the first person loses any cognizable interest under the Fourth Amendment in what the second person does with the information.  *See United States v. Miller*, 425 U.S. 435, 443 (1976); *Couch v. United States*, 409 U.S. 322, 335 (1973); *White*, 401 U.S. at 752 (plurality opinion); *Hoffa v. United States*, 385 U.S. 293, 302-03 (1966).  For Fourth Amendment purposes, the same principle applies whether the recipient intentionally makes the information public or stores

---

[23]  Although the Supreme Court has formerly analyzed questions concerning an individual's ability to claim Fourth Amendment protections under the rubric of "standing," the Court made clear in *Rakas* that "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  439 U.S. at 140.  Nevertheless, the nomenclature of "standing" is still commonly used by lower courts when addressing whether an individual can assert a Fourth Amendment claim.

it in a place subject to a government search.  Thus, once a non-U.S. person located outside the United States receives a communication, the sender loses any cognizable Fourth Amendment rights with respect to that communication.  That is true even if the sender is a U.S. person protected by the Fourth Amendment, because he assumes the risk that the foreign recipient will give the information to others, leave the information freely accessible to others, or that the U.S. government (or a foreign government) will obtain the communication.[24]

This rule applies to physical mail, even within the United States.  Although the Fourth Amendment protects sealed letters in transit, "once a letter is sent to someone, 'the sender's expectation of privacy ordinarily terminates upon delivery.'"  *United States v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999) (quoting *United States v. King*, 55 F.3d 1193, 1196 (6th Cir. 1995)).  The same rule applies to email users, who lack "a legitimate expectation of privacy in an email that had already reached its recipient."  *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001); *see also United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007) (An "expectation of privacy may be diminished" for "transmissions over the Internet or email that have already arrived at the recipient.") (citation omitted); *United States v. Jones,* 149 Fed. Appx. 954, 959 (11th Cir. 2005) (affirming the district court's admission of testimony concerning text messages received on or sent by witness using a text message pager "[b]ecause the defendants did not have a reasonable expectation of privacy in the text messages received or sent by McCalebb"); *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004) (noting that a sender of email, like a letter-writer, would lose an objective expectation of privacy in email that the recipient had received); *United*

---

[24]   The "recipient" in this context refers to the ultimate recipient, not (for example) an internet service provider. *See United States v. Warshak*, 631 F.3d 266, 282-88 (6th Cir. 2010).  Thus, while *Warshak* held that a subscriber has a reasonable expectation of privacy in emails that the provider stores in the *subscriber's* account, it did not say that a person's Fourth Amendment rights are implicated when the government obtains, from the service provider, emails from *someone else*'s account.

*States v. Haffner,* No. 3:09-CR-337, 2010 WL 5296920, at *5-6 (M.D. Fla. Aug. 31, 2010) (rec-ommending denial of challenge to seizure from a third party's computer of screen name used by defendant and instant message chats of defendant because once received, "[d]efendant lost his reasonable expectation of privacy in the messages"), *adopted by United States v. Haffner,* No. 3:09-CR-337, 2010 WL 5296847, at *2 (M.D. Fla. Dec. 20, 2010).[25]

Finally, the principles underlying the "border search" doctrine are also relevant to this Court's weighing of the individual's privacy interests relative to the government's interests in this context.  Courts have long recognized the government's paramount interest in examining persons and property entering or exiting the country.  *Flores-Montano*, 541 U.S. at 152.  In that context, "not only is the expectation of privacy less," but also "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 539-40 (1985) (citation omitted).  Accordingly, under the rubric of the "border search" doc-trine, courts have long recognized a diminished expectation of privacy in letters or packages that transit an international border, even where the search takes place in the interior of the country. *See United States v. Ramsey*, 431 U.S. 606, 620 (1977) (holding that the border search exception applies to international letters, because "[t]he critical fact is that the envelopes cross the border . .

---

[25]  Moreover, any expectation of privacy of defendants in their electronic communications with a non-U.S. person overseas is also diminished by the prospect that their foreign correspondent could be a target for surveillance by for-eign governments or private entities, whose activities are not governed by the United States Constitution or federal law, or by the U.S. Government, pursuant to various authorities applicable to foreign intelligence surveillance con-ducted abroad.  *Cf. Clapper*, 133 S. Ct. at 1149 (noting that the government conducts surveillance of persons abroad under "programs that are governed by Executive Order 12333" and that "[t]he Government may also obtain infor-mation from the intelligence services of foreign nations"); *Amnesty Int'l USA v. Clapper*, 667 F.3d 163, 192 (2d Cir. 2011) (Raggi, J., dissenting) (Because "the United States is hardly the only government conducting electronic sur-veillance," the foreign contacts of plaintiffs challenging the FAA might "be prime targets for surveillance by other countries," especially foreign contacts "believed to be associated with terrorist organizations."); *Verdugo-Urquidez*, 494 U.S. at 278 (Kennedy, J., concurring) (noting the relevance of "differing and perhaps unascertainable concep-tions of reasonableness and privacy that prevail abroad")  This reality, which courts have acknowledged, arguably put defendants "on notice . . . that some reasonable [government] intrusion on [their] privacy is to be expected." *King*, 133 S. Ct. at 1969.

. not that they are brought in by one mode of transportation rather than another"); *United States v. Seljan*, 547 F.3d 993, 1003 (9th Cir. 2008) ("An envelope containing personal correspondence is not uniquely protected from search at the border."); *United States v. King*, 517 F.2d 350, 354 (5th Cir. 1975) ("Appellants here could have had no reasonable expectation that their letters, mailed from abroad, would remain uninspected.").

The same rationale applies also to international data transmissions, because such transmissions, in the form of terrorist communications, cyber attacks, illegal financial transactions, and the like, may implicate national security or other government interests to a similar degree as physical mail in an envelope. *See Seljan*, 547 F.3d at 1001-03 (upholding suspicionless search of envelope containing personal correspondence in light of "tempered" expectation of privacy in international mail and the government's interest in "regulating the flow of persons and property across the border."). Although the government does not contend that Section 702 collection is per se reasonable under the border search doctrine, the point remains that the principles underlying that doctrine support the constitutional reasonableness of such collection, because, at a minimum, privacy expectations are sharply reduced in their context.

      *c.   The Privacy Interests of U.S. Persons Are Protected by Stringent Safeguards and Procedures*

The government employs multiple safeguards that are designed to ensure that surveillance is appropriately targeted at non-U.S. persons located outside the United States for foreign intelligence purposes and to protect the privacy interests of U.S. persons who communicate with targets or whose communications are otherwise incidentally collected. These safeguards and procedures – some of which go beyond what courts have held reasonable in the context of "special needs" warrantless searches involving less compelling governmental interests – provide constitutionally sufficient protection for the privacy interests of U.S. persons.

(1)   Senior officials certify that the government's procedures satisfy statutory requirements

Section 702 requires the DNI and the Attorney General to certify that procedures are in place to protect the privacy of U.S. persons, including targeting procedures and minimization procedures.  50 U.S.C. § 1881a(a), (g), and (i).  In addition, the DNI and Attorney General must also certify, *inter alia*, that a significant purpose of the acquisition is to obtain foreign intelligence information, that the Attorney General and DNI have adopted guidelines to ensure compliance with the statutory limitations in Section 702(b), and that the targeting procedures, minimization procedures, and guidelines adopted by the government are consistent with the Fourth Amendment.  50 U.S.C. § 1881a(g)(2)(A).  The requirement that these senior Executive Branch officials certify that the procedures comply with statutory requirements and with the Constitution represents an important "internal check" on the actions of the Executive Branch.  *See In re Sealed Case*, 310 F.3d at 739.

(2)   Targeting procedures ensure that the government targets only non-U.S. persons reasonably believed to be outside the United States

Section 702 provides that the targeting procedures must be "reasonably designed" to "ensure that any acquisition authorized under [the certification] is limited to targeting persons reasonably believed to be located outside the United States" and to "prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States."  *See* 50 U.S.C. § 1881a(d)(1).  The FISC repeatedly has found that the targeting procedures employed by the government meet that standard.  *[Caption Redacted]*, 2011 WL 10945618, at *6 (FISC Oct. 3, 2011) ("The Court found in those prior dockets that the targeting and minimization procedures were consistent with the requirements of 50 U.S.C. § 1881(d)-(e) and with the Fourth Amendment.").

44

       (3)   Minimization procedures protect the privacy of U.S. persons whose communications are acquired

Section 702 requires the government to employ minimization procedures, as defined in FISA, to limit the acquisition, retention, and dissemination of information concerning U.S. persons. *See* 50 U.S.C. § 1801(h)(1). Section 702 further requires that the FISC review those procedures and determine that acquisitions in accordance with such procedures are consistent with the FAA and the Fourth Amendment. 50 U.S.C. § 1881a(i)(1) and (2).

The minimization procedures governing Section 702 collection, some of which have recently been declassified, are appropriately designed to minimize the acquisition, retention, and dissemination of information to, from, or about U.S. persons, consistent with the government's foreign intelligence needs. *See Minimization Procedures Used by the National Security Agency in Connection with Acquisitions of Foreign Intelligence Pursuant to Section 702 of the Foreign Intelligence Surveillance Act of 1978, as amended* (dated October 31, 2011), dated October 31, 2011), available at www.dni.gov/files/documents/Minimization%20Procedures%20used%20 by%20NSA%20in%20Connection%20with%20FISA%20SECT%20702.pdf ("NSA 2011 Minimization Procedures"). The procedures further require, among other things, that the identity of U.S. persons be redacted from intelligence reports prior to dissemination unless the information constitutes foreign intelligence information, is necessary to understand foreign intelligence information, or is evidence of a crime. *Id.* § 6(b). In other words, the procedures by design aim to ensure that any intrusion on the privacy of U.S. persons is reasonably balanced against the government's intelligence and law enforcement needs.

For the same reasons that courts have found the use of minimization procedures to be an important factor in holding traditional FISA surveillance to be reasonable under the Fourth Amendment, *In re Sealed Case*, 310 F.3d at 740-42, the use of substantially similar minimization

procedures supports the reasonableness of surveillance under Section 702. *In re Directives*, 551 F.3d at 1015 (finding it "significant," in upholding the PAA, that "effective minimization procedures are in place" to "serve as an additional backstop against identification errors as well as a means of reducing the impact of incidental intrusions into the privacy of non-targeted United States persons.").

The procedures employed concerning Section 702 collection provide materially equivalent protection to the procedures employed for FISA Title I and III collection, and courts have found that these procedures sufficiently protect the privacy interests of U.S. persons whose communications are incidentally acquired. *In re Sealed Case*, 310 F.3d at 740-41; *see In re Directives*, 551 F.3d at 1015 (recognizing as "significant" to the Court's finding that acquisitions under the PAA were reasonable, that "effective minimization procedures are in place" that were "almost identical" to those used in traditional FISA surveillance). In addition, those procedures have repeatedly been found sufficient in the context of traditional FISA electronic surveillance and physical search, which target U.S. persons in the United States and therefore are more likely to capture communications of non-targeted U.S. persons than the foreign communications targeted under Section 702. *See [Caption Redacted]*, 2011 WL 10945618, at *7 (FISC Oct. 3, 2011).

The FISC has authority to supervise the government's compliance with minimization procedures. The FAA's oversight provisions require regular reporting to the FISC concerning the government's implementation of minimization procedures. 50 U.S.C. § 1881a(*l*). In addition, Rule 13(b) of the FISC's Rules of Procedures requires the government to report, in writing, all instances of non-compliance.[26] In response to such reports, the FISC has authority to disap-

---

[26] FISA Ct. R. of P. 13(b).

prove or to require amendments to the minimization procedures, as, indeed, the FISC has done.[27]

    (4)    A significant purpose of the acquisition must be to obtain foreign intelligence information

Section 702 only authorizes collection when a "significant purpose" of the collection is to "obtain foreign intelligence information." 50 U.S.C. § 1881a(g)(2)(A)(v). That requirement precludes the government from using directives issued under Section 702 "as a device to investigate wholly unrelated ordinary crimes." *In re Sealed Case*, 310 F.3d at 736.

    (5)    Executive Branch, Congressional, and Judicial Oversight

Section 702 requires the Attorney General and DNI to periodically assess the government's compliance with both the targeting and minimization procedures and with relevant compliance guidelines, including, for example, the extent to which U.S. persons' communications have been acquired under the statute and the number of intelligence reports stemming from Section 702 acquisitions referring to the identity of a U.S. person. *See* 50 U.S.C. § 1881a(*l*). They must submit those assessments both to the FISC and to congressional oversight committees. *Id.* The Attorney General must also keep the relevant oversight committees "fully inform[ed]" concerning the implementation of Section 702. 50 U.S.C. § 1881f(a) and (b)(1); *see also Clapper*, 133 S. Ct. at 1144 ("Surveillance under § 1881a is subject to statutory conditions, judicial authorization, congressional supervision, and compliance with the Fourth Amendment.").

In 2012, the Senate Select Committee on Intelligence, following four years of such oversight, found that

---

[27] In *[Caption Redacted]*, 2011 WL 10945618, at *1 (FISC Oct. 3, 2011), the FISC found that the government's minimization procedures, as applied to certain electronic communications acquired at "upstream" points on the internet backbone networks, did not comply with Section 702 or the Constitution, due to technical limits on the government's ability to isolate targeted communications that were transmitted as part of a multi-communication batch. The government revised its procedures, and the FISC held that the amended procedures were consistent with the statute and the Fourth Amendment. *[Caption Redacted]*, 2011 WL 10947772, at *1 (FISC Nov. 30, 2011).

> [T]he assessments, reports, and other information obtained by the Committee demonstrate that the government implements the FAA surveillance authorities in a responsible manner with relatively few incidents of non-compliance.  Where such incidents have arisen, they have been the inadvertent result of human error or technical defect and have been promptly reported and remedied.  Through four years of oversight, the Committee has not identified a single case in which a government official engaged in a willful effort to circumvent or violate the law.  Moreover, having reviewed opinions by the FISA Court, the Committee has also seen the seriousness with which the Court takes its responsibility to carefully consider Executive Branch applications for the exercise of FAA surveillance authorities.

S. Rep. No.174, 112th Cong. 2d Sess. 7 (June 7, 2012); *see also* H.R. Rep. No. 645(II), 112th Cong., 2d Sess. 4 ("The oversight this committee has conducted since the FAA was enacted in 2008 has shown no evidence that the Intelligence Community has engaged in any intentional or willful failure to comply with statutory requirements or Executive Branch policies and procedures.").  Under the FAA, as in traditional FISA, the "in-depth oversight of FISA surveillance by all three branches of government" helps to "ensure[]" the "privacy rights of individuals" and to "reconcile national intelligence and counterintelligence needs with constitutional principles in a way that is consistent with both national security and individual rights."  *United States v. Belfield*, 692 F.2d 141, 148 (D.C. Cir. 1982).

(6)   Prior Judicial Review

Finally, Section 702 requires the FISC to enter an order approving the certification and the use of the targeting and minimization procedures if the court finds that the certification contains all the required elements, and that the targeting and minimization procedures are consistent with the requirements of 50 U.S.C. §§ 1881a(d) and (e) and with the Fourth Amendment.  50 U.S.C. § 1881a(i)(3)(A).  The requirement of prior FISC approval, and in particular the requirement of a judicial finding that the government's targeting and minimization procedures are consistent with the Fourth Amendment, support a finding that Section 702 collection conducted pur-

suant to such procedures is constitutional.  *See Clapper*, 133 S. Ct. at 1150 (noting the importance of the requirement that the FISC "assess whether the Government's targeting and minimization procedures comport with the Fourth Amendment"); *see also Clapper*, 667 F.3d at 190 (Raggi, J., dissenting) ("There is no reason to think that the Article III judges who serve on the FISA court will be timid in exercising this review authority").  Indeed, the FISC's declassified opinions make clear that the FISC takes seriously its responsibility to independently review the constitutional reasonableness of the applicable procedures and subjects those procedures to exacting scrutiny.  *See, e.g., [Caption Redacted],* 2011 WL 10945618 (FISC Oct. 3, 2011).

## II.  The FAA Does Not Violate Article III

"Article III courts perform a variety of functions not necessarily or directly connected to adversarial proceedings in a trial or appellate court."  *Mistretta v. United States*, 488 U.S. 361, 389 n.16 (1989); *see also Morrison v. Olson*, 487 U.S. 654, 679 n.16 (1988).  In particular, the courts have long participated in the oversight of government searches and surveillance by reviewing warrant and wiretap applications, notwithstanding that these proceedings are wholly *ex parte* and do not occur at the behest of an aggrieved party as ordinarily required for a "case or controversy" under Article III.  *Mistretta*, 488 U.S. at 389 n.16; *see also, e.g.*, *In re Sealed Case*, 310 F.3d at 732 n.19 ("In light of [*Morrison* and *Mistretta*], we do not think there is much left to an argument . . . that the statutory responsibilities of the FISA court are inconsistent with Article III case and controversy responsibilities of federal judges because of the secret, non-adversary process."); *Matter of Kevork*, 634 F. Supp. 1002, 1014 (C.D. Cal. 1985) ("The *ex parte* nature of FISC proceedings is . . . consistent with Article III."), *aff'd*, 788 F.2d 566 (9th Cir. 1986).[28]

---

[28]  The judiciary participates in oversight of searches and seizures not only by reviewing applications and issuing warrants, but also through its participation in promulgating the procedural rules governing the warrant process.  *See* Fed. R. Crim. P. 41; *Mistretta*, 488 U.S. at 387-88 (noting that Congress may properly delegate to the courts the authority to prescribe rules of procedure in criminal cases).

Congress, in assigning the FISC an analogous function in Section 702, did not vest the FISC with a power that is "incongruous" with the judicial function or that "more appropriately belong[s] to another Branch" – the central question in a separation of powers challenge under Article III.  *Mistretta*, 488 U.S. at 390; *see also In re Application of the U.S. for an Order Pursuant to 18 U.S.C. § 2703(d)*, 830 F. Supp. 2d 114, 144 (E.D. Va. 2011) ("Grand Juries, search warrants, wiretap orders, and many other *ex parte* applications and orders rely on judicial review to protect the rights of potential subjects of investigation.  All of these tools have been routinely and consistently approved by the courts.").  Congress's decision to vest the FISC with jurisdiction to review the reasonableness of procedures for searches or surveillance under the FAA is perfectly consistent with the traditional function of Article III courts in protecting the privacy rights of persons whose interests are potentially implicated by proposed searches, seizures, or compulsory processes.  *Cf. Mistretta*, 488 U.S. at 390-91 (given the judiciary's traditional role in determining individual criminal sentences, the judiciary could constitutionally participate in formulating general sentencing guidelines).

Moreover, the decision the FISC is called upon to render under Section 702 is not merely "advisory," any more than a decision on a traditional search warrant or wiretap application is "advisory."  If the FISC disapproves the government's proposed targeting or minimization procedures under Section 702, that decision has legal effect, because it bars the government from conducting collections under the statute if it does not remedy the deficiency within thirty days.  A FISC order approving the proposed certification and procedures also has an effect on third parties, because it authorizes the government to issue directives (compulsory process analogous to a subpoena) to electronic communications service providers.  The fact that the providers have a right to challenge a directive in court further establishes that a FISC order approving a Section

702 certification is not an advisory opinion but a legally enforceable order potentially subject to legal challenge.  *See Clapper*, 133 S. Ct. at 1154 ("[A]ny electronic communications service provider that the Government directs to assist in § 1881a surveillance may challenge the lawfulness of that directive before the FISC.").

### III. <u>The FAA Does Not Violate the First Amendment</u>

The defendants generally contend that Section 702 violates the First Amendment.  That claim should be rejected.

First, the defendants do not claim that Section 702 has had any effect on their own First Amendment rights.  Instead, by attaching a brief in an unrelated case and adopting all of its arguments, they claim that the statute has an unconstitutional chilling effect on Americans generally and on various specific third parties.  Such claims do not provide a basis for exclusion of evidence.  Although the Supreme Court has fashioned exclusionary rules for evidence obtained in violation of defendants' Fourth Amendment rights or Fifth Amendment *Miranda* rights, defendants cite no case in which a court has excluded evidence on the ground that it was obtained under a statute that unconstitutionally chills the First Amendment rights of third parties.  *See United States v. Aguilar*, 883 F.2d 662, 697 (9th Cir. 1989) (noting that defendant's claim that evidence should be suppressed "is a *Fourth* Amendment claim, rather than a First") (citation omitted); *Abell v. Raines*, 640 F.2d 1085, 1088 (9th Cir. 1981) (rejecting suppression claim based on alleged First Amendment violations in government investigation because "the Fourth Amendment (and the exclusionary rule) provide the only basis" upon which the evidence could have been excluded); *United States v. Sanders,*  597 F.2d 63, 64 (5th Cir. 1979) (holding in an obscenity case that the proper remedy for a violation of First Amendment right is the return of the materials to the owner, not suppression); *United States v. Bush,* 582 F.2d 1016, 1021 (5th Cir. 1978) (same);

*cf. United States v. Mayer*, 503 F.3d 740, 747 (9th Cir. 2007) ("We have not found any cases where an indictment was dismissed because the preceding investigation allegedly violated the *First Amendment* rights of a third party.").

Further, as the Supreme Court and other courts have held, when the government's investigative activities have an effect on individuals' First Amendment interests, those interests are safeguarded by adherence to Fourth Amendment standards. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (requiring only that the Fourth Amendment be applied with "scrupulous exactitude" where First Amendment interests are implicated by a search); *Mayer*, 503 F.3d at 747-48 (noting that the "*Fourth Amendment* provides the relevant benchmark" for a challenge to a criminal investigation on First Amendment grounds); *Redd v. City of Enterprise*, 140 F.3d 1378, 1383-84 (11th Cir. 1998); *United States v. Rubio, as modified,* 727 F.2d 786, 791 (9th Cir. 1984)("We strongly disagree with any inference that criminal investigation is somehow prohibited when it interferes with . . . First Amendment interests.  When activity protected by the First Amendment becomes the subject of a criminal investigation, the protections afforded by the Fourth Amendment come in play."); *Reporters Comm. For Freedom of the Press v. AT&T*, 593 F.2d 1030, 1054-59 (D.C. Cir. 1978); *Jabara v. Kelley*, 476 F. Supp. 561, 572 (E.D. Mich. 1979) ("[T]he first amendment and the fourth amendment provide coextensive zones of privacy in the context of a good faith criminal investigation," including warrantless electronic surveillance by NSA and FBI), *vacated on other grounds*, 691 F.2d 272 (6th Cir. 1982).

Accordingly, "surveillance consistent with Fourth Amendment protections in connection with a good faith law enforcement investigation does not violate First Amendment rights, even though it may be directed at communicative or associative activities." *Gordon v. Warren Consol. Bd. of Educ.*, 706 F.2d 778, 781 n.3 (6th Cir. 1983) (collecting cases); *see Mayer*, 503 F.3d

at 750 (explaining that undercover surveillance lawful under the Fourth Amendment does not violate First Amendment rights); *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 471 (D.C. Cir. 1991) (same in context of FISA surveillance); *cf. Ramsey*, 431 U.S. at 623-24 (customs officers' inspection of international mail, without reading the correspondence, did not violate the First Amendment).   As set forth above, the government's collection of foreign intelligence information under Section 702 does not violate the Fourth Amendment.   And because defendants do not allege, and cannot show, that the government has conducted Section 702 collection with any purpose to suppress expressive or associative activity, their argument fails.

Even if the defendants could properly bring an independent First Amendment overbreadth claim in this context, they must show that the statute's "overbreadth [is] *substantial*, not only in an absolute sense, but also relative to [its] plainly legitimate sweep."   *United States v. Williams*, 553 U.S. 285, 292 (2008); *see also id.* (noting that this requirement is "vigorously enforced").   The defendants have not made such a showing.   To the contrary, the defendants' overbreadth claim relies on the same allegation – that people will alter their behavior because they fear the possibility that their communications will be incidentally acquired under Section 702 – that the Supreme Court found to be too speculative to establish a cognizable injury.   *See Clapper*, 133 S. Ct. at 1152 (plaintiffs could not bring constitutional challenge to Section 702 based on allegations that subjective fear of surveillance under Section 702 would deter plaintiffs from "conducting constitutionally protected activities") (citation omitted).   Moreover, as the Supreme Court recognized, the self-censorship and countermeasures that the defendants claim are caused by fear of Section 702 surveillance are "not fairly traceable" to that statute because "[t]he government has numerous other methods of conducting surveillance" of non-U.S. persons overseas in addition to Section 702.   *Id.* at 1149, 1151.

Finally, although "constitutional violations may arise from the chilling effect of regulations that fall short of a direct prohibition against the exercise of First Amendment rights," *id.* at 1152 (internal quotation marks omitted), the Court has not recognized constitutional violations based on chilling effects that allegedly "aris[e] merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some *other* and additional action detrimental to that individual." *Id.* at 1152 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).  Because Section 702 does not "regulate, constrain, or compel any action" by an individual, *id.* at 1153, the mere subjective fear of surveillance under that statute does not amount to a constitutionally significant burden on the exercise of First Amendment rights.

## **CONCLUSION**

For the reasons stated above, Section 702 of the FAA is constitutional.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By : _ /s/ *Karen E. Gilbert* _____
Karen E. Gilbert
Assistant U.S. Attorney
Fla. Bar No. 771007
99 N.E. 4th Street, Suite 800
Miami, Florida 33132-2111
Telephone Number (305) 961-9161
Fax Number (305) 536-4675

_ /s/ *Adam S. Fels* _____
Adam S. Fels
Assistant U.S. Attorney
Court Identification No. A5501040
99 N.E. 4th Street, Suite 800
Miami, Florida 33132-2111
Telephone Number (305) 961-9325
Fax Number (305) 536-4675

_ /s/ *Jennifer E. Levy* _____
Jennifer E. Levy
Trial Attorney
D.C. Bar No. 291070
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone Number 202-514-1092
Fax Number 202-514-8714

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2014, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.

/s/ *Karen E. Gilbert*
Karen E. Gilbert