**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 12-60298-CR-BLOOM/O'SULLIVAN**

**UNITED STATES OF AMERICA**
      **Plaintiff,**

    **v.**

**RAEES ALAM QAZI**
**and SHEHERYAR ALAM QAZI,**

        **Defendants.**
_____

**DEFENDANTS' RESPONSE TO UNITED STATES'**
**MEMORANDUM ON THE CONSTITUTIONALITY**
**OF THE FISA AMENDMENTS ACT OF 2008**

**Introduction**

The government's Memorandum of the Merits of Defendants' Facial Constitutional Challenge to the FISA Amendments Act of 2008 asks the Court to approve a radical expansion of the power of Executive Branch agents to read and listen to Americans' electronic communications without a warrant or any other form of individualized judicial review. The government's innovative claims include:

- The Warrant Clause is not implicated by electronic surveillance of Americans' electronic communications, whether at acquisition, retention, access, or use, as long as the original, nominal target is a non-United States person abroad;

- The massive acquisition, retention, accessing, and use of Americans' electronic communications, while inevitably concomitant to the government's program, are merely "incidental" and therefore receive no protections under the Fourth Amendment;

- The Fourth Amendment should have an exception that allows mass collection of Americans' electronic communications and subsequent retention, access, and use of said communications, without individualized judicial review.

The government claims that Americans lack any meaningful privacy interest in their international electronic communications, permitting government agents to rummage through and read Americans' emails and listen to their phone calls without restriction. This results in a stunning and unjustified depreciation of constitutionally protected American freedom.

No precedent approves the massive scope of the government's acquisition of Americans' communications or the government's claims that the Fourth Amendment protections are inapplicable once communications have been acquired.[1]  No precedent allows the government to inspect the contents of millions of American communications simply because they might relate to the "foreign affairs" of the United States.  No precedent authorizes government agents to retain, database, access, listen to, read, and disseminate the most private communications of United States citizens that are written and sent from homes in the United States, simply because the communications were acquired by the government's information dragnet.  The courts have yet to countenance such a systematic and pervasive violation of the basic privacy rights of Americans.

The government claims that the Court cannot consider a facial challenge to the statute because the defendant lacks standing to challenge the constitutionality of the FAA.  DE 201 at 1.  Not so.  The federal courts have routinely considered challenges to the FAA since its day of enactment, most notably in the litigation leading to *Clapper v. Amnesty U.S.A.*, 133 S. Ct. 1138 (2013).  On its face, the Court can strike down the FAA for several reasons:

- Under the Fourth Amendment, as in the electronic surveillance statute in *Berger v. New York*, 288 U.S. 41, 44 (1967), "the language of the statute is too

---

[1] The defense understands that telephone calls and emails are intercepted under § 702 of the FISA Amendments Act (FAA).  Similar communications such as text messages, instant messages, and online direct communications such as Skype should be incorporated into the definition of electronic surveillance to the extent that such communications are being intercepted under § 702.

broad in its sweep," failing to implement sufficient safeguards to prevent warrantless, unreasonable searches and seizures of Americans' electronic communications;

- Under the First Amendment, the statute's facial breadth and vagueness unconstitutionally chill the exercise of expressive rights by millions of Americans in their use of electronic communications;

- Under the doctrine of separation of powers, § 702 institutionalizes an administrative, law-making role for judges that violates Article III of the Constitution and undermines judicial neutrality.

The statute also violates the Constitution as applied, as the known programs of § 702 fail to satisfy Fourth Amendment requirements.  Because the FAA program intrudes upon core privacy rights, without any meaningful counterbalancing protections, the Court should find that § 702 of the FAA – on its face and as applied – violates the protections of the First and Fourth Amendments and Article III's limitations on judicial power.

Alternatively, if the Court desires to avoid considering serious constitutional questions, § 702 should be construed in a narrow and limited way.  Such a construction should foreclose the current surveillance programs implemented by the government under § 702, requiring suppression of all evidence obtained or derived from the violation of the properly and narrowly construed statute.  *See Zadvydas v. Davis*, 533 U.S. 678 (2001) (finding that serious constitutional problems with indefinite detention statute warranted statutory interpretation that limited detention to six months).

In the event the foregoing analyses do not lead to suppression of evidence in this case, the Court must determine whether the surveillance exceeded the scope of the programmatic authorizations.  If the surveillance was not lawfully authorized or conducted, the Court should order suppression of all information obtained and derived from the warrantless surveillance under 50 U.S.C. § 1806(g).

**Procedural History**

On November 30, 2012, Defendants Raees Alam Qazi and Sheheryar Qazi were indicted on charges of conspiracy to provide material support to terrorists in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2, and conspiracy to use a weapon of mass destruction in violation of 18 U.S.C. § 2332A and 18 U.S.C. § 2.   On December 6, 2012, the Defendants were provided with notice that the government intended to use "information obtained or derived from electronic surveillance or physical search conducted pursuant to [FISA], 50 U.S.C. §§ 1801-12 and 1821-29."  DE 9, 10. The notices provided by the government are citations to Titles I and III of FISA, which respectively allow for electronic surveillance and physical search when a significant purpose is to obtain foreign intelligence and when the government has satisfied the Foreign Intelligence Surveillance Court that the target of the surveillance is an agent of a foreign power. *See* 50 U.S.C. §§ 1801, 1804-05, 1821, and 1823-24.   On April 7, 2013, Defendants filed motions seeking to compel production of FISA materials pertaining to electronic surveillance and physical search under Titles I and III.  DE 45, 46.

On April 22, 2013, Defendant S. Qazi filed a Motion to Compel Advance Notice of the Government's Intent to Use Information Obtained of Derived Pursuant to the FISA Amendments Act (FAA), which Defendant R. Qazi moved to join the following day. DE 67, 69.   The provision of the FAA at issue in the Defendants' motions is codified as Section 702 of Title VII of FISA.  *See* 50 U.S.C. §§ 1881-1881g.  Section 702 permits the targeting of non-U.S. persons reasonably believed to be located outside the United States, in order to acquire foreign intelligence information, subject to certain statutory requirements.  *See* 50 U.S.C. § 1881a.

On May 6, 2013, after the government filed a response and Defendant S. Qazi filed a reply, the Court (Judge O'Sullivan) issued an Order granting Defendants' motion and ordering

4

the government to disclose, *inter alia*, "whether the affidavit and other evidence offered in support of any FISA order relied on information obtained under and derived from an FAA surveillance order."   DE 77.   On May 9, 2013, the government filed a motion seeking reconsideration of the Court's order.   DE 80.   The government argued that it was not required to disclose any classified content of any FISA application and noted that it had already "provided both the defendant and the Court with notice that any FISA-obtained or derived information that it would enter into evidence was acquired pursuant to Title I and Title III of FISA."   *Id.* at 2.   On June 5, 2013, the Court entered an Order staying the previous order of May 6, 2013, pending resolution of the Defendants' motion to compel production of FISA materials.   DE 105.   By this time, Defendant S. Qazi had filed another FISA-related motion.   DE 96.   In a two-page motion filed on May 28, 2013, he requested that the Court declare the FAA unconstitutional due to violations of "the First and Fourth Amendments to the U.S. Constitution as well as Article III of the Constitution."   DE 96, at 1.   On July 30, 2013, the government responded to this motion.   DE 130.   In their response, the government maintained that it "does not intend to use any information obtained or derived from FAA-authorized surveillance as to which Defendant S. Qazi is an aggrieved person."   *Id.* at 1.   The government argues that there is no suppression or other remedy available to Defendant S. Qazi from a declaration that the FAA is unconstitutional, and that any such declaration would be an impermissible advisory opinion.   *See id.* at 2-3.   The government filed another response on the same day, in which it admitted its general duty to provide specific notice when prosecutors intend to use or disclose evidence derived from FAA surveillance of a criminal defendant.   *See* DE 131 at 2-3, n. 3.

On September 10, 2013, Defendant S. Qazi replied to the government's responses.   DE 144.   This reply presented evidence of testimony to the United States Senate by Senator Dianne

Feinstein, Chair of the Senate Select Committee on Intelligence, advocating for an extension to the FAA, which was set to expire at the end of 2012.  During her testimony, Senator Feinstein indicated that FAA surveillance contributed to the apprehension and prosecution of both Defendants:

> [I]f Members want to see the specific cases where FISA Amendments Act authorities were used, they can go and look at the classified background of these cases . . . First, in November, 1 month ago, two arrests for conspiracy to provide material support to terrorists and use a weapon of mass destruction. That was Raees Alam Qazi and Sheheryar Alam Qazi. They were arrested by the FBI in Fort Lauderdale, FL.

Testimony of Senator Diane Feinstein in support of the FISA Amendments Reauthorization Act of 2012, 145 Cong. Rec. S8393 (daily ed. Dec. 27, 2012) ("Feinstein Testimony"), *available at* http://www.gpo.gov/fdsys/pkg/CREC-2012-12-27/html/CREC-2012-12-27-pt1-PgS8383-2.htm. Senator Feinstein's comments suggest that at least some of the information that was obtained by the government against the Defendants in the present case were obtained through or derived from FAA surveillance.   This calls into question the government's repeated argument that the Defendants are not "aggrieved persons" with respect to the FAA.  DE 131.

On March 14, 2014, Judge Scola referred Defendant S. Qazi's motion for a declaration that the FAA is unconstitutional to Judge O'Sullivan.  DE 167.  On March 28, 2014, the Court ordered the government to file "a substantive memorandum of law addressing the defendant's [S. Qazi's] assertion that the FISA Amendments Act of 2008 is unconstitutional" by April 10, 2014. DE 173.

On April 8, Defendant R. Qazi moved to adopt Defendant S. Qazi's motion seeking a declaration that the FAA is unconstitutional.   DE 175.   The next day, the Court granted Defendant R. Qazi's motion.  DE 176.  On April 10, the government moved for an extension of time to respond to Defendant R. Qazi's adoption of DE 96.  DE 178.  Since the government's

6

prior response had only addressed the issues raised with respect to Defendant S. Qazi, the government requested the opportunity to respond to the issues raised in the original motion as they applied to Defendant R. Qazi.  *Id.* at 2.  On April 11, 2014, the Court granted the government additional time until May 12, 2014, to: (1) file a "supplemental substantive memorandum of law on the merits of Sheheryar Qazi's constitutional challenge to the [FAA]"; and (2) "respond to R. Qazi's adoption of DE 96 [S. Qazi's motion]."  DE 179.  The Court also set a deadline for the government to file any motion for reconsideration. *Id.*

On April 28, 2014, the government filed a motion to reconsider the Court's March 28, 2014, order that the government brief the constitutionality of the FAA as to Defendant S. Qazi. DE 181.  The government claimed that Defendant S. Qazi lacks standing to challenge the FAA and a decision by the Court on the constitutionality of the FAA would not affect any substantive rights.  *Id.*  The government also requested that the Court quash or hold in abeyance its orders that the government submit any substantive memorandum of law on the merits of the FAA's constitutionality until after it reviewed the government's response to Defendant R. Qazi's adoption of Defendant S. Qazi's motion.  *Id.* at 1.

On May 12, 2014, in accordance with the Court's April 11, 2014, order, the government filed its response to Defendant R. Qazi's adoption of Defendant S. Qazi's motion.  DE 195.  This response repeated the argument that the government does not intend to use or disclose any information obtained or derived from FAA-authorized collection as to which Defendant R. Qazi is an aggrieved person, that there is no suppression or other remedy that could be available to Defendant R. Qazi from a declaration regarding the constitutionality of the FAA, and that any such declaration would be an impermissible advisory opinion.  *Id.* at 2.  On the same date, the Court denied the motion for reconsideration as to Defendant S. Qazi's constitutional challenge,

7

and ordered the government to file its substantive response to the Defendants' motion by May 19, 2014.  DE 194.  On May 14, 2014, the government complied with the Court's order and filed a substantive response to the Defendants' constitutional challenge of the FAA.

**Argument**

A.      **The Government Must Disclose Its Interpretation Of "Derived From" In 50 U.S.C. § 1806 In Order To Afford Mr. Qazi And The Court A Meaningful Opportunity To Assess The Government's Standing And Notice Arguments.**

Before the Court ordered the government to address the constitutionality of the FAA, the government repeatedly insisted that Mr. Qazi did not have "standing" to challenge the statute – yet that assertion rests on a legal interpretation the government has failed to disclose to either Mr. Qazi or the Court.  Until the Court knows precisely how the government is interpreting § 1806 for notice and suppression purposes, it cannot assess the government's threshold claim that the FAA does not implicate Mr. Qazi's rights.  That is especially critical in this case for at least three reasons: (1) because the government has a history of failing to provide notice of FAA surveillance when it was required to do so, based on its own narrow and legally untenable interpretation of its notice obligations; (2) because public statements and disclosures, including those of Senator Dianne Feinstein and the Privacy and Civil Liberties Oversight Board, strongly suggest that the FBI relied on FAA surveillance in its investigation in this case; and (3) because the government should not be the sole arbiter of whether Mr. Qazi is entitled to notice, at least not in close cases where it has a plain interest in construing the defendant's rights far too narrowly.  Accordingly, the government should be required to spell out precisely how it is interpreting its notice obligations, and why its reliance on any information gathered using FAA surveillance does not trigger Mr. Qazi's right to notice and to seek suppression.

**1. The Government Has A Record Of Improperly Withholding Notice From Criminal Defendants Based On Narrow And Undisclosed Interpretations Of Its Obligations Under § 1806.**

The government argues that Mr. Qazi cannot invoke § 1806 to seek suppression of FAA-derived evidence because the government has determined, unilaterally, that its evidence in this case does not rest on "any information obtained or derived from FAA-authorized surveillance as to which either defendant is an aggrieved person."  DE 195 at 1 (emphasis removed); *see* DE 181; DE 130.  The government equates this determination with the conclusion that the defendant's FAA challenge "does not implicate . . . any of his substantive rights" under the Constitution and that, as a result, the defendant lacks standing to challenge the FAA.  DE 195 at 3.  But the government's statements raise more questions than they answer – because, after more than a year of litigating this issue, it still has not clearly explained how it interprets its notice obligations when it comes to FAA surveillance.[2]  Instead, the government has simply denied in conclusory terms any duty to give notice to the defendants, by reciting the statutory elements for notice and blankly asserting that they are not met.  *See, e.g.*, DE 131 at 2.  Yet the government's vague descriptions leave key terms undefined: most crucially, how and when the government determines whether evidence is "derived from" FAA surveillance under both § 1806 and the Fourth Amendment.  That definition is critical, because the question of whether the Constitution

───────────────────

[2] The government's view of its notice obligation has been a moving target throughout this case.  In a two-page filing last year, the government initially claimed that Sheheryar Qazi's motion to compel notice of FAA surveillance was moot.  *See* DE 80 at 2.  After the Court granted the defendant's motion, the government pointedly told the Court that it did not have an obligation to notify defendants of FAA-derived evidence.  DE 88 at 6.  Months later, the government abandoned that position, explaining that it *would* provide notice of evidence derived from the FAA, at least in certain circumstances, even while it declined to explain in any detail how it defined the key term "derived from."  DE 131 at 3 n.2.  That remains the key question—especially where reports indicate that the government routinely searches its immense database of FAA-collected communications in the course of criminal investigations like this one. *See infra*, Part A.2.

bears on the rights of the defendant is ultimately one for the Court, and not the government, to decide.

The government has never – either in this litigation or elsewhere – explained its specific, internal interpretation of the statutory term "derived from" in § 1806.  The government's failure to clearly explain its own legal interpretation of its notice obligation means that it is unable to give meaningful, let alone credible, assurances to the defendant and to the Court about the applicability of § 1806 or the Constitution in this case. After failing to give notice of FAA surveillance to criminal defendants around the country for five years, the government now admits that "information obtained or derived from [traditional] FISA collection *may, in particular cases*, also be derived from prior [FAA] collection."  *Gov't Unclassified Mem. in Opp. to Mot. to Suppress Evidence Obtained or Derived From Surveillance Under the FISA Amendments Act and Mot. for Discovery* at 9 n.2, *United States v. Muhtorov*, No. 1:12-cr-00033 (D. Colo. May 9, 2014) (DE 559) ("Gov't *Muhtorov* Mem.") (emphasis added); *see* DE 131 at 2.

The government has indicated its general view that § 1806 "incorporates legal principles *similar to* those applied under the Fourth Amendment's 'fruit of the poisonous tree' doctrine and Title III of the Wiretap Act."  *Additional Prehearing Questions for John Carlin Upon His Nomination to be Ass't Att'y Gen. for National Security*, Dep't of Justice at 9, *available at* http://1.usa.gov/1mSQqdj ("Carlin QFR") (emphasis added); *see* DE 131 at 3 n.2.  But these general statements do not suffice where the record suggests that the government may, to this day, interpret its notice obligations differently when it comes to foreign-intelligence surveillance. In particular, if the government does not view its notice obligations as absolutely identical to the Fourth Amendment's requirements (or the statute's requirements), then its determination of Mr. Qazi's rights cannot possibly be credited.  The government should provide a precise explanation

of how it interprets its obligation to give notice of FAA surveillance – one that allows the Court to determine whether that interpretation is correct as a matter of both law and fact in this case.

There is reason to believe that the government's interpretation of "derived from" here is unduly narrow to protect criminal defendants' statutory and constitutional rights. The government has reportedly long held a "narrow understanding of what 'derived from' means in terms of when it must disclose specifics to defendants" in the context of foreign-intelligence surveillance (and of § 1806 in particular). Charlie Savage, *Door May Open for Challenge to Secret Wiretaps*, N.Y. Times, Oct. 16, 2013, *available at* http://nyti.ms/1r7mbDy.[3]   The government has never publicly described that "narrow understanding" – either before or after its notice policies began to draw scrutiny.  Yet, according to the same reports, for years after the passage of the FAA in 2008, federal prosecutors "believed [the government] would have to disclose the use of that program only if it introduced a recorded phone call or intercepted e-mail gathered *directly* from the program – and for five years, they avoided doing so." *Id.* (emphasis added).  The government adopted and applied this rule entirely behind closed doors, despite § 1806's express requirement that prosecutors give notice of evidence "derived from" FAA surveillance.  The consequences were significant.  This interpretation allows the government to "launder" FAA information through traditional FISA; even when the government included FAA-obtained information in an application for traditional FISA surveillance, it did not consider evidence obtained through traditional FISA to be "derived" from the FAA for purposes of § 1806

---

[3] The government's "narrow understanding" of its notice obligation led the Solicitor General to falsely assure the Supreme Court, in *Clapper*, 133 S. Ct. 1138, that "someone else would have legal standing to trigger review of the program because prosecutors would notify people facing evidence derived from surveillance under the [FAA]."  *See* Savage, *supra*.  The government appears not to have had a uniform view of its notice obligation at the time.  *See id.* ("Mr. Verrilli's assurances clashed with the practices of national security prosecutors, who had not been alerting such defendants that evidence in their cases had stemmed from wiretapping their conversations without a warrant.").

notice.  In this way, the government kept an unknown number of defendants from ever learning, or challenging, the true underlying source of the government's evidence, and it thereby avoided *any* judicial review of the controversial surveillance statute in a public court.

The government has recently altered its FAA notice policy, but the new policy remains almost as opaque as the old one.  While the government has notified a handful of criminal defendants of FAA surveillance, it has done so without fully explaining the legal principles and factual benchmarks that control its new determinations concerning when evidence is "derived from" FAA surveillance.[4]  That is particularly significant if the government maintains its belief, in some form, that its ordinary notice obligations under the Fourth Amendment are different in the foreign-intelligence context.  If so, that view should not be hidden from Mr. Qazi or the Court.  In sum, neither Mr. Qazi nor the Court have any idea whether the government has abandoned its old, flawed interpretation in whole or only in part, because the government has nowhere detailed the standards it is now applying.[5]

---

[4] Compounding these questions is the fact that the government has provided notice to a total of only five defendants, over six years. That number is exceedingly small given that the FBI searches its database of FAA communications in virtually every national-security investigation. Moreover, the government has publicly identified at least three cases where it relied upon FAA surveillance yet never filed a notice with the court.  *Compare* Charlie Savage, *N.S.A. Chief Says Surveillance Has Stopped Dozens of Plost*, N.Y. Times, June 18*,* 2013, *available at* http://nyti.ms/11ZXZoZ (chronicling FBI Deputy Director Sean Joyce's testimony to House Intelligence Committee disclosing that FAA surveillance led to apprehension of defendants in *Zazi*, *Headley*, and *Ouazzani*, *infra*); *with United States v. Zazi,* 09-cr-663 (E.D.N.Y); *United States v. Headley*, 09-cr-830 (N.D. Ill.); *United States v. Ouazzani*, 10-cr-25 (W.D. Mo.).

[5] FISA's definition of "derived from" incorporates the constitutional standard drawn from the "fruit of the poisonous tree" doctrine of the Fourth Amendment.  *See United States v. Schulz*, 486 F. Appx. 838, 841 (11th Cir. 2012) (setting out constitutional standard); *see also Chandler v. U.S. Army*, 125 F. 3d 1296, 1304 (9th Cir. 1997) (describing "evidence derived therefrom" as "well established term of art").  Yet the government's public statements suggest that it believes that "derived from" in FISA means something different. *See, e.g.*, Carlin QFR 9 (stating that § 1806 "incorporates legal principles *similar to* those applied under the Fourth Amendment's 'fruit of the poisonous tree' doctrine and Title III of the Wiretap Act") (emphasis added).  If that is

    **2.**  **FAA Surveillance Contributed To The Government's Investigation In This Case.**

The government's definition of "derived from" is a crucial one because there is evidence that the FBI relied on FAA surveillance in its investigation of Mr. Qazi. As the defendants have long pointed out, Senator Feinstein specifically identified this prosecution in connection with FAA surveillance, in a statement on the Senate floor, as she urged her colleagues to reauthorize the FAA. *See* Feinstein Testimony, *supra*. That is, Senator Feinstein proffered the Qazi prosecution as a prime example of how well FAA surveillance "has worked." *Id*. The government, to this day, has never addressed this statement.

But that is not the only evidence that the FAA played a role in this case. In recent weeks, new disclosures have shown how frequently the FBI searches FAA information in the course of its investigations, especially in national-security prosecutions like this one.[6] The Privacy and Civil Liberties Oversight Board ("PCLOB") has reported that "whenever the FBI opens a new national security investigation or assessment, FBI personnel will query previously acquired information from a variety of sources, including Section 702 [of the FAA], for information relevant to the investigation or assessment." *PCLOB Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* ("PCLOB Report") at 59 (July 2, 2014), *available at* http://bit.ly/1pJz0EA. Moreover, the government has recently admitted that the FBI intermingles information obtained using traditional FISA warrants with information obtained using FAA surveillance, and that the FBI "does not track" how many searches of this combined pool it conducts using U.S. person identifiers. Letter from the Office

---

indeed the government's view, it should be required to articulate why the meaning of "derived from" in FISA is not *identical to* that term's meaning under the Fourth Amendment.

    [6] When conducted using the names of U.S. persons, like Mr. Qazi, these searches are commonly called "backdoor searches," because they occur without a warrant.

of the Director of National Intelligence to Hon. Ron Wyden at 4 (June 27, 2014), *available at* http://1.usa.gov/1pETOgA; *see also* PCLOB Report at 59.   That disclosure raises serious questions about how the FBI and prosecutors track their reliance on FAA-obtained information, and whether they are consistently able to determine whether evidence is "derived from" FAA surveillance when it comes time to give notice to defendants.

Practically speaking, the question is this: if the FBI searched its FAA database for information about Mr. Qazi – as these reports strongly suggest it did – what did that search produce and how did the FBI rely on it?  If the search revealed communications to or from Mr. Qazi, then the government must explain how the FBI subsequently used those communications in its investigation.   Only then, can Mr. Qazi and the Court properly test whether the government's evidence is "derived from" information obtained pursuant to the FAA.   The government has never addressed when it will give notice under § 1806 of a backdoor search.   In fact, to date, the government has identified only a single type of factual scenario where it might consider its evidence derived from FAA-obtained information: when that information specifically appears in a subsequent warrant application.   *See, e.g.*, Gov't *Muhtorov* Mem. at 9 n.2.  But that is plainly not the only circumstance in which evidence is "derived from" an earlier source, under either § 1806 or the Fourth Amendment. *See Schulz*, 486 F. Appx. at 841.   There are many ways in which the FBI's investigation may have relied on Mr. Qazi's communications collected under the FAA without those communications appearing directly in a warrant application.   Those communications might have led the FBI to witnesses or informants who provided information and assistance.   They might have prompted the FBI to issue subpoenas or national-security letters for further information, such as financial records, toll billing records, internet subscriber data, or travel records.   They might have prompted the FBI to seek a

production order under Section 215 of the Patriot Act, 50 U.S.C. § 1861, for similar records. They might have caused the FBI to upgrade its inquiry from an assessment to a more intrusive type of investigation.  All that might have happened before the FBI ever sought a warrant. And in all those scenarios, as well as many others, Mr. Qazi would be entitled to challenge the government's evidence as "derived from" FAA surveillance.[7]  Yet the government has kept from both Mr. Qazi and the Court the legal and factual information needed to assess this very question.

### 3. The Government Cannot Be The Sole Arbiter Of Mr. Qazi's Right To Notice.

Despite obvious and persistent questions about the government's use of FAA-derived evidence in this case, the government appears to believe that it gets to decide whether Mr. Qazi has a right to seek suppression, alone and in secret.  That is plainly unjustifiable, given the government's clear conflict of interest.  Mr. Qazi is entitled to have the Court decide issues going to his basic constitutional rights, not the government.  Thus, if Mr. Qazi has any colorable claim of suppression, the Court must ensure that he has sufficient notice to press his arguments fairly before the Court.  For the reasons described above, it appears extremely unlikely that the government has applied such a standard in making its FAA notice determinations in this case.

This final point is a simple one.  Where the suppression question is likely to be a close one, due process requires notice to be given so that the Court, and not the government, is ultimately playing the role of gatekeeper.  Thus, if Mr. Qazi has a colorable claim that the

---

[7] These possibilities underscore the need for disclosure and a hearing to determine the extent to which the government's evidence in this case is derived from any interception of Mr. Qazi's communications pursuant to the FAA.  The Court may order such disclosure and a hearing under 50 U.S.C. § 1806 or, on due process grounds, directly under the Fourth and Fifth Amendments. *See* Part B.1, *infra*; *cf. United States v. Schmidgall*, 25 F. 3d 1523, 1527–28 (11th Cir. 1994) (conducting *Kastigar* hearing to determine whether prosecution's evidence was "derived from" defendant's immunized testimony).

government's evidence is "derived from" FAA surveillance of his communications, then he is entitled to notice. That is because due process entitles Mr. Qazi to test, on the facts of this case, whether the government's evidence should be suppressed as the fruit of unlawful surveillance. Due process does not leave these questions to the government's sole judgment and discretion. *See Smith v. Black*, 904 F. 2d 950, 965 (5th Cir. 1990) (due process mandates the disclosure of information in the government's possession if nondisclosure would "affect the outcome of [a] suppression hearing"); *see also United States v. Gamez-Orduño*, 235 F. 3d 453, 461 (9th Cir. 2000); *cf., e.g., United States v. Eastman*, 465 F. 2d 1057, 1062–63 n.13 (3d Cir. 1972) (concluding that the Wiretap Act's statutory notice provision was "intended to provide the defendant whose telephone has been subject to wiretap an opportunity to test the validity of the wiretapping authorization").

It would make little sense if the government could predetermine, as part of its notice analysis, difficult or novel legal questions that a defendant would properly put before the Court had he been made aware. Accordingly, the government must give notice where Mr. Qazi could reasonably argue that evidence is "derived from" FAA surveillance of his communications. This allows the Court to properly and ultimately decide whether there is a constitutional or statutory basis for suppression.

**B.     Mr. Qazi Is Entitled To Discovery Concerning The Government's Interception Of His Communications Under The FAA.**

The Court should order disclosure under Sections 1806(f) and (g) to make clear the role that FAA surveillance of Mr. Qazi's communications played in the government's investigation of him, and to provide Mr. Qazi with material that allows him to craft a challenge to the specific manner in which FAA surveillance was used here. This Court must "make an accurate determination of the legality of the surveillance" under § 1806(f), and as required by due

process.  50 U.S.C. § 1806(g); *Brady v. Maryland*, 373 U.S. 83 (1963) Accordingly, the Court should order disclosure of information including but not limited to: (1) the government's applications to the FISC seeking authorization for, and the FISC's orders authorizing, FAA surveillance that intercepted communications to or from Mr. Qazi; (2) notice of all communications to or from Mr. Qazi intercepted under the FAA; (3) all evidence obtained under the FAA that the government intends to use at trial or that is material to Mr. Qazi's defense; (4) all evidence derived from communications intercepted under the FAA that the government intends to use at trial; and (5) records indicating how Mr. Qazi's communications were intercepted and identified under the FAA or were derived from communications collected under the FAA. *See* Part B.2, *infra*.

> ### 1.  Disclosure Of Additional Information Is Required By Both FISA And The Due Process Clause.

FISA provides two avenues that would allow Mr. Qazi to craft a suppression motion addressed to the specific FAA surveillance to which he was subjected.  First, even where the Attorney General has certified that disclosure of materials relevant to a motion to suppress would harm the national security, FISA provides that "the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance."  50 U.S.C. § 1806(f).  Second, even where § 1806(f) does not mandate disclosure, § 1806(g) requires disclosure "to the extent that due process requires" it, expressly incorporating the protections of the Fifth Amendment's due process clause.  50 U.S.C. § 1806(g).

a. Disclosure Is Necessary To Make An Accurate Determination Of The Legality Of The Surveillance, In Light Of The Complexity Of The Issue And The Lack Of Prior Judicial Interpretation Of The FAA.

Mr. Qazi's challenge to the FAA presents significant and complex legal and factual questions, the resolution of which justify disclosure of information to defense counsel to facilitate an informed adversarial process. *See United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982). Only one federal court has previously addressed the constitutionality of FAA surveillance. *See United States v. Mohamud*, 2014 WL 2866749 (D. Or. June 24, 2014). In light of the complexity of the issues and the relative absence of judicial interpretations of § 1881a, disclosure is warranted. The issues before the Court are many and complicated. This Court must evaluate whether any order or orders authorizing the FAA surveillance of Mr. Qazi comply with the Fourth Amendment and §1881a, and whether the government's applications to the FISC seeking those orders contained material omissions or misrepresentations or were otherwise deficient. *Cf. Franks v. Delaware*, 438 U.S. 154 (1978).

This Court must further determine whether the targeting and minimization procedures in use at the time the government obtained any of Mr. Qazi's communications under the FAA complied with the Fourth Amendment and § 1881a, whether the government followed those targeting and minimization procedures, and whether the methods used to collect, identify, and search Mr. Qazi's communications were lawful. It must determine whether Mr. Qazi's communications were obtained via "to/from" or "about" searches of targeted communications, whether the selectors for which the government searched were consistent with the FAA's requirements (e.g., whether they were identified with a non–United States person), whether Mr. Qazi's communications obtained pursuant to § 1881a were with a lawfully targetable non–United States person, and whether, if the communications were not properly obtained, they were

inappropriately retained by the government and identified via later queries seeking selectors linked to Mr. Qazi or other individuals.  Finally, the Court must assess whether other evidence derived, directly or indirectly, from the FAA surveillance must be suppressed as the fruit of an unconstitutional search.  *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963); *United States v. Santa*, 236 F. 3d 662, 676–78 (11th Cir. 2000).  Answering the latter question will involve determining whether the applications for traditional FISA warrants were tainted by information unconstitutionally obtained pursuant to the FAA.

Not only are these questions factually and legally complex, but this Court must answer them without the benefit of a developed body of judicial precedent.  That sets this case apart from cases involving traditional FISA surveillance in which courts have denied disclosure under section 1806(f).  In traditional FISA cases, courts can look to a significant body of case law assessing the constitutionality of the FISA scheme and providing factors with which to evaluate FISA applications and orders.  *See, e.g., United States v. Duka*, 671 F. 3d 329, 336–47 (3d Cir. 2011); *United States v. Abu-Jihaad*, 630 F. 3d 102, 117–31 (2d Cir. 2010); *United States v. Hammoud*, 381 F. 3d 316, 332–34 (4th Cir. 2004), *vacated on other grounds*, 543 U.S. 1097 (2005).

In such cases, courts have found that "review of the FISA materials . . . [was] relatively straightforward and not complex," and therefore *ex parte*, *in camera* consideration was appropriate.  *Abu-Jihaad*, 630 F.3d at 129 (brackets in original) (internal quotations omitted).  That is not true here, however, where there is little guidance from other courts about how to evaluate complex legal questions such as the constitutionality of orders granting applications for FAA surveillance or the actual execution of that surveillance.  Disclosure of the requested information is therefore "necessary to make an accurate determination of the legality of the

surveillance."  50 U.S.C. § 1806(f); *see Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 509–10 (D.C. Cir. 2003) (explaining that "necessary" has a flexible meaning informed by context and often "mean[s] less than absolutely essential") (internal quotations omitted).

Without disclosure, Mr. Qazi can challenge the FAA statutory scheme, as he has done here, but he cannot assess the government's actual surveillance of him.  Nor can he participate in the adversarial process to inform this Court's evaluation of these issues.  Mr. Qazi would surely advance additional arguments regarding the legality of the government's surveillance of him if he understood what that surveillance entailed.  Without disclosure, the Court will lose the benefit of informed arguments from the defense on these issues.

> b.  Disclosure And An Adversarial Hearing With Full Defense Participation Is Required In Light Of The Government's Repeated Misrepresentations To The FISC.

In cases involving traditional FISA surveillance, courts of appeals have identified factors that would warrant disclosure of applications, warrants, and other materials under section 1806(f).  Consistent with FISA's legislative history"

> [D]isclosure is "necessary" only where the court's initial review of the application, order, and fruits of the surveillance indicates that the question of legality may be complicated by factors such as "indications of possible misrepresentation of fact, vague identification of the persons to be surveilled, or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order."

*Belfield*, 692 F. 2d at 147 (quoting S. Rep. No. 95–701, 95th Cong., 2d Sess. 64 (1978)); *accord United States v. Ott*, 827 F. 2d 473, 476 (9th Cir. 1987); *United States v. Duggan*, 743 F. 2d 59, 78 (2nd Cir. 1984). Recent disclosures demonstrate that all of these factors are present in the context of FAA surveillance.  Recently declassified FISC opinions show that the government has made a series of incomplete or inaccurate representations in its applications for approval of

surveillance under the FAA and other FISA authorities, and that the government has repeatedly failed to comply with restrictions imposed by the FISC.

Most notably, in October 2011, the FISC held that certain collection of communications under the FAA preceding the court's opinion violated the Fourth Amendment. *See [Caption Redacted]*, 2011 WL 10945618 (FISC Oct. 3, 2011). The FISC's opinion details the government's May 2011 disclosure to the FISC that, contrary to previous statements, the NSA was relying on the FAA to collect internet communications that are "wholly unrelated to the tasked selector, including the full content of discrete communications that are not to, from, or about the facility tasked for collection," and that the "government might lack confidence in the effectiveness" of its procedures for ensuring that FAA surveillance of internet transactions was being limited to targets actually located overseas. *Id.*, at *2. Essentially, "the government . . . advised the Court that the volume and nature of the information it [had] been collecting [was] fundamentally different from what the Court had been led to believe." *Id.*, at *9. These disclosures "fundamentally alter[ed] the Court's understanding of the scope of collection conducted pursuant to Section 702." *Id.*, at *5. The government's applications for authorization to conduct FAA surveillance thus contained all of the problems that justify disclosure: "misrepresentation of fact, vague identification of the persons to be surveilled, [and collection of] surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in [past] orders." *Belfield*, 692 F.2d at 147.

The government submitted incorrect and misleading information to the FISC on other occasions, as well. As Judge Bates of the FISC explained, "The Court is troubled that the government's revelations regarding NSA's acquisition of Internet transactions mark the third

instance in less than three years in which the government has disclosed a substantial misrepresentation regarding the scope of a major collection program." *[Caption Redacted]*, 2011 WL 10945618, at *30 n.14; *see also In re Application of the FBI for an Order Requiring the Production of Tangible Things from [Redacted]*, 2009 WL 9150896, at *2 (FISC Sept. 25, 2009) (Walton, J.) ("The Court is deeply troubled by the incidents described above, which have occurred only a few weeks following the completion of an 'end to end review' by the government of NSA's procedures and processes for handling the BR metadata, and its submission of a report intended to assure the Court that NSA had addressed and corrected the issues giving rise to the history of serious and widespread compliance problems in this matter and had taken the necessary steps to ensure compliance with the Court's orders going forward."); *In re Production of Tangible Things from [Redacted]*, 2009 WL 9150913 (FISC Mar. 2, 2009) (Walton, J.) (detailing "misrepresentations to the Court" and "violations of its Orders"); *In re Production of Tangible Things from [Redacted]*, 2009 WL 9157881, at *2 (FISC Jan. 28, 2009) (Walton, J.) ("The Court is exceptionally concerned about what appears to be a flagrant violation of its Order in this matter . . . ."); *In re All Matters Submitted to Foreign Intelligence Surveillance Court*, 218 F. Supp. 2d 611, 620–21 (FISC 2002) (Lamberth, J.) (explaining government's "errors related to misstatements and omissions of material facts" in FISA applications), *abrogated on other grounds, In re Sealed Case*, 310 F. 3d 717 (FISA Ct. Rev. 2002).

The errors in the government's applications to the FISC, including its applications for FAA surveillance authorization, were not merely "typographical or clerical in nature." *United States v. El-Mezain*, 664 F.3d 467, 566 (5th Cir. 2011) (internal quotations omitted). Rather, "the errors were . . . pervasive enough to confuse the court as to the quantity or quality of the

evidence described in the applications," such that "disclosing the applications and related materials to defense counsel would assist the court in making an accurate determination of the legality of the surveillance."   *Id*. at 567 (internal quotations omitted).   Moreover, because numerous FISC opinions – including opinions authorizing FAA surveillance – remain classified, counsel for Mr. Qazi have no way to know the full extent of the government's misrepresentations to the FISC and noncompliance with its orders.  Disclosure under §1806(f) is necessary to enable the kind of vigorous adversarial testing that accurate review of these issues demands.

Any misrepresentations in the applications that led to the orders under which Mr. Qazi's communications were seized also provide a basis for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Contrary to the government's opposition to a *Franks* hearing and their claim that the defense should have no role, the *Franks* decision recognized that *ex parte* proceedings should give way to adversary proceedings upon an initial post-investigative showing that lawless or reckless conduct needs to be discouraged:

> [T]he hearing before the magistrate not always will suffice to discourage lawless or reckless misconduct.  The pre-search proceeding is necessarily *ex parte*, since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence.  The usual reliance of our legal system on adversary proceedings itself should be an indication that an *ex parte* inquiry is likely to be less vigorous.  The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations.  The pre-search proceeding will frequently be marked by haste, because of the understandable desire to act before the evidence disappears; this urgency will not always permit the magistrate to make an extended independent examination of the affiant or other witnesses.

*Franks*, 438 U.S. at 169.

"Under *Franks*, a hearing on the veracity of the affidavit supporting a warrant is required if the defendant makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a

finding of probable cause." *United States v. Kennedy*, 131 F. 3d 1371, 1376 (10th Cir. 1997). *Franks* permits challenges to "material omissions[] as well as affirmative falsehoods" and applies to applications for electronic surveillance.  *Id.* (internal quotations omitted); *United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999); *see Duggan*, 743 F. 2d at 77 n.6.  As the government has conceded elsewhere, *Franks* applies to FAA surveillance, and for good reason. *See* Gov't *Muhtorov* Mem. at 95; *see United States v. Daoud*, 2014 WL 2696734, at *7 (7th Cir. June 16, 2014) (Rovner, J., concurring) ("*Franks* serves as an indispensable check on potential abuses of the warrant process, and means must be found to keep *Franks* from becoming a dead letter in the FISA context."); *see id.*, at *15–16 ("[A]lthough a court may be able to discover inconsistencies in the FISA materials, its ability to discover false statements and omissions is necessarily limited, as it has only the government's version of the facts. . . . [A] court cannot conduct more than a limited *Franks* review on its own.").

In the context of the particular programs involving warrantless surveillance, the defense has made a substantial showing that should trigger both a hearing and defense adversarial participation.  In this case, the government failed to comply with the mandatory pretrial notice to the defense regarding warrantless surveillance under circumstances demonstrating at least reckless disregard for the requirements of § 1806(c). Additionally, there is a record of affirmative misrepresentations and omissions made by the government in its applications for § 1881a authorizations.  These are compelling reasons to hold a *Franks* hearing and permit full adversary participation by the defense, allowing them to assess whether the fruits of the surveillance of Mr. Qazi must be suppressed.

c.   Disclosure Is Required Because Information About Applications, Orders, And Fruits Of FAA Surveillance Are Helpful To Mr. Qazi's Suppression Motion And Defense.

The information sought by Mr. Qazi is relevant both to his motion to suppress the fruits of any unconstitutional FAA surveillance in this case, and to the adjudication of his guilt and punishment.  Evidence must be turned over under *Brady* if it is favorable to the defense – in other words, if it is "exculpatory or impeachment evidence."  *McMillian v. Johnson*, 88 F. 3d 1554, 1567 (11th Cir. 1996).  The due process rights embodied in *Brady* apply both to trials and to motions to suppress.  *United States v. Barton*, 995 F. 2d 931, 935 (9th Cir. 1993); *Smith v. Black*, 904 F. 2d 950, 965 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992); *see also United States v. Johnson*, 117 F. 3d 1429, at *2 (10th Cir. 1997) (unpublished table opinion) (finding that *Brady* applies to motions to suppress).

The information and records requested in this motion will likely contain information favorable to Mr. Qazi's motion to suppress.  For example, the government's applications to the FISC and the FISC's orders that led to any FAA surveillance of Mr. Qazi will provide evidence that the FAA surveillance scheme approved by the FISC and used to surveil Mr. Qazi violated the warrant clause and the requirements of § 1881a.[8]  Information about what communications were surveilled and how and why they were obtained will indicate whether the government violated the targeting and minimization restrictions approved by the FISC, whether the search was unreasonable under the Fourth Amendment, and whether Mr. Qazi's communications were intercepted for a law enforcement purpose rather than a foreign intelligence purpose. The identification of Mr. Qazi's communications obtained through FAA surveillance, and any

---

[8] FISA provides for suppression of evidence on the grounds that "(1) the information was unlawfully acquired; or (2) the surveillance was not made in conformity with an order of authorization or approval."  50 U.S.C. § 1806(e); *see* 50 U.S.C. § 1806(f)-(g).

evidence derived from that surveillance, will allow the defense to identify the evidence that should be suppressed as the fruits of an unconstitutional search.  All of the requested materials will provide grounds for impeaching declarations or testimony of government officials in opposition to this motion to suppress.

The information and records requested in this motion are also likely favorable to Mr. Qazi's ability to mount a defense at trial.  The contents of any communications obtained under the FAA but not provided to the defense or even described in the criminal complaint may be exculpatory, and may provide innocent explanations for seemingly incriminating evidence.  Those contents may also provide grounds for impeaching the testimony of prosecution witnesses.  Due process requires that all records favorable to Mr. Qazi, including records that are exculpatory or impeaching, must be disclosed.

d.   If Information Helpful Or Material To The Defense Is Classified,
     The Information Must Be Disclosed Or Excluded.

When the government withholds information or evidence from the defense as classified, but still seeks the benefit of the information in its prosecution, it violates due process:

> [T]he Government can invoke its evidentiary privileges only at the price of letting the defendant go free.  The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

*United States v. Reynolds*, 345 U.S. 1, 12 (1953) (footnote omitted).

Some or all of the information sought by this motion as material to Mr. Qazi's defense, including any relevant applications to and orders of the FISC, is marked classified.  Consistent with the principle set out in *Reynolds*, the Classified Information Procedures Act (CIPA), 18 U.S.C. app. III, provides a mechanism for accommodating both the government's interest in protecting classified information and the defendant's right to due process.

When the government makes a claim of privilege over classified information, a court must "decide whether the information is helpful or material to the defense." *United States v. Aref*, 533 F.3d 72, 80 (2d Cir. 2008). This is a low standard: "To be helpful or material to the defense, evidence need not rise to the level that would trigger the Government's obligation under *Brady* . . . to disclose exculpatory information. [I]nformation can be helpful without being 'favorable' in the *Brady* sense." *Id.* (internal citations and quotations omitted). If information meets this standard of helpfulness and materiality, the government has four options: (1) disclose the material to defense counsel; (2) declassify the material and disclose it; (3) in some circumstances, provide an unclassified summary; or, if it rejects the first three options, (4) face exclusion of the material or dismissal of the prosecution. *See* 18 U.S.C. app. III at § 6(c) and (e). These provisions function to "protect[ ] and restrict[ ] the discovery of classified information in a way that does not impair the defendant's right to a fair trial." *United States v. Dumeisi*, 424 F.3d 566, 578 (7th Cir. 2005) (brackets in original) (internal quotations omitted).

CIPA thus provides this Court with the mechanism to honor Mr. Qazi's due process rights, as required by section 1806(g), without compromising the government's interest in protecting classified information .

> e. *Ex Parte* Proceedings Are Inconsistent With The Requirements Of Due Process.

Failure to disclose requested materials to the defense would, under the circumstances of this case, result in *ex parte* proceedings on the legality of any FAA surveillance of Mr. Qazi and be inconsistent with due process and the adversary process upon which this nation's justice system is premised. The Supreme Court has recognized the necessity of adversarial proceedings to protect the rights of defendants and arrive at accurate legal determinations concerning those rights: "'[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of

27

rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'" *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55 (1993) (brackets in original) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170–72 (1951) (Frankfurter, J., concurring)). Indeed, "[o]ne would be hard pressed to design a procedure more likely to result in erroneous deprivations" than an *ex parte* proceeding. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F. 3d 1045, 1069 (9th Cir. 1995) (internal quotations omitted).

The guarantee of adversarial proceedings is rooted not only in the due process clause, but also in the Sixth Amendment's confrontation and assistance-of-counsel clauses. As the Eleventh Circuit has explained, "[t]he Confrontation Clause of the Sixth Amendment guarantees the reliability of 'evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.'" *Dorsey v. Chapman*, 262 F. 3d 1181, 1188 (11th Cir. 2001) (quoting *Maryland v. Craig*, 497 U.S. 836, 845 (1990)). Likewise, the Sixth Amendment "right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits." *Evitts v. Lucey*, 469 U.S. 387, 395 (1985). When a defendant's counsel is denied access to material evidence and information, the defendant is denied a constitutionally adequate defense.

The Supreme Court has cautioned that "[i]n both the volume of the material to be examined and the complexity and difficulty of the judgments involved, cases involving electronic surveillance will probably differ markedly from those situations in the criminal law where in camera procedures have been found acceptable to some extent." *Alderman, v. United States*, 394 U.S. 165, 182 n.14 (1969). Here, only by direct, informed participation can defense

28

counsel be confident that the court is made aware of material omissions or misrepresentations in the government's FISC submissions, evaluate the content of intercepted communications for exculpatory or otherwise material information, and enable adequate and accurate consideration by this Court.

The need for adversarial proceedings is highlighted by the failures of the FISC's initial *in camera*, *ex parte* authorization of the § 1881a surveillance that may have swept up Mr. Qazi's communications.  *See Franks*, 438 U.S. at 169 (explaining inadequacies of *ex parte* proceedings for issuing search warrants and explaining why defendants must be provided an opportunity to later challenge the adequacy and veracity of the government's warrant applications in adversary proceedings).  Recently declassified FISC opinions demonstrate not only a repeating pattern of government misrepresentations, but also repeated reprieves granted by the FISC as the government failed to meet successive deadlines to report to the FISC or to conform its surveillance to the law.  *See, e.g.*, *[Caption Redacted]*, 2011 WL 10945618, at *2–3; *see also* Part B.1.b, *supra*.  During these delays, the FISC failed to halt illegal surveillance for the duration of the government's noncompliance, providing no relief to persons subject to that surveillance.  Most importantly, relying on only the representations of the government, without adversarial testing, the FISC approved surveillance programs that turned out to be overly broad, in violation of statutory authority. *See* Part B.1.b, *supra*. The failure of *ex parte* proceedings to achieve fair and correct outcomes has resulted in calls – from members of Congress,[9] the

---

[9] *See, e.g.*, USA FREEDOM Act, H.R. 3361, 113th Cong. § 401 (2013), *available at* http://1.usa.gov/1mPQmsh (proposing creation of Office of the Special Advocate to "vigorously advocate before the Foreign Intelligence Surveillance Court or the Foreign Intelligence Surveillance Court of Review, as appropriate, in support of legal interpretations that protect individual privacy and civil liberties.").

President's blue-ribbon panel on intelligence reform,[10] the PCLOB,[11] and others – for appointment of an advocate to argue against the government in FISC proceedings. The President has agreed with the need for the FISC to "hear[] a broader range of privacy perspectives," and has proposed "the establishment of a panel of advocates from outside government to provide an independent voice in significant cases before the Foreign Intelligence Surveillance Court."[12]

Counsel for Mr. Qazi understand that the Court would, in any *in camera*, *ex parte* proceedings, make diligent efforts to anticipate the arguments counsel would make were they privy to the information sought in this motion and allowed to advocate for suppression on that basis. However, given the complex constitutional issues of first impression raised here, it would be particularly difficult—and inappropriate—for the Court to function as both advocate and judge. The Court would need to anticipate the defense arguments that seek a particular result, evaluate how secret evidence may or may not support that result, and then decide—without particularized briefing or pointed advocacy—whether the arguments it assumes would have been made are persuasive. In this case, as in any case where an accused faces the loss of liberty, Mr. Qazi is entitled to have the lawyer defending him be his advocate, and to do everything possible to persuade the Court to grant the relief he seeks.

---

[10] *See* President's Review Group on Intelligence and Communications Technologies, *Liberty and Security in a Changing World* 200–05 (Dec. 12, 2013), *available at* http://www.whitehouse.gov/sites/default/files/docs/2013-12-12_rg_final_report.pdf.

[11] Privacy & Civil Liberties Oversight Board, *Report on the Telephone Records Program Conducted under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court*, 183–87 (Jan. 23, 2014), *available at* http://www.pclob.gov/All%20Documents/Report%20on%20the%20Telephone%20Records%20Program/PCLOB-Report-on-the-Telephone-Records-Program.pdf.

[12] [President Barack Obama, Remarks by the President on Review of Signals Intelligence (Jan. 17, 2014), *available at* http://1.usa.gov/1l2zOBS.

**2. Mr. Qazi Is Entitled, At A Minimum, To Disclosure And Discovery Of Specific Materials And Facts.**

For the preceding reasons, Mr. Qazi respectfully seeks disclosure to the defense of the following information and records, with full opportunity for defense participation in any hearings pertaining to them:

1. Materials relating to the government's failure to provide Mr. Qazi with timely notice that it intended to introduce or otherwise use information obtained or derived from FAA surveillance in this proceeding, including copies of any documents setting out, or purporting to justify, the Justice Department's now-withdrawn policy of concealing the role of FAA surveillance from criminal defendants.

2. Materials indicating how Mr. Qazi's communications were intercepted and identified under the FAA, including the nature of the targeting and queries that led to their detection (e.g., whether the government conducted "to/from" searches or "about" searches, whether the government collected metadata or contents of communications, and what surveillance programs the government used to effect the collection).

3. Documents indicating which of Mr. Qazi's communications were intercepted under the FAA, and the contents of those communications.

4. Documents indicating whether the fruits of FAA surveillance were used to justify further investigation of Mr. Qazi, or were used in applications for additional surveillance authority, including under 50 U.S.C. §§ 1842 and 1861(b)(2)(A), and 18 U.S.C. § 2709.

5. Intelligence reports and other materials produced in reliance on any of Mr. Qazi's communications collected under the FAA.

6. Documents indicating when and how the government established that Mr. Qazi was a United States person.

7. Applications, certifications, orders, and directives relating to the government's surveillance of Mr. Qazi under the FAA, including the applicable targeting and minimization procedures.

8. Applications, certifications, orders, and directives relating to the government's surveillance of Mr. Qazi under traditional FISA, in order to illuminate the extent of their reliance on FAA-obtained information.

9. Materials indicating which of Mr. Qazi's FAA-collected communications were disseminated to other agencies, including the FBI, and the dates on which they were disseminated.

**C.  The Mass Acquisition, Retention, And Accessing Of American Citizens' Electronic Communications Under § 702 Of The FISA Amendments Act Violates The Fourth Amendment.**

This case involves government agents in the United States searching and seizing the private electronic communications of American citizens living in the United States.   The government claims that the Warrant Clause of the Fourth Amendment is irrelevant here, and that privacy intrusions on Americans are reasonable, because § 702 programs target foreign persons abroad – a group not traditionally protected by the Fourth Amendment.   Regardless of the nominal targeting of foreign persons abroad, however, the § 702 programs routinely acquire huge numbers of Americans' communications in America.   The mass acquisition of Americans' communications – as well as the extensive retention, querying, accessing, and subsequent use of

those communications – implicates the Fourth Amendment.  This case is a major test of fundamental American liberties: the Court should reject the claim that, simply because foreign persons are being targeted, Americans lose their privacy rights as collateral damage.  The constitutional protections for Americans' privacy have yet to become so debilitated.  *See Riley v. California*,  2014 WL 2864483, (Jun. 25, 2014).

Section 702 fails at every level of Fourth Amendment analysis.  First, the extreme intrusion into the core privacy rights of Americans should require a warrant or similar individualized judicial review.  Second, even if a narrow, foreign intelligence exception to the warrant requirement exists, as the government argues that it does, the § 702 programs do not fit within such an exception.  Finally, to the extent that "reasonableness" is at issue here, the § 702 programs are unreasonable based on the competing interests of freedom and security at stake and the lack of any meaningful protection for Americans' privacy.

> **1.  The Warrant Requirement Applies To Government Surveillance Of The Electronic Communications Of American Citizens Living In The United States.**

The government claims that the measure of constitutional protections of American citizens whose communications are listened to and read under § 702 is identical to that of foreign persons who are searched abroad – nothing.  DE 201 at 21-22.  Relying on a case that involved a search of property in Mexico owned by a nonresident alien, the government asserts that the Fourth Amendment is inapplicable because § 702 targets foreigners abroad.  DE 201 at 21-22 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)).  However, the government's premise ignores that the sweep of the programs operated under § 702 inevitably and inexorably results in the search and seizure of massive amounts of Americans' private communications.

Because Americans retain an undiminished expectation of privacy in their electronic communications, the Fourth Amendment's Warrant Clause applies.[13]

> a. The § 702 Programs Inevitably Result In The Massive Collection, Retention, And Accessing Of Americans' Communications, Which Greatly Exceeds Previous Programs With Fewer Effective Protections For Citizens.

The government's response is based throughout on its assertion that domestic searches and seizures of Americans' communications should not concern the Court because they are merely "incidental" to the legitimate seizure of the communications of targeted foreigners abroad. DE 201 at 7, 18, 20, 22, 23, 24, 26, 33, 34, 37, 43, 46, 53. However, the program of surveillance and collection of Americans' communications under § 702 is anything but incidental; the search and seizure of Americans' communications is extensive, pervasive, and inherent to § 702.[14] According to the FISC, the "NSA acquires more than two hundred fifty million Internet communications each year pursuant to Section 702." *[Caption Redacted]*, 2011 WL 10945618, at *9. In *[Caption Redacted]*, the FISC did not address the acquisition of telephone or other non-internet based communications. Presumably, the total number of electronic communications seized by the government each year is significantly greater. Of these

---

[13] In a recent nearly-unanimous decision, the Supreme Court strictly applied the Fourth Amendment warrant requirement in the context of Americans' electronic communications. *See Riley*, 2014 WL 2864483 (requiring law enforcement to secure warrant before searching suspects' cell phones for electronic communications and information).

[14] Data recently derived from a large cache of intercepted communications disclosed by Snowden shows that nine out of every ten digital account holders whose communications are intercepted by § 702 surveillance are not the originally-intended target of surveillance. Barton Gellman, Julie Tate and Ashkan Soltani, *In NSA-intercepted data, those not targeted far outnumber the foreigners who are*, Wash. Post, Jul. 5, 2014 ("If Snowden's sample is representative, the population under scrutiny . . . is far larger than the government has suggested. In a June 26 'transparency report,' the Office of the Director of National Intelligence disclosed that 89,138 people were targets of last year's collection under [FAA] Section 702. At the 9-to-1 ratio of incidental collection in Snowden's sample, the office's figure would correspond to nearly 900,000 accounts, targeted or not, under surveillance.").

seizures, a vast number involve the communications of American citizens.[15]   A FISA judge estimated in 2010 that the NSA collects 46,000 wholly domestic emails per year, a figure which does not incorporate other forms of electronic communications.[16]  Elena Nakashima and Barton Gellman, *Court gave NSA broad leeway in surveillance, documents show*, Wash. Post, Jun. 30, 2014.  These are hardly de minimis intrusions.  *[Caption Redacted]* at *26 (taking "into account the absolute number of non-target protected communications that are acquired," finding that "tens of thousands of non-targeted protected communications is a *very* large number.") (emphasis in original).  To call the potential volume of seizures merely "incidental" is to dramatically understate the unacceptable level of intrusion into the privacy rights of Americans and the pervasiveness at issue here.[17]

---

[15] The NSA is aware of, and has actively tried to hide, the extent to which Americans' electronic communications are searched via warrantless surveillance. The Director of National Intelligence, when asked by a congressional committee about the § 702 programs, unequivocally stated that no such searches occurred wittingly. Later, after several public disclosures to the contrary, he asserted that he had answered in "the least untruthful manner."  Glenn Kessler, *James Clapper's 'least untruthful' statement to the Senate*, Wash. Post, Jun. 12, 2013, *available at* http://www.washingtonpost.com/blogs/fact-checker/post/james-clappers-least-untruthful-st atement-to-the-senate/2013/06/11/e50677a8-d2d8-11e2-a73e-826d299ff459_blog.html.

[16] The government has submitted supplemental authority to support their proposition that "incidental" collection of Americans' electronic communications does not trigger a warrant requirement.  DE 220.  In that case, the judge dismissed the defendant's speculation as to the volume of Americans' electronic communications that were collected under § 702.  Here, however, speculation is not necessary, as figures regarding the pervasive nature of domestic surveillance under § 702 have been presented.

[17] According to recent disclosures by Snowden, NSA employees can and routinely do access and share nude photos of surveillance targets "in sexually compromising situations." According to Snowden, "your private images, records of your private lives, records of your intimate moments have been taken from your private communications stream from the intended recipient and given to the government without any specific authorization."  James Vincent, *Nude photos of strangers are a 'fringe benefit' for NSA employees, says Snowden*, The Independent, Jul. 18, 2014, *available at* http://www.independent.co.uk/life-style/gadgets-and-tech/nude-photos-of-strangers-are-a-fringe-benefit-for-nsa-employees-says-snowden-9614097.html.

The government – relying on *In re Directives*, 551 F. 3d 1004 (FISA Ct. Rev. 2008) – argues that the extensive and pervasive collection of Americans' communications that is inherent to the § 702 program is not unlawful "because the privacy interests of U.S. persons whose communications are incidentally collected are specifically protected by minimization procedures." DE 201 at 23.  In *In re Directives*, the FISA Review Court addressed the Protect America Act of 2007 (PAA) against claims by a service provider that the program violated the Fourth Amendment. Contrary to the government's claims, the court's reasoning in *In re Directives* does not support the constitutionality of § 702.  Furthermore, the government's argument ignores the proven ineffectiveness of the § 702 minimization procedures in protecting the privacy rights of American citizens.[18]

First, the government ignores the *In re Directives* court's adherence to the Warrant Clause as providing the definitive guidance for Fourth Amendment reasonableness.  551 F.3d at 1013 ("[T]he more a set of procedures resembles those associated with the traditional warrant requirements, the more easily it can be determined that those procedures are within constitutional bounds.") (citing *In re Sealed Case*, 310 F. 3d at 737, 742).  Similarly, the Supreme Court has stated that legislative design is based on the "type" of protections afforded under the Warrant Clause. *United States v. U.S. Dist. Court for the E. Dist. Of Mich.*, 407 U.S. 297, 322-23 (1972). Ignoring the language in the prime case upon which it relies, the government suggests that the

---

[18] The cache of intercepted communications provided to the Washington Post by Snowden included 65,000 files - nearly half of the cache - that "contained names, email addresses or other details that the NSA marked as belonging to U.S. citizens or residents" and "'minimized' . . . to protect Americans' privacy."  Barton Gellman, Julie Tate and Ashkan Soltani, *In NSA-intercepted data, those not targeted far outnumber the foreigners who are*, Wash. Post, Jul. 5, 2014.  However, the Post found within the disclosed surveillance files more than 900 email addresses with strong links to United States citizens and residents that had not been minimized by the NSA.  *Id.*

Warrant Clause is irrelevant and that protections for American citizens' telephonic and email communications are as non-existent as those of foreigners living and communicating abroad.

Second, the government ignores the fundamental distinctions between the PAA and the FAA's § 702. In *In re Directives*, the court cautioned that "our decision does not constitute an endorsement of broad-based, indiscriminate executive power." 551 F. 3d at 1016. Due to "several layers of serviceable safeguards to protect individuals against unwarranted harms and to minimize incidental intrusions," the court ultimately rejected the objections of the service providers. *Id.* However, some of the most critical safeguards present in the PAA and relied upon by the court in *In re Directives* are notably absent from § 702. For example, the PAA did not involve the retention, databasing, and later accessing of incidentally collected electronic communications:

> The government assures us that it does not maintain a database of incidentally collected information from non-targeted United States persons, and there is no evidence to the contrary. On these facts, incidentally collected communications of non-targeted United States persons do not violate the Fourth Amendment.

551 F. 3d at 1015. In this case, by contrast, the information can be put in a database for later access and review of content.[19] The government claim that, once Americans' communications are "incidentally" acquired, the Fourth Amendment is not implicated is one of the most egregious departures from traditional Fourth Amendment protections wrought by the § 702 program. A second major difference between the PAA and § 702 of the FAA is that the former requires, at the very least, an executive determination of probable cause. Specifically, the PAA incorporated § 2.5 of Executive Order 12333, which required the Attorney General to determine on a case-by-

---

[19] The intelligence community asserts without qualification that "subsequently querying that information isn't a search under the Fourth Amendment, it's information already in the government's custody." PCLOB Hearing at 28 (Mar. 19, 2014). As testified to at the PCLOB hearing, the government is later querying the databases derived from FAA activity with specific United States person identifiers.

case basis whether there was probable cause to believe the target of the surveillance was a foreign power or an agent of a foreign power.  *Id.* at 1014.  Thus, the PAA provided some level of individualized suspicion similar to that which exists under traditional FISA surveillance, although the determination was made by the Executive Branch rather than a judicial officer.  In contrast, § 702 requires no probable cause determination of any kind by any branch of the government.[20]

It is also important to note that the facts before the courts in the cases relied upon in *In re Directives* bear no relation to the facts before this Court.  In *United States v. Kahn*, 415 U.S. 143 (1974), the question was whether the conversations of Minnie Kahn could be used when they were seized pursuant to a Title III wiretap authorized by the court for a particular telephone and the conversations of Irving Kahn and "others as yet unknown."  Upholding a judicially-authorized warrant to intercept all calls involving a specific telephone, known to be used for illegal purposes, is not the type of seizure at issue in the present case.  Similarly, *United States v. Schwartz* 535 F. 2d 160 (2nd Cir. 1976), also involved a judicially-approved Title III wiretap. Schwartz was overheard on two of the calls intercepted.  The calls were permitted to be used against him because "the extent of non-pertinent matters was slight. It is virtually impossible to completely exclude all irrelevant matter from intercepted conversations."  *Id.* at 164.  Here, in

---

[20] Even the much-criticized warrantless surveillance program authorized by President Bush after 9/11, prior to the passage of the PAA, had a narrower focus than the FAA.  In that program, surveillance could only occur after an executive determination that there was a reasonable basis – which the Attorney General in 2006 equated with the traditional standard of probable cause – "that one party to the communication [wa]s a member of al Qaeda, or a member of an organization affiliated with al Qaeda."  1 David S. Kris & J. Douglas Wilson, NATIONAL SECURITY INVESTIGATIONS & PROSECUTIONS, § 15:13 (2d Ed. 2012).  Section 702 requires no similar determination regarding an individual nor any limitation based on a nexus between the warrantless surveillance and a threat to the United States.

contrast, the government activity was not based on probable cause, there was no judicial authorization, and the extent of seizure of communications of protected persons was massive.

To the extent that the service provider in *In re Directives* failed to raise issues such as the First Amendment and separation of powers claims, the decision does not carry persuasive value. *See Texas v. Cobb*, 532 U.S. 162, 169 (2001) ("Constitutional rights are not defined by inferences from opinions which did not address the question at issue.").  Further, the hypothetical problems raised by the service provider in *In re Directives* failed to account for the individual interests at stake under the concrete facts of this case.   The government's reliance on *In re Directives*  ignores the passages that support suppression in this case, while exaggerating the endorsement of unreviewed Executive Branch authority in a case that cautioned that "**the Constitution is the cornerstone of our freedoms, and government cannot unilaterally sacrifice constitutional rights on the altar of national security**."  551 F. 3d at 1016 (emphasis added).

The government's response repeatedly refers to the "stringent safeguards and procedures" of § 702 collection, retention, and accessing of Americans' electronic communications, alleging that said procedures "provide constitutionally sufficient protection for the privacy interests of U.S. persons."  DE 201 at 43-49.  This assertion of effectiveness runs contrary to the plain fact that collection, retention, and accessing of Americans' electronic communication under § 702 routinely runs afoul of legal requirements.  "An internal NSA audit, dated May 2012, identifies 2776 'incidents,' or violations of the rules or court orders for surveillance of Americans or foreign targets in the United States, from April 2011 to March 2012."  Barton Gellman, *NSA broke privacy rules thousands of times per year, audit finds*, Wash. Post, Aug. 15, 2013.  Of those, nearly 800 were FISA violations.  *Id.*  Extrapolating those figures over the life of the FAA

suggests that the NSA has committed several thousand violations since the 2008 passage of the law.[21]  This data suggests that the stringent protection of Americans' privacy rights that the government attempts to rely upon is either ineffective or non-existent.

In advocating the sufficiency of the § 702 safeguards, the government relies particularly heavily on the § 702 requirement of prior judicial review.  DE 201 at 48.  According to the government, the FISC ensures that the "Government's targeting and minimization procedures comport with the Fourth Amendment."  DE 201 at 49.  However, statistics suggest that the oversight offered by the FISC is anything but scrutinous.  Since the creation of the FISC in 1979, the court has rejected just 11 of the more than 33,900 surveillance requests made by the government.  Evan Perez, *Secret Court's Oversight Gets Scrutiny*, Wall St. Journ., June 9, 2013.  That rate of .03 percent raises serious questions about the degree of judicial review that is actually being provided.  Considering the ineffective minimization procedures employed by the government and the lack of adequate judicial oversight, the procedural safeguards referenced by the government in their defense of the constitutionality of the FAA are insufficient to protect the privacy rights of Americans.

> b.  Both The Identity Of United States Citizens And Their Location
>     Within The United States Foreclose Loss Of Privacy Rights.

The government argues that *Verdugo-Urquidez* – which held that a Mexican citizen whose property was seized in Mexico did not have Fourth Amendment rights – applies to the present case involving domestic searches of the electronic communications of United States citizens.  DE 201 at 25.  In doing so, the government completely ignores the identity of those

---

[21] Additionally, the FISC has made repeated findings that the agencies implementing the FAA made misrepresentations to the court and failed to comply with court directives in cases such as *In re Production of Tangible Things from [redacted]*, 2009 WL 9150913, at *2 (declassified Sept. 10, 2013), *[Caption Redacted]*, 2011 WL 10945618, at *5 (declassified on Aug. 21, 2013), and others.  *See* Part B.1.B, *supra*.

being searched.  DE 201 at 25-26.  The core of the Court's reasoning in *Verdugo-Urquidez* confirms that, as American citizens, the defendants in this case are fully protected by the Constitution and that its holding is limited to cases involving searches of non-U.S. persons abroad: "[T]he purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government; it was never suggested that the provision was intended to restrain the actions of the Federal Government against aliens outside of the United States territory."  494 U.S. at 266.  Contrary to the government's attempted application of the case, the *Verdugo-Urquidez* Court also found the location of the search to be important: "At the time of the search, he was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico."  494 U.S. at 274-75.  The government admits that "collection under Section 702 takes place within the United States."  DE 201 at 25.

When the government claims that – contrary to the direct reasoning of *Verdugo-Urquidez* – the location of the search "makes no difference" (*Id.*), the only support cited is *United States v. Yonn*, 702 F.2d 1341 (11th Cir. 1983).  In *Yonn*, agents in the United States made consensual recordings of a conversation between an informant and a drug dealer that took place in a motel room. The court found no significance in the location of the microphone in the motel room, which was activated only when the informant was in the room, therefore making the recording consensual: "The location of the electronic equipment does not alter the irrefutable fact that Yonn had no justifiable expectation of privacy in his conversation with Dozier."  702 F. 2d at 1347.  *Yonn* simply provides no support for the warrantless, nonconsensual intrusion into the private communications of American citizens in the United States by government agents.

**2. The FAA Program Does Not Fit Into Any Foreign Intelligence Exception To The Warrant Requirement Because The Searches And Seizures Are Not Narrowly Circumscribed, Protective Of Americans' Privacy, Or Individually Subject To Fourth Amendment Protections.**

The government's claim that § 702 falls under a foreign intelligence exception both incorrectly frames the issue and incorrectly minimizes the potential scope of the surveillance programs. DE 201 at 26. The government recognizes that, as the FISC has noted, "[t]here surely are circumstances in which incidental intrusions can be so substantial as to render a search or seizure unreasonable." *Id.* (citing *[Caption Redacted]* at *26). The present case presents exactly such circumstances. But the question here is not whether any exception applies exclusively to the mass collection of American communication; the government's subsequent retention, dissemination, and use of American communications also falls outside any exception to the warrant requirement. Here, the Court should find that no foreign intelligence exception to the warrant requirement applies to the overbroad surveillance authorized by, and carried out under, § 702.

      a. The Special Needs Doctrine Does Not Apply To Mass Acquisition, Retention, And Accessing Of Americans' Electronic Communications.

The government's invocation of the special needs doctrine fails to recognize that § 702 does not facially invoke or justify mass surveillance of American communications. CR 201 at 26-28. Programmatic intrusions into privacy that are validated by special needs generally involve openly-implemented safety programs that are carefully confined to a "primary purpose" other than ordinary law enforcement, so as to guard against abuse. *Compare, Ferguson v. City of Charleston*, 532 U.S. 67, 81, 84-85 (2001) (refusing to uphold drug-testing program of pregnant women with primary law enforcement purpose) *with Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652-653 (1995) (upholding school locker drug searches with primary purpose of

addressing safety and health issues); *see also Illinois v. Lidster*, 540 U.S. 419, (2004) (upholding highway checkpoint with primary purpose of gathering information from general public about a "crime in all likelihood committed by others").   Similarly, in probation and parole cases involving individuals whose privacy expectations have been drastically reduced as a result of criminal convictions, the Supreme Court has validated the special need of supervision.  *See United States v. Knights*, 534 U.S. 112, 118-119 (2001); *see also Maryland v. King*, 133 S. Ct. 1958 (2013) (justifying DNA testing under special need of supervising arrested persons).   In contrast, the FAA purports to authorize the programmatic acquisition, retention, and accessing of electronic communications merely based on a "significant purpose" of collecting foreign intelligence (50 U.S.C. § 1881a(g)(2)(A)(5)), rejecting the "primary purpose" language of the Supreme Court's special needs decisions.

Because the FAA targeting need not be primarily for foreign intelligence, the risk of overbroad collection and bleed-over into criminal investigations is especially high.  Searches and seizures that are carried out with a primary purpose of uncovering ordinary criminal wrongdoing violate the Fourth Amendment.  *See City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000) (holding drug interdiction highway checkpoint unconstitutional because checkpoint had "primary purpose" of general law enforcement).   Because foreign intelligence need not be the "primary purpose" of the  § 702 programs, but merely a "significant purpose," the special needs doctrine should not apply.  *Id.* at 40 ("Rather, what principally distinguishes these checkpoints from those we have previously approved is their *primary purpose*.") (emphasis added); *Ferguson*, 532 U.S. at 81 ("In looking to the programmatic purpose, we consider all the available evidence to determine the relevant *primary purpose*.") (emphasis added).   Further, the government has not shown an inability to provide a measure of judicial oversight regarding the acquisition of

American communications and the incrementally increasing intrusions of retaining, processing, querying, using, and dissemination American private electronic communications.

Although some courts have invoked the special needs doctrine by analogy in favor of a foreign intelligence exception to the Warrant Clause, the present case does not support invocation of a doctrine that, if not carefully cabined as in *Edmond* and *Ferguson*, threatens to swallow the Fourth Amendment. *See Edmond*, 531 U.S. at 37 (finding "individualized suspicion of wrongdoing" to be the "usual rule"). This danger is especially acute in the present case. With no clear statutory authorization, secret government agencies can seize and read massive amounts of Americans' private electronic communications with no requirement that the primary purpose of the acquisition, retention, and accessing of said communications relate to national security. At the very least, the government's invocation of special needs strongly supports strict judicial review. *Ferguson*, 532 U.S. at 81 (requiring "close review" of the "scheme at issue" in determining whether the need in questions was "special, as that term has been defined in our cases") (citing *Chandler v. Miller*, 520 U.S. 305, 322 (1997)).

      b.  Any Foreign Intelligence Exception to The Warrant Requirement
        Must Be Narrowly Construed.

The government's argument ignores the abundant authority stating that the scope of any foreign intelligence exception to the warrant requirement must be closely circumscribed, as are all warrant exceptions. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009) (describing warrant requirement exceptions as "specifically established and well delineated") (citations omitted); *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (describing warrant requirement exceptions as "jealously and carefully drawn" (citation omitted). Although the government claims that the exception is "broad," DE 201 at 29, the cases the government relies upon are to the contrary. "[T]he warrant exception adopted by this Court is *narrowly* drawn to include only those overseas

searches, authorized by the President (or his delegate, the Attorney General), which are conducted *primarily* for foreign intelligence purposes, and which target foreign powers or their agents." *United States v. Bin Laden*, 126 F. Supp. 2d 264, 277 (S.D.N.Y. 2000) (citing *United States v. Truong*, 629 F. 2d 908, 915-917 (4th Cir. 1980)) (emphasis added). Instead, the government invokes foreign national security to make the blanket claim that no judicial warrant is required and refuses to demonstrate how any analogue to the protections of the Warrant Clause are included in § 702.

The government criticizes the defense for its "misplaced" reliance on *United States v. United States District Court (Keith)*, 407 U.S. 297 (1972). DE 201 at 29. However, the government fails to acknowledge that the very cases upon which it relies in its response refer to *Keith* as providing the template for Fourth Amendment analysis of foreign intelligence surveillance. *See, e.g., In re Sealed Case*, 310 F. 3d at 738 ("Congress was aware of *Keith's* reasoning, and recognized that it applies *a fortiori* to foreign threats."); *Truong*, 629 F. 2d at 913 (In *Keith*, the Supreme Court "formulated the analytical approach we employ here in an analogous case"). The Court's reasoning in *Keith* should inform this Court's analysis, especially because Congress directly and explicitly considered the case in enacting FISA. *See, e.g.*, S. Rep. 604(I), 95th Cong., 1st Sess. 13-14, *reprinted* in 1978 U.S.C.C.A.N. 3904, 3914-16; S. Rep. 701, 95th Cong., 1st Sess. 9, 15-16, *reprinted* in 1978 U.S.S.C.A.N. 3973, 3977, 3984-85.

Congress was not only aware of the Court's articulation of the range of privacy interests that are necessary to our constitutional democracy, but also of the Church Committee Report that had just warned that "[u]nless new and tighter controls are established by legislation, domestic intelligence activities threaten to undermine our democratic society and fundamentally alter its nature." S. Rep. No. 94-755 (Book II), at 2 (1976). This case involves domestic intelligence

activities: searches and seizures occurring within the United States, of the private communications of American citizens, that were sent and received in the United States. The reasoning of *Keith* is directly relevant. Indeed, the constitutional considerations favoring privacy are weightier here because of the breadth of surveillance for "foreign intelligence purposes," which is defined in the FAA broadly to include any information relevant to "the conduct of the foreign affairs of the United States." 50 U.S.C. § 1801(e)(2)(b).

The cases upon which the government relies involve limitations completely missing from the § 702 programs. For example, the government cites *Truong* but omits the central holding that restricts warrantless surveillance in a way that § 702 disregards. 629 F. 2d at 915 (excusing the Executive Branch from the warrant requirement "*only* when the surveillance is conducted 'primarily' for foreign intelligence reasons" and only when "the object of the search or the surveillance is a foreign power, its agents or collaborators") (emphasis added). Similarly, in *In re Sealed Case*, the FISA Court of Review, in conducting an *ex parte* review of whether the FISC inappropriately created a "wall" between national security investigation and national security crimes, focused on the narrow scope of foreign intelligence surveillance. According to the Court of Review, in order to grant a surveillance request the FISC must find "probable cause to believe that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power," meaning a group engaged in international terrorism or activities in preparation for terrorism. 310 F. 3d at 722; *see Zweibon v. Mitchell*, 516 F. 2d 594, 613-14 (D.C. Cir. 1975) (en banc) (requiring judicial warrant for foreign national security electronic surveillance of domestic individuals neither agents of nor acting in collaboration with a foreign power, absent exigent circumstances).

Moreover, the surveillance in *In re Sealed Case* only related to potential attack, sabotage, and clandestine intelligence activities under 50 U.S.C. § 1801(e)(1), explicitly discounting reliance on information gathering related to the "conduct of foreign affairs of the United States" under 50 U.S.C. § 1801(e)(2).  310 F. 3d. at 722-23. The Court distinguished between "protective" or "counterintelligence" information described in § 1801(e)(1) and the general information referred to as "affirmative" or "positive" in § 1801(e)(1).  *Id.* at 723 n. 9.  *In re Sealed Case* only involved the national security issues in § 1801(e)(1); the virtually limitless authorizations under the FAA include foreign affairs information that may involve no danger. Any foreign intelligence exception to the Warrant Clause is far narrower than § 702's massive programmatic collection and accessing of the communications of broadly-defined targets, for broadly-defined purposes, that results in widespread seizures and searches of Americans' private communications.

Finally, the government relies on *MacWade v. Kelly*, 460 F. 3d 260 (2d. Cir. 2006), involving random and suspicionless subway baggage searches in New York City, which had the primary purpose of protection against terrorist attack.  DE 201 at 29.  In that case, subway passengers were given the option of submitting to the search or leaving the subway. In contrast, § 702 involves the massive secret collection of American communications that has only a significant purpose of gathering general information about foreign policy issues.  Any foreign intelligence exception to the Warrant Clause must be limited to actions designed to protect against foreign threats to national security, as in *MacWade*, and not to allow surveillance of Americans for general information-gathering purposes, as here.  The government fails to describe a foreign intelligence exception that is sufficiently narrow to avoid the destruction of privacy interested precluded by the Court's decision in *Keith*.

c. The Purposes Of § 702 Surveillance Do Not Diminish Americans'
Protected Privacy Rights And Does Not Justify Warrantless
Searches.

There is no disagreement that, as the government contends, surveillance under § 702
"goes beyond routine law enforcement."  DE 201 at 31.  However, the multiple purposes do not
reduce the protected privacy interests of American citizens, nor do they provide carte blanche for
the government to intrude on those interests merely by reference to some non-law enforcement
purpose.

The government's citation to *Cassidy v. Chertoff*, 471 F. 3d 67 (2d. Cir. 2006), a decision
authored by now-Justice Sotomayor, supports the need to rigorously assess programmatic
intrusions of privacy in the name of national security.  In *Cassidy*, Justice Sotomayor addressed
the propriety of limited warrantless screenings of passenger baggage and vehicles on certain
maritime vessels.  In light of the September 11, 2001 terrorist attacks and pursuant to the
Maritime Transportation Security Act of 2002, the U.S. Coast Guard assessed the "risks
associated with specific threat scenarios" against particular types of vessels.  471 F. 3d at 70-71.
This assessment focused directly on the threat of terrorism by evaluating "the likelihood that a
particular type of vessel would be a terrorist target or would be used as a weapon itself; the
plausibility of terrorists actually carrying out various hypothetical attack scenarios; the risk
associated with a given attack against a given target; and the likelihood and consequences of
various attack scenarios."  *Id.* at 71.  As a result of that assessment, certain large vessels were
deemed to be "at a high risk of a transportation security incident," which led to "minimally
intrusive" random "visual inspections of vehicles and their trunks and brief examinations of the
contents of carry-on baggage."  *Id.* at 71, 78-79.  Further, similar to previously approved airport

screening measures, passengers were provided "[a]mple notice" of the potential for warrantless searches prior to attempting to board a particular vessel. *Id.* at 79.

Two points in *Cassidy* are relevant here. First, the clear non-law enforcement purpose of preventing specific terrorist attacks did not diminish the passengers' "full expectation of privacy." *Cassidy*, 471 F. 3d at 76-77. Second, Justice Sotomayor stressed the "very narrow circumstances" of the case and the "obvious nexus" between the "minimally intrusive searches" and protecting a ferry from terrorist attack. *Id.* at 78 n. 4, 82. In other words, it was very important that even these minimal intrusions into privacy interests be justified by narrow and specific non-law enforcement purposes. Justice Sotomayor noted the "legitimate concern" of a slippery-slope, "because the threat of terrorism is omnipresent" and there is thus "no clear limit to the government power to conduct suspicionless searches." *Id.* at 80. These concerns were not implicated in *Cassidy*, however, because the government "imposed security requirements only on the nation's largest ferries after making extensive findings about the risk these vessels present[ed] in relation to terrorism and . . . the scope of searches [wa]s rather limited." *Id.* at 81.

Section 702 surveillance slides down the slippery-slope to complete sacrifice of American privacy for only nebulous purposes related to foreign affairs. In contrast to the open and announced cursory searches that passengers experienced when boarding certain, specifically determined maritime vessels in *Cassidy*, the surreptitious intrusions on Americans" private communications under § 702 are far more substantial. These intrusions potentially include 1) any communication that crosses borders (including wholly domestic communications that happen to cross a border (DE 201 at 7)); 2) any communication with or about a foreign individual abroad; 3) any communication (including wholly domestic communication) traversing the Internet "backbone"; and 4) any communication (including wholly domestic communication) that

happens to travel in the same Internet "packet" as a targeted communication.  Additionally, despite the government's repeated invocation of terrorism concerns, § 702 has no such limited nexus because the definition of foreign intelligence includes information generally related to "the conduct of the foreign affairs of the United States."  50 U.S.C. § 1801(e)(2)(B).  Thus, even though § 702's purpose extends beyond ordinary law enforcement, it also has a purpose far broader than combatting terrorism.  Given the undiminished privacy interests of Americans in this context, the purpose invoked by the government here is insufficient to justify sweeping warrantless surveillance.

> d.  The Government's Claim That Providing Fourth Amendment Protections Would Be Inconvenient Neither Justifies Abandonment Of Traditional Privacy Guarantees Nor Finds Support In The Record.

Given that § 702's purpose is far broader that preventing imminent terrorist attacks – or anything related to terrorism at all – the government's blanket assertion that additional Fourth Amendment protections are "impracticable" is unsupported.   DE 201 at 31.   Nor is impracticability a ground to abandon constitutional rights.   Even in situations where the government legitimately must act quickly to thwart terrorism, or otherwise deal with a threat to national security, there are ways to accomplish that goal without completely subverting the privacy interests of Americans.

When the government seeks to marginalize the Constitution on grounds of efficiency and practicality, the liberty of all citizens is jeopardized:

> Cases like this involve grave danger. The very natural desire of government officers who try to enforce the law to the best of their ability leads them to adopt the most practical and efficient way to do it whenever by some plausible reasoning they can satisfy themselves that no Constitutional rights are contravened. But their zeal for the cause in which they have enlisted so often creates in their minds such an emphasis upon the theory that the virtue in the end will justify the means that the fundamental rights of a liberty loving people will be

> gradually sapped, undermined, and finally destroyed by a subtle, insidious, and persistent narrowing of vital bedrock principles unless courts are steadfast and firm in the preservation of what has been gained through centuries of struggle. The Fourth Amendment, which prohibits unreasonable searches and seizures, is one of the pillars of liberty so necessary to a free government that expediency in law enforcement must ever yield to the necessity for keeping the principles on which it rests inviolate.

*United States v. 1013 Crates Of Empty Old Smuggler Whiskey Bottles*, 52 F. 2d 49, 50-51 (2d. Cir. 1931).  The Supreme Court has echoed those sentiments in the very context of electronic surveillance:

> In any event we cannot forgive the requirements of the Fourth Amendment in the name of law enforcement . . . Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices.  Some may claim that without the use of such devices crime detection in certain areas may suffer some delays since eavesdropping is quicker, easier, and more certain.  However, techniques and practices may well be developed that will operate just as speedily and certainly and – what is more important – without attending illegality.

*Berger v. New York*, 388 U.S. 41, 62-63 (1967).  In shorts, efficiency is not a valid response to dispense with constitutional protections.

The concerns expressed in the above two quotations are amplified in the national security context where even more zeal may exist than in traditional law enforcement, and where the actions of the Executive Branch are often hidden from public scrutiny.  One only need to consider the Snowden disclosures and the ensuing public outcry to recognize how difficult it is to meaningfully learn about and review actions taken in the name of national security that threaten to undermine constitutional protections.  Glenn Greenwald, *Edward Snowden: the whistleblower behind the NSA surveillance revelations*, The Guardian, Jun. 9, 2013.  As a result, when such activities do come to light, it is critical that the government's invocation of practicality and need receive meaningful scrutiny.

Here, the government's argument about practicality and need are factually deficient for several reasons. First, the government's claim that judicial oversight of warrantless searches and

seizures of Americans' communications under § 702 would "hinder the government's ability to collect time-sensitive information" ignores the fact that Congress has already dealt with this concern in the context of traditional FISA surveillance.  DE 201 at 31.  Under 50 U.S.C. § 1805(e), Congress provided an exception for exigent circumstances whereby the Executive could engage in individualized surveillance on an emergency basis, then later receive approval from the FISC.  The government provides no reason why a similar arrangement could not be applied in the context of § 702 surveillance.

Second, the government – as it does throughout its brief – focuses only on the acquisition stage without addressing whether it is equally impracticable to provide Fourth Amendment protections to seized American communications at a later stage.  For example, the government could be required to seek judicial authorization before it retains, disseminates, or queries already-seized communications.  This is essentially the current procedure under traditional FISA.  50 U.S.C. § 1801(h)(4).  In fact, judicial approval prior to querying is now what occurs for § 215 metadata collection, although the government originally raised many of the same objections there that it now raises here.  *Klayman v. Obama*, 957 F. Supp. 2d 1, 39-40 (D.D.C. 2013) (questioning government justifications for metadata collection); White House Press Release, *Statement by the President on the Section 215 Bulk Metadata Program* (Mar. 27, 2014) (requiring judicial approval for § 215 queries).  The government could use a wide range of traditional and technological screens to interpose some judicial judgment between government agents and Americans' communications.  No such potential system can be evaluated because § 702 provides nothing in the way of individualized review before Americans' communications are listened to and read.

Third, surveillance under § 702 does not limit the collection or retention of Americans' private communications to only those involving terrorism or other similar threats to national security. Although the government's response almost exclusively discusses "threats" and other "vital national security interests" (DE 201 at 31), § 702 allows the government to collect and retain communications that have nothing to do with any danger to the country. *See* 50 U.S.C. § 1801(e) (defining "foreign intelligence information"). Thus, not only does the government overstate the necessity and urgency of collections under § 702 by relying on only part of the information that it is authorized to search and seize without a warrant, it also entirely ignores the reality that judicial oversight can be adapted to meet any legitimate time-sensitive needs, as has been done in other parts of FISA. In short, the government presents a false dichotomy by suggesting that a zero-sum choice must be made between individualized judicial oversight and national security.

Individualized judicial review before the government retains and accesses the content of Americans' electronic communications is not only required by the Constitution, but also by the statute. Section 702 explicitly uses "foreign intelligence information," which is defined in 50 U.S.C. § 1801(e). 50 U.S.C. §§ 1881(a)(1) and (g)(2)(A)(v). Section 1801(e) incorporates separate standards for foreigners and United States persons. For communications of foreigners, the information may be seized if it "relates to" subjects including "the conduct of foreign affairs of the United States;" when communications are "concerning a United States person," the information must be "necessary to" the conduct of foreign affairs, among other subjects. 50 U.S.C. § 1801(e)(2). Thus, the statute on its face requires a separate assessment for collection communications that are "concerning a United States person." Any government complaint that

separate assessment is impracticable should be made to Congress, where the requirement was imposed, and not to this court.

Further, if the government's position is that the volume of American communications seized makes individual assessment impracticable, then this is evidence that the government's mass dragnet of communications far exceeds what the statute authorizes.  If the government opposes the interposition of a decision-node within its collections, the statute contemplates such a step as necessary to protect Americans from overbroad intrusions under vague standards.  To construe the statute to avoid serious constitutional problems, the determination that the government is authorized to collect, database, and examine the content of Americans' electronic communications should be made by a judicial officer in accordance with traditional FISA and Fourth Amendment standards.

          e.   Concerns About Meaningful Protection For Americans' Electronic Communications Are Not "Considerably Diminished" In The Context Of Collection Of Foreign Intelligence.

The government suggests that the Fourth Amendment's warrant requirement is not as important in the context of foreign intelligence because the Executive Branch has "superior expertise" with respect to that subject matter, while the constitutional interests at stake relate to "interpos[ing] a judicial officer between the zealous police officer ferreting out crime and the subject of the search."  DE 201 at 34.  This argument should be rejected on multiple grounds.

The Fourth Amendment protects American citizens' privacy rights without regard to which government actors are involved.  Privacy rights are infringed in exactly the same way regardless of whether the intruding individual is a zealous police officer or a zealous NSA analyst.  Nor is there any reason to believe that Executive actions with respect to foreign intelligence surveillance with somehow result in fewer privacy abuses that would occur with

ordinary law enforcement officers.  To the contrary, history has proven such an assumption false, which is the fundamental reason that FISA was originally enacted.  *See* S. Rep. No. 95-604(1) (understanding FISA as curbing "the practice by which the Executive Branch may conduct warrantless electronic surveillance on its own unilateral determination that the national security justifies it"); *see also In re National Security Telecommunications Records Litigation*, 564 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (finding that FISA's repeal of 18 U.S.C. § 2511(3) eliminated "any congressional recognition or suggestion of inherent Presidential power with respect to [foreign intelligence] electronic surveillance.") (*quoting* S. Rep. 95-701, 72).

Moreover, the national debate occurring now in the aftermath of the Snowden disclosures is almost entirely based on purported Executive Branch excesses with respect to surveillance.[22] A recent book published by one of the journalists involved in the Snowden affair recounts a 2008 statement by then-NSA director Keith Alexander to the effect: "Why can't we collect all the signals, all the time?"  David Cole, *"No Place to Hide" by Glenn Greenwald, on the NSA's sweeping efforts to "Know it All,"* Wash. Post, May 12, 2014.  Mr. Greenwald's book also documented a 2011 meeting in which the "NSA described its 'collection posture' as 'Collect it All,' 'Process it All,' 'Exploit it All,' 'Partner it All,' 'Sniff it All,' and ultimately, 'Know it All.'"  *Id.*  Given the recent giant strides toward a surveillance state, the need for judicial oversight of Executive surveillance activity of American citizens is not "considerably diminished" merely because the context may involve foreign affairs.  DE 201 at 34.

---

[22] At the time of Snowden's disclosures, 53% of Americans disapproved of the broad NSA surveillance programs that he revealed.  Glenn Greenwald, *Edward Snowden's worst fear has not been realised − thankfully*, The Guardian, Jun. 14, 2013.

**3. The Government's Acquisition, Retention, And Accessing Of Americans' Electronic Communications Violate Core Privacy Interests Protected By The Warrant Clause And Constitute Unreasonable Searches And Seizures.**

The Court need not reach the government's reasonableness argument because any foreign intelligence exception to the warrant requirement is far narrower than the foreign affairs surveillance in the present case. *See, In re Directives*, 551 F. 3d at 1012 ("[W]e hold that a foreign intelligence exception to the Fourth Amendment's warrant requirement exists when surveillance is conducted to obtain foreign intelligence *for national security purposes and is directed against foreign powers or agents of foreign powers* reasonably believed to be located outside the United States.") (emphasis added).  In advocating for a "general reasonableness test," the government abandons any reference to Warrant Clause norms and prematurely undertakes balancing based on misconstruction of the interest at stake.  DE 201 at 34-38.  Contrary to this approach, the threshold question regarding foreign intelligence gathering is whether a warrant is required.  *Zweibon*, 516 F. 2d at 633.

Even on reasonableness, although referencing *In re Directives* repeatedly, the government makes no mention of the unequivocal use of the Warrant Clause as the key metric in determining reasonableness.  "[T]he more a set of procedures resembles those associated with the traditional warrant requirements, the more easily it can be determined that those procedures are within constitutional bounds." *In re Directives*, 551 F. 3d at 1013.  Under that standard, the vast distance between the six components of the Warrant Clause and the dragnet acquisition, retention, and accessing of Americans' communications under the FAA demonstrates the unreasonableness of the § 702 programs.  DE 201 12-18.  In the absence of any meaningful analogues to the Warrant Clause protections, the government relies on inapt references to DNA and drug screenings, always omitting the limitations of those cases as exceptions to warrant

requirements.  For example, the DNA swabs of arrestees involved "negligible" intrusions, *King*, 133 S. Ct. at 1969-70, while this case involves listening to and reading Americans' private – and sometimes intimate – electronic communications.  The DNA cases involve no discretion exercised by law enforcement officers, who simply need "a safe and accurate way to process and identify the persons and possessions they must take into custody."  *Id.* at 1970.  Similarly, the Court has approved probation searches based on the offenders' significantly diminished expectations of privacy and prior notice and the probations officers' need to provide supervision in the community.  *Samson v. California*, 547 U.S. 843 (2006); *Knights*, 534 U.S. 112 (2001).[23]

In contrast, under the FAA, there are virtually no limits: the persons who might be targeted are broadly defined; the purposes of surveillance include anything related to foreign policy; and the intelligence agencies, once in possession of Americans' private communications, claim completely unrestricted authority over their use.  The cases relied upon by the government simply provide no useful analogy to the mass acquisition, retention, and accessing of Americans' electronic communications under the FAA.

    a.   **The Government Interest At Stake Is Too Broadly Defined To Justify The Mass Acquisition, Retention, And Accessing Of Americans' Electronic Communications.**

The government's claim of a national security interest of the highest magnitude must be closely scrutinized.  As an initial matter, the government fails to acknowledge the difference recognized in *In re Sealed Case* between national security "protective" and "counterintelligence" information – which involves terrorist attacks, sabotage, and clandestine activities of foreign spies under § 1801(e)(1) – and the relatively innocuous "affirmative" or "positive" material that

---

[23] The individualized temporary detention needed to preserve a scene while a search warrant is obtained is even more remote from the issues in this case.  *See Illinois v. McArthur*, 531 U.S. 326 (2001).

can inform the conduct of foreign affairs under § 1801(e)(2). 310 F. 3d at 723 n. 9. On its face, § 702 encompasses both purposes under §1801(e). Thus, despite the government's repeated invocations of "threats" to national security, § 702 authorizes warrantless surveillance of Americans' communications for far more mundane purposes. Although the government's description of the program is mostly redacted, the Court should find the acquisitions authorized to be extremely overbroad and indiscriminate in light of the absence of any statutory limitation focusing narrowly on national security instead of generally useful and relevant "foreign affairs" information. While even a proper invocation of national security would not provide the government a blank check for warrantless intrusions, *Keith*, 407 U.S. at 320, the government interest in this case is far more general and lacking in exigency, thereby detracting for the reasonableness of the individual privacy intrusion with no judicial supervision or review.

      b. Americans Have A Reasonable Expectation Of Privacy In Their Electronic Communications, Regardless Of Routing Or Destination.

Ignoring the basic principle that "the Fourth Amendment protects people, not places," *Katz v. United States*, 389 U.S. 347, 351 (1967), the government argues that U.S. persons have limited expectations of privacy in their electronic communications with non-U.S. persons outside the United States. DE 210 at 39. This is not the law, and the Court should not condone the massive violation of privacy rights that would ensue if this principle were accepted.[24] When a person in the United States pens a letter, or writes an email, or communicates on a telephone, that

_____

[24] Although in the brief in this case the government argues that Americans' privacy interests are "significantly diminished" when they communicate with people overseas, in its pleading filed shortly before in a similar case in Colorado, the government extended its argument still further, arguing that such privacy rights "are significantly diminished, *if not completely eliminated*," when communications are directed to persons overseas. *See* Gov't *Muhtorov* Mem. at 35. This extension indicates the sweep of the government argument and demonstrates that once the argument about diminished rights is accepted, there is no boundary between diminished rights and no privacy rights at all.

person has a reasonable expectation of privacy in the communication.  *Keith*, 407 U.S. at 313 ("[*Katz*] implicitly recognized that the broad and unsuspected governmental incursions into conversational privacy which electronic surveillance entails necessitate the application of Fourth Amendment safeguards."); *Alderman*, 394 U.S. at 177; *United States v. Warshak*, 631 F. 3d 266, 288 (6th Cir. 2010).  The Fourth Amendment's protection extends not just to domestic communications but to some international ones as well.  *See, e.g.*, *United States v. Ramsey*, 431 U.S. 606, 616-620 (1977).  In the absence of a warrant or judicially recognized exception to the warrant requirement, the government cannot search that communication in the United States without violating the Fourth Amendment.  The government's arguments to the contrary should be dismissed.

The Supreme Court has recently affirmed that the Fourth Amendment affords Americans an expectation of privacy in their electronic communications.  In *Riley*, 2014 WL 2864483, the Court held that law enforcement officers were required to secure a warrant before searching the digital information contained on the cell phone of an arrestee.  According to the Court, "when privacy-related concerns are weighty enough a search may require a warrant."  *Id.* at *13 (internal quotations omitted).  Of particular importance to the case at hand, the *Riley* Court explicitly rejected the government's assertion that law enforcement officers could always search the call logs of cell phones, without exception.  *Id.* at *18.  A call log represents a record of electronic communications, the type of which the government here claims they can collect, retain, and access without a warrant.  Because the Supreme Court has refused to allow this kind of intrusion into the privacy of arrestees − who have "diminished privacy rights," *Id.* at *13 − so too should this Court disallow broader and more pervasive warrantless intrusions into the privacy of Americans who are not suspected of committing crimes.

The government relies on cases establishing that no Fourth Amendment protection exists for information voluntarily disclosed, (*e.g.*, *United States v. Miller*, 425 U.S. 435, 443 (1976); *Couch v. United States*, 409 U.S. 322, 335 (1973); *Hoffa v. United States*, 385 U.S. 293, 302-03 (1966)), but then attempts to extend this principle to instances where the disclosure was not voluntary. "[T]he same principle applies whether the recipient intentionally makes the information public or stores it in a place subject to a government search."   DE 201 at 40-41. That argument is the equivalent of saying that a person has a privacy interest in a letter inside one's home, but not after it is handed over to the letter carrier, where it could be "subject to government search."   The Supreme Court has unequivocally rejected that argument.  *See United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970) ("Letters and sealed packages . . . in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles.").  The government cannot snatch a communication as it is being transmitted and then store and later access its contents without Fourth Amendment consequences.

Moreover, the fact that a communication has been received and held by the recipient does not authorize the government to seize the communication without consent of the recipient.  The government argues that a "sender's expectation of privacy ordinarily terminates upon delivery." DE 201 at 41.  However, this contention fails to address what can happen after that expectation of privacy has terminated.  Does the government suggest that, upon delivery of a letter, it is entitled to go into the home of the recipient and take the delivered letter?  When spelled out, the idea is preposterous. However, this is precisely what the government suggests it can do with emails, attempting in a footnote to distinguish *Warshak* and arguing that the Fourth Amendment

does not apply when the government obtains emails from someone else's account.  DE 201 at 41 n. 24.

Because searches conducted under § 702 occur within the United States and not at the border, the government recognizes that it cannot rely on the border search exception to justify its warrantless incursions into data lines and email accounts.  DE 201 at 43 ("[T]he government does not contend that Section 702 collection is per se reasonable under the border search doctrine . . .").  The border search doctrine is a narrowly tailored exception to the Fourth Amendment grounded in the "right of the sovereign to control . . . who and what may enter the country." *Ramsey*, 431 U.S. at 620; *see also id.* at 619 ("Border searches . . . have been considered to be 'reasonable' by the single fact that the person or item in question has entered the country from outside."); *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) (recognizing exception for "[r]outine searches of the persons and effects of entrants").[25]  The government's suggestion the principles from the border search context are relevant to the analysis here attempts to extend the exception beyond its limits.  Indeed, because electronic and telephonic communications routinely cross international borders even when both parties are within the United States, use of the border search exception for electronic searches would allow the government to search every domestic email and phone call without limit.

---

[25] The government cites *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), for the proposition that the border search exception applies to "persons and property entering or *exiting* the country" (DE 201 at 42) (emphasis added), but that citation does not support the search of items exiting the country; furthermore, the Supreme Court justifies the exception based only on controlling entry of items or people into the United States.  The Ninth Circuit, however, has extended the border search doctrine to include both entries and exits.  *See United States v. Seljan*, 497 F. 3d 1035, 1040 (9th Cir. 2007); *United States v. Des Jardins*, 747 F. 2d 499, 504 (9th Cir. 1984), *vacated in part*, 772 F. 2d 578 (9th Cir. 1985).

**D.    Section 702 Blurs The Constitutionally Required Separation Of Powers By Providing Article III Judges The Role Of Designing Programs, Rather Than Ruling On Individual Applications To Authorize Surveillance, And By Delegating To Article III Judges Legislative And Executive Functions Far Afield From The Judicial Role Of Deciding Cases And Controversies.**

The government's response fails to account for the fundamental difference between *ex parte* review of an application for authorization to conduct a specific search, and the general programmatic authorization that judges undertake under § 702. DE 201, 49-51.  In close cooperation with government agents and prosecutors, judges help design programs that result in the search and seizure of the electronic communications of unspecified United States citizens. The § 702 program involves judicial officers in the non-judicial role of designing programs, rather than determining whether – under legislatively or executively established standards – a particular search and seizure is authorized by law.

The Supreme Court has reaffirmed the separation of powers limitations that should apply here.  "[W]e have not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of another coordinate Branch." *Mistretta v. United States*, 488 U.S. 361, 382 (1989).  Where the statute co-opts judges to design Executive programs – while judges make no determinations based on individualized suspicion regarding specific subjects of Executive interest – the Court should strike down the provisions as both exceeding the proper functions of the separate branch of government and undermining the independence of the Judiciary.  *See Mistretta*, 488 U.S. at 380 ("This Court has consistently given voice to, and has affirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty.").

While it is not required that the three Branches be entirely separate and distinct, *Mistretta*, 488 U.S. at 380, the outer limits of appropriate congressional delegation to the Judiciary is expressed in Article III of the Constitution, under which "[t]he judicial power of the United States is limited to 'Cases' or 'Controversies.'"  *Mistretta*, 488 U.S. at 385 (citing *Muskrat v. United States*, 219 U.S. 346, 356 (1911)).  As the Supreme Court has explained, "[t]hese doctrines help to ensure the independence of the Judicial Branch by precluding debilitating entanglements between the Judiciary and the two political Branches, and prevent the Judiciary from encroaching into areas reserved for the other Branches by extending judicial powers to matters beyond those disputes 'traditionally thought to be capable of resolution through the judicial process.'"  *Mistretta*, 488 U.S. at 385 (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)); *see also, Clinton v. City of New York*, 524 U.S. 417, 440-47 (1998) (holding that line item veto violated separation of powers by conferring upon the President the power to amend statutes).[26]

The government's repeated citations to cases upholding FISA ex parte decisions regarding the issuance of surveillance orders in individual cases are irrelevant.  DE 201 at 49-50. As *Keith* held, Congress could design warrant analogues to permit surveillance under appropriate legal standards.  407 U.S. at 322-23.  The FAA involves a quantum leap away from individualized judicial review to generalized programmatic design.  As seen in the *[Caption Redacted]* opinion, the judge's review and collaboration with the Executive Branch attorneys involves the general design of administrative programs, with no judicial review of any individual

---

[26] Although the FISA Court of Review found no problem with the FISC's secret and non-adversarial proceedings regarding specific surveillance orders, "administrative guidance" outside the normal judicial role – here under FAA programmatic surveillance – raises precisely the issues of a program that may be "a bureaucratic success story, but it would have serious constitutional ramifications."  *In re Sealed Case*, 310 F. 3d at 732 (quoting *Morrison*, 487 U.S. at 684).

acquisition, retention, and accessing of Americans' communications.  2011 WL 10945618, at *1-3; *see Morrison*, 487 U.S. at 677 ("As a general rule, we have broadly stated that 'executive or administrative duties of a non-judicial nature may not be imposed on judges holding office under Art. III of the Constitution.'") (citations omitted).

In addition to the abandonment of the judicial role, the participation of judicial officers in the design of the collection program violates the non-delegation doctrine because the statute fails to provide clearly delineated policies that specify the boundaries of the delegated authority. *Mistretta*, 488 U.S. at 372-73.  The design of the programmatic surveillance program includes the unguided instruction to design a program not to violate the Fourth Amendment.  50 U.S.C. § 1881a(b)(5).  Given the Fourth Amendment's reasonableness requirement, and the possibility that the least intrusive search does not determine the limits of reasonableness (*City of Ontario, Cal. v. Quon*, 560 U.S. 746, 763 (2010)), Article III judges are being assigned a legislative and executive function that also compromises the judicial neutrality necessary to adjudicate whether a search authorized by the judges' program violates the Fourth Amendment.

In the end, § 702 improperly incorporates the Judiciary into the Executive function of designing search and seizure programs, delegates Legislative functions to the Judiciary without delineating the scope of the programs with intelligible and limiting guidelines, and compromises the Judiciary's neutrality in judging the applications of the programs to a particular individual citizen.  It is, therefore, unconstitutional, both facially and as applied.

E.    **Section 702 Violates The First Amendment Because Its Overbreadth And Vagueness Chills Exercise Of Speech, Press, Religious, And Associational Rights.**

Courts have repeatedly recognized that the government's investigatory and surveillance activities can infringe on rights protected by the First Amendment, and that the First Amendment

has force independent of the Fourth Amendment.  *See*, *e.g.*, *Stanford v. Texas*, 379 U.S. 476, 484-85 (1965) ("The bill of rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression."); *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 556-57 (1963) (underscoring the substantial "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association" resulting from government investigation and compelled disclosure of political associations); *see also Perry v. Schwarzenegger*, 591 F. 3d 1147, 1156 (9th Cir. 2009) ("Compelled disclosures concerning protected First Amendment political associations have a profound chilling effect on the exercise of political rights.").  The government's massive surveillance of communications under § 702 burdens First Amendment rights by exposing Americans' associational contacts and political thoughts and writings to government monitoring and scrutiny.

The breadth and scope of the FAA program of acquiring, databasing, and querying the emails and other communications of Americans far exceeds the demands for basic membership rolls that the Supreme Court assessed in *NAACP v. Alabama*, 357 U.S. 449 (1958), and its progeny.  *See Gibson, supra*; *Bates v. City of Little Rock*, 361 U.S. 516 (1960).  A corollary of this direct intrusion on Americans' communications is the chill it imposes on all who would ordinarily communicate by phone and email.  Generalized surveillance of this scale "chills associational and expressive freedoms."  *See United States v. Jones*, 132 S. Ct. 945, 956 (2012) (Sotomayor, J., concurring).  This harm amounts to a substantial and discrete burden on American citizens' First Amendment rights.

The government errs in urging the Court to reject the defense's First Amendment claims on technical grounds.  First, the government argues that there is no judicially-created

exclusionary rule to remedy the violations of the First Amendment. DE 201 at 51-52 (citing cases noting that suppression of evidence is a Fourth Amendment claims). That point is irrelevant, however, because Congress has provided a statutory remedy of suppression for "unlawful" surveillance, which undeniably applies to this case. 50 U.S.C. § 1806(e) and (g) (authorizing motion to suppress evidence obtained through unlawful surveillance and providing remedy of suppression). Actions that are unconstitutional – under the First, Fourth, or any Amendment – are unlawful. *See*, *e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (noting that statute provides remedy for "unlawful" action, "which of course includes unconstitutional action"). The cases cited by the government concerning the judicially-created exclusionary rule form a red herring and should not govern the Court's decision.[27]

Second, although the government is correct that the plaintiffs in *Clapper* were not able to establish standing to bring a constitutional challenge to the FAA because their "fear of surveillance" was "too speculative," (DE 201 at 53), there is no dispute here that Mr. Qazi has standing as an aggrieved party because his communications were in fact seized. The government's statutory notice acknowledges this fact. DE 201 at 2. As an aggrieved party, Mr. Qazi can bring a facial challenge to the statute of behalf of other harmed persons. *Acosta v. City of Costa Mesa*, 718 F. 3d 800, 811 (9th Cir. 2013) (finding statute overbroad and noting acceptability of facial challenge on First Amendment grounds when "there [is] a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.").

---

[27] The government cites *United States v. Mayer*, 503 F. 3d 740, 747 (9th Cir. 2007). However, that case involves a defendant's efforts to suppress evidence obtained by an undercover informant's infiltration of a meeting in the absence of a statutory bases for evidence suppression.

Third, the government's statement that the defense cannot show "that the government has conducted § 702 collection with any purpose to suppress expressive or associative activity" (DE 201 at 53) is not relevant, because the Supreme Court has established that a First Amendment injury does not depend on government intent to curtail speech.  *See*, *e.g.*, *Elrod v. Burns*, 427 U.S. 347, 362 (1976) (noting that First Amendment injury can occur through the "unintended but inevitable result of the government's conduct").

Finally, case law does not support the government's suggestion that the First Amendment claim need not be addressed if the government complied with vague Fourth Amendment "standards" (DE 201 at 52).  Instead, the courts have applied the Fourth Amendment's "warrant requirements with particular exactitude when First Amendment interests would be endangered by the search."  *Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978) (relying specifically on the warrant requirements of specificity and probable cause); *Armstrong v. Asselin*, 734 F. 3d 984, 993-94 (9th Cir. 2013) ("[W]here the materials sough to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with scrupulous exactitude.").  In some cases, the precise safeguards required by the Fourth Amendment may satisfy the First Amendment as well.  *Zurcher*, 436 U.S. at 565.  In this case, given the government's predominant argument that the Fourth Amendment's warrant requirements do not apply to § 702 searches at all (DE 201 at 21-34), the government's reliance on cases applying precisely those requirements of probable cause and particularity is inconsistent.  The Court should assess the First Amendment claim on its own merits, without subordinating it to Fourth Amendment analysis.

Section 702 violates the First Amendment because it is both overbroad and vague.  The overbreadth and vagueness doctrines are well-established methods of challenging imprecise laws:

> First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible application of the law are substantial when "judged in relation to the statute's plainly legitimate sweep." . . . Second, even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests.

*City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (citations omitted). Under the overbreadth doctrine, a statute may be facially invalid if the threat of its enforcement deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas.  *United States v. Williams*, 553 U.S. 285, 292 (2008).

The first step in the analysis is to construe the statute, because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."  *Id.* In this case, § 702, as construed by the government, permits surveillance of all communications to "foreign persons" (which includes individuals, entities, groups, or foreign powers) for information involving "the conduct of the foreign affairs of the United States."  50 U.S.C. §§ 1881a(a) and 1801(e)(2)(B).[28] The communications to foreign persons may be, and in fact often are, communications by Americans from within the United States.

---

[28] The relevant text of the FAA, 50 U.S.C. § 1881(a)(a), states:

Notwithstanding any other provision of law, upon the issuance of an order in accordance with subsection (i)(3) or a determination under (c)(2), the Attorney General and the Director of National Intelligence may authorize jointly, for a period of up to 1 year from the effective date of the authorization, the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information.

The definitions of "persons" and "foreign intelligence information" are located in 50 U.S.C. § 1801(e) and (m).

The second step is to determine whether the statute, as construed, covers "a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297. The sweep of § 702's surveillance of protected First Amendment activity is enormous. Under the language of the surveillance statute, the government could capture, for example, an American's email to a grandparent overseas that is about Guantanamo or Al-Qaeda, even though neither the sender nor the recipient has any relevance to a foreign intelligence purpose.[29] Moreover, communication about the "conduct of foreign affairs" is political speech, deserving the highest degree of protection. The government has not disclosed exactly how many hundreds of thousands of such emails have been "incidentally" obtained under § 702, but the volume is massive. Because § 702 permits the government to gather up and review a substantial amount of communication "beyond the statute's plainly legitimate sweep," and because this governmental intrusion into private communications chills protected speech, § 702 is overbroad and violates the First Amendment.

The vagueness of the statute also chills protected associational and communicative activity. By the plain words of the statute, one might not recognize that Americans' communications are being "incidentally" gathered up under § 702. And yet, as the press reports on leaks and government admissions about the program have become more widespread, the possibility of Americans changing their online behavior or self-censoring their communications is exceedingly high. The specter of surveillance may indeed be as oppressive as the surveillance itself:

> The First and Fourteenth Amendment rights of free speech and free association are fundamental and highly prized, and need breathing space to survive. . . .

---

[29] The government has publicly claimed it does not use such broad terms in its "targeting" procedures. While the defense is not in a position to assess that claim, it is clear that nothing in the text of § 702 prevents such targeting. Further, there are certainly technological means to effect the same surveillance without using broad terms like the name of a country (*e.g.*, targeting country emails with ".ru" rather than "Russia").

> Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle government interference.

*Gibson*, 372 U.S. at 544 (citations omitted).   In this case, the Court should find § 702 unconstitutional because, through its overbreadth and vagueness, it compromises and diminishes cherished rights in violation of the First Amendment.   The use of this unconstitutional statute in this case was "unlawful;" thus, under 50 U.S.C. § 1806(e), the evidence derived must thereby be suppressed.

**F.     Both FISA And The Constitution Require Suppression Of Any Unlawfully Obtained Or Derived Evidence.**

Assuming the government acted unlawfully in conducting the warrantless electronic surveillance, the Court should grant the motion to suppress any evidence obtained or derived from the unlawful surveillance.   Authority for this suppression can be found under the statutory exclusionary rule of 50 U.S.C. § 1806(g) and the constitutionally-based exclusionary rule of *Wong Sun*, 371 U.S. at 471.

If the surveillance was "not lawfully acquired or conducted," the evidence obtained or derived from the electronic surveillance shall be suppressed under § 1806(g).   If the statute is unconstitutional, the electronic surveillance was neither lawfully conducted nor acquired.   *See ACLU Found. of S. Cal. v. Barr*, 952 F. 2d 457, 465 (D.C. Cir. 1991) ("The Constitution is law" under the FISA definition of the term); *see* H. Rep. No. 95-1283 at 92-93 (1978) (stating that trial court "is also free to review the constitutionality of the law itself" when reviewing motion to suppress FISA evidence).   As with Title III wiretaps, violation of the statute as well as constitutional violations result in suppression under the "fruit of the poisonous tree" doctrine. *United States v. Giordano*, 416 U.S. 505, 524-32 (1974).   As with Title III, the language and legislative history of the FISA statutory exclusionary rule does not include a good faith exception.   *See United States v. Rice*, 478 F. 3d 704, 711-14 (6th Cir. 2007) ("The language and

70

legislative history of Title III strongly militate against engrafting the good-faith exception into Title III warrants."). The statutory exclusionary rule applies without qualification in this case, and must result in the suppression of all information obtained through the warrantless surveillance of Mr. Qazi and all derivative actions and evidence.

**Conclusion**

This Court is tasked with determining the constitutionality of a law that provides the government with unprecedented authority to collect, retain, access, and use the private communications of American citizens. The government alleges that the domestic surveillance of American citizens under § 702 is merely "incidental" to the surveillance of foreign targets for foreign affairs purposes. Yet the defense has shown the degree to which the surveillance of American citizens is extensive, pervasive, and inherent to § 702. The recent disclosures by Edward Snowden illuminate just how deeply the government can intrude into the private lives of ordinary Americans.

Compounding the insidious nature of § 702 are the government's active efforts to preclude any constitutional challenge to the law. The government – in this case and in others – has repeatedly and absolutely refused to admit that FAA surveillance was used to secure evidence against the defendant. These refusals are blatantly contrary to the Congressional testimony of many high ranking officials in the intelligence community who point to these as perfect examples of the efficacy of the FAA. Furthermore, while the § 702 surveillance programs have been active for six years now, this case marks the first time that the government has even admitted a duty to provide notice to a defendant if FAA surveillance is to be used against him.

The government has good reason to avoid a constitutional challenge to § 702. The statute, both on its face and as applied, violates multiple provisions of the United States Constitution. Because FAA surveillance does not fall into one of the established exceptions of the constitutional warrant requirement, the suspicionless domestic collection, retention, access, and use of Americans' private electronic communications under § 702 violates the Fourth Amendment. Because § 702 delegates to the judiciary the legislative and executive functions of designing and implementing surveillance programs, it violates Article III. Lastly, because § 702 is both overbroad and vague, it chills the exercise of Americans' speech, press, religious, and associational rights, in violation of the First Amendment.

WHEREFORE, the defendant, Raees Alam Qazi, through undersigned counsel respectfully request that the Court grant the defendant's motion to have § 702 of the FISA Amendments Act of 2008 ruled unconstitutional.

Respectfully submitted,


MICHAEL CARUSO

FEDERAL PUBLIC DEFENDER


By: s/ Daniel L. Ecarius
Daniel L. Ecarius
Assistant Federal Public Defender
Florida Bar No. 719765
150 W. Flagler Street, Suite 1700
Miami, FL 33l30-1556
Telephone: (305) 530-7000
Fax: (305) 536-4559
E-mail: daniel_ecarius@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on July 21, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                              /s Daniel L. Ecarius
                              Daniel L. Ecarius